UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

CITIBANK, N.A.,                                             No. 08-cv-00569 (MGC)

                   Plaintiff,

       -against-

                                                           **ANSWER AND**
UNITED SUBCONTRACTORS INC.,               **<u>COUNTERCLAIM</u>**

                   Defendant.

----------------------------------------------------------------x

         Defendant United Subcontractors Inc. ("USI"), by its attorneys, Vandenberg & Feliu LLP, as and for its Answer to the Complaint of plaintiff Citibank, N.A. ("Citibank") dated January 23, 2008, alleges as follows:

         1.       Denies the allegations in paragraph 1 of the Complaint, except admits that a notice of technical default under a certain credit agreement was provided, that a certain Swap Agreement as therein defined exists and respectfully refers to that agreement for the terms thereof, and that plaintiff seeks an award of damages in this action.

         2.       Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Complaint.

         3.       Admits the allegations in paragraph 3 of the Complaint.

         4.       Denies the allegations in paragraph 4 of the Complaint, except admits that plaintiff purports to assert jurisdiction under 28 U.S.C. § 1332 and respectfully refers to the Swap Agreement for the terms thereof.

5. As for paragraph 5 of the Complaint, admits that venue is proper in this District based on the terms of the Swap Agreement, respectfully refers to the Swap Agreement for the terms thereof, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of said paragraph.

6. Admits the allegations in paragraph 6 of the Complaint that a Swap Agreement was entered into between the parties identified and respectfully refers to that document for the contents thereof.

7. Admits the allegations in paragraph 7 of the Complaint that three swap transactions were entered into between the parties identified pursuant to the terms of the aforementioned Swap Agreement, and respectfully refers to the documents reflecting such transactions for the terms thereof.

8. Admits the allegations in paragraph 8 of the Complaint that a First Lien Credit and Guaranty Agreement was entered into among the parties specified, and respectfully refers to the documents reflecting that agreement for the terms thereof.

9. Denies the allegations in paragraph 9 of the Complaint, except admits that Section 5(a)(vi)(1) of the Swap Agreement defines "cross default," and that Section 6(a) of the Swap Agreement provides for certain early termination rights, and respectfully refers to these Swap Agreement provisions for the specific terms thereof.

10. Denies the allegations in paragraph 10 of the Complaint, except admits the allegation that USI provided notice to lenders, including Citibank, of certain technical defaults under a credit agreement on or about the time alleged, and respectfully refers to the notice for the contents thereof.

11. Admits the allegation in paragraph 11 of the Complaint that Citibank, by letter dated December 12, 2007, notified USI of an Event of Default under the Swap Agreement, respectfully refers to that letter for the contents thereof, but denies the remaining allegations of said paragraph.

12. Admits the allegation in paragraph 12 of the Complaint that Citibank purported to terminate the Swap Transactions on December 18, 2007, but denies that Citibank had the right to do so.

13. Admits the allegation in paragraph 13 of the Complaint that Citibank advised USI on December 18, 2007 that Citibank had designated an "Early Termination Date" and had terminated the Swap Transactions, but denies that Citibank had the right to designate such a date or terminate the Swap Agreements, and further denies that USI owes Citibank any amounts thereunder.

14. USI repeats, reiterates and realleges the admissions, denials and other responses set forth in paragraphs 1 through 14 as if fully set forth herein.

15. Denies the allegations in paragraphs 15 through 19 of the Complaint.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

16. The Complaint must be dismissed, in whole or in part, because it fails to state a claim upon which relief may be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

17. The Complaint must be dismissed, in whole or in part, because lenders holding 50% or more of the outstanding indebtedness under the Credit Agreement had agreed to waive the technical default upon which Citibank's wrongful termination of

the Swap Agreement transactions was based, Citibank knew that the requisite lenders had agreed to such waiver and, under the terms of the Credit Agreement, Citibank was legally bound by such waiver.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

18.   The Complaint must be dismissed, in whole or in part, because, even if there had been no waiver of USI's technical default by the requisite number of banks, and there was such a waiver, Citibank could not lawfully exercise its discretion under the Swap Agreement to terminate the swap transactions entered into thereunder unless it had a good faith belief that its prospects for payment or performance were impaired.  Here, however, Citibank did not have a good faith belief that its prospects for payment or performance were impaired. Indeed, Citibank N.A. was one of the lenders that agreed to waive the technical default that gave rise to the early termination of the swap transactions. Accordingly, Citibank's early termination of the swap transactions was unjustified.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

19.   The Complaint must be dismissed, in whole or in part, because, having agreed under the Credit Agreement to be bound by a waiver of USI's technical default under the Credit Agreement if the requisite number of lenders had agreed to such waiver, and Citibank knew that they had, Citibank is estopped from using such technical default as an excuse to exercise any right of early termination of any swap transactions under the Swap Agreement.

**AS AND FOR A FIFTH AFFIRMATIVE DEFENSE**

20.     The Complaint must be dismissed, in whole or in part, by application of the doctrine of unclean hands.

**AS AND FOR USI'S FIRST COUNTERCLAIM**

**(BREACH OF CONTRACT)**

21.     USI repeats, reiterates, and realleges the admissions, denials and other responses set forth in paragraphs 1 through 20 above as if fully set forth herein.

22.     Citibank was one of USI's lenders. On or about December 27, 2005, USI and certain affiliated entities, including USI Senior Holdings, Inc. ("USI Holdings"), entered into a First Lien Credit and Guaranty Agreement (the "Credit Agreement") with a consortium of lenders (the "Lenders") and an affiliate of plaintiff, Citicorp North America Inc. ("Citicorp"), as administrative agent and collateral agent.

23.     Under the terms of the Credit Agreement, USI was permitted to borrow up to $335 million in order to refinance existing debt, supply working capital, and for other corporate purposes. The obligations were all guaranteed and secured by a first priority lien on all assets of USI's parent and its subsidiaries, including a pledge of all the capital stock of each of the subsidiaries. As is customary with borrowings of this magnitude, USI was also required to maintain certain financial covenants, including a requirement that the interest paid on borrowings during any four-quarter period not exceed company earnings during that same four-quarter period by a certain specified ratio, and a further requirement that the company's consolidated total debt at the end of any fiscal quarter not exceed earnings for that quarter by a certain specified ratio.

24. Interest on the loans and other credit facilities made available to USI under the Credit Agreement was to be a floating rate based on the greater of either Citibank's prime rate or a federal funds rate. However, because of the risk that interest rates might rise, the Credit Agreement required USI to covenant and agree to hedge up to 50% of its interest rate exposure under the Credit Agreement for a term of not less than three years and otherwise in form and substance reasonably satisfactory to Citibank as Administrative Agent.

25. In accordance with the Credit Agreement's requirement that 50% of USI's interest rate exposure be hedged pursuant to an agreement satisfactory to Citibank, USI entered into a Swap Agreement with Citibank dated as of December 29, 2005. Under that agreement, the parties entered into three long term swap transactions on notional amounts of $100 million, $50 million, and $50 million, respectively. The $100 million swap had a termination date of January 12, 2009. Under that swap, USI agreed to pay Citibank a fixed interest rate of 4.8325% on the notional amount, while Citibank agreed to pay USI on that same notional amount a floating interest rate tied to the London Interbank Offered Rate ("LIBOR"), with payments to be made by the counterparties on January 12, April 12, July 12, and October 12 of each year through and including the termination date of January 12, 2009. Thus, for example, if LIBOR interest rates on January 12 of any year were to be above 4.8325%, then Citibank would owe USI under the swap; conversely, if LIBOR interest rates on that date were to fall below 4.8325%, then USI would owe Citibank on that date. The first of the two $50 million swaps had a termination date of January 12, 2010. Under that swap, USI agreed to pay Citibank a fixed interest rate of 4.8650%, while Citibank again agreed to pay Citibank a

floating rate tied to LIBOR. The second $50 million swap had a termination date of January 12, 2011. Under that swap, USI agreed to pay Citibank a fixed interest rate of 4.9200%, while USI again agreed to pay Citibank a floating rate tied to LIBOR. Under each of the swaps, the payment dates were all the same, i.e., January 12, April 12, July 12, and October 12, until the respective termination dates.

26. USI has at all relevant times herein made all payments required to be made under both the Credit Agreement and the swap transactions. In other words, at all relevant times herein, there has never been a payment default under any of the agreements here at issue.

27. Under the terms of the Swap Agreement, Citibank had the right to terminate the swap transactions in the event of a cross default under the parties' Credit Agreement. Such defaults could include payment defaults, as well as technical defaults. The Swap Agreement gave Citibank the discretion whether to exercise any right to terminate for a technical default.

28. On or about November 12, 2007, USI's chief financial officer notified the lenders under the Credit Agreement that certain financial covenants had not been met. Specifically, USI notified lenders that the earnings-to-interest ratio over the past four quarters ending September 30, 2007 fell below the required level. In addition, USI reported that the total debt-to-earnings ratio had exceeded required level. This was a technical default because all payments due and owing had been made and continued to be made and all collateral fully securing any and all borrowings that had been made remained in place. Consistent with the technical nature of this default, USI's notice further stated that "[t]he Borrower is currently in the process of obtaining an amendment

to the Credit Agreement to address the current non-compliance with the two Financial Covenants set forth above. Discussions with Lenders have and continue to take place and a Management Presentation to all Lenders is being given on November 13, 2007. The target is to finalize and executive an amendment by the end of November 2007."

29. Under the terms of the Credit Agreement, if lenders holding 50% or more of the outstanding indebtedness thereunder agree, technical defaults may be waived. In accordance therewith, a steering committee of nine lender banks holding more than 50% of the outstanding debt was formed to negotiate a waiver of USI's technical default. USI then negotiated an amendment to the Credit Agreement in which the steering committee agreed, among other things, to waive the financial defaults in exchange for payment of a fee equal to 0.25% of the outstanding indebtedness owed to each lender and payment of the steering committee's legal fees. Although Citibank was not a member of the steering committee, Citibank's counsel, Cahill Gorden & Reindel LLP, led the negotiations on behalf of the steering committee, and all other lenders were kept informed. Accordingly, Citibank was at all times relevant herein fully aware of what was happening – and, under the terms of the Credit Agreement – Citibank was bound by the steering committee's agreement.

30. On December 12, 2007, while the steering committee was finalizing its agreement to waive USI's technical defaults, Citibank notified USI that it was declaring an Event of Default under their Swap Agreement and that Citibank intended to terminate their three long-term swap transactions. The purported Event of Default was the technical default under the Credit Agreement that the bank's steering

committee, consisting of the requisite number of lenders, had agreed to waive on behalf of all lenders, including Citibank.

31.     As of December 12, 2007, interest rates were below the fixed rates provided for in the swap transactions. Consequently, any early termination of the swap transactions would result in USI having to make a cash payment to Citibank, and leave USI unable to recoup such payments should there be upswings in interest rates during the remaining years the swap transactions were in effect.  It would also leave USI exposed under the Credit Agreement for such increases in interest rates and, because the Credit Agreement required that at least 50% of USI's interest rate exposure be hedged, such premature termination of the swap transactions by Citibank would force USI to face a new financial default under the Credit Agreement.

32.     On December 18, 2007, at 9:27 a.m. EST, Citibank notified USI that it was designating December 18, 2007 as the "early termination date" under the Swap Agreement and that a computation of amounts owed under the three swap transactions would be sent later in the day.  Citibank sent that notice even though it knew that there had been no payment defaults under either the Credit Agreement or the Swap Agreement – indeed, no money would have been due and owing under the swap transactions until January 12, 2008 – and even though it knew that the requisite number of lenders needed to waive the default had already agreed to do so and that all lenders were at that moment in the process of executing the final waiver and amendment agreement that removed any technical default under the Credit Agreement.

33.     At 2:50 p.m. CST that same day, USI notified Citibank of its objection to the early termination of the swap transactions on the ground that "Requisite

9

Lenders to the First Lien Credit and Guaranty Agreement, dated December 27, 2005, between United Subcontractors, Inc. and Citicorp N.A., among others, have agreed to and are in the process of executing a Waiver and Amendment Agreement which removes any default under that Agreement," and that, as such, "there is no default at the present time."

34. At 5:38 p.m. EST that same day, Citibank notified USI that it was too late, the swap transactions had been terminated as of 11 a.m. Citibank further stated that because not all of the banks had signed and returned the Waiver and Amendment Agreement as of that moment in time, the technical defaults under the Credit Agreement were still technically in place. Citibank then stated that as a result of the early termination of the swap transactions, USI owed Citibank the sum of $2,751,333 and demanded that the amount be paid immediately.

35. Under the terms of the Swap Agreement, Citibank had no right to terminate the Swap Agreement based on defaults in another agreement – here, the Credit Agreement – if the defaults under that other agreement were being waived. Here, Citibank knew that the requisite number of USI's lenders had agreed to waive the defaults upon which the Swap Agreement's early termination had been predicated, and that Citibank was bound by their agreement. Accordingly, Citibank's early termination of the Swap Agreement was a breach of contract.

36. Alternatively, even if not all the banks had signed the documentation waiving the defaults under the Credit Agreement, Citibank knew they were in the process of doing so. Accordingly, Citibank's exercising any right to early termination of the Swap Agreement based on technical defaults under another agreement which it knew were being waived by the requisite number of lenders needed to bind all

10

other lenders, including Citibank, violated the covenant of good faith and fair dealing implied in every contract. Accordingly, for that reason, Citibank's early termination of the Swap Agreement was a breach of contract.

37. Furthermore, even though Citibank may have had the right under the Swap Agreement to terminate the swap transactions even for a technical default under the Credit Agreement, Citibank had the power to terminate such agreement only if it in good faith believed that the prospect of payment or performance was impaired. Here, however, all the facts and circumstances demonstrate that Citibank could not have had a good faith belief that the prospect or payment or performance was impaired. Not only had there been no payment defaults under either the Credit Agreement or the Swap Agreement, but Citibank knew that the requisite number of lenders had agreed to waive the technical defaults under the Credit Agreement, and even though its signature was not necessary because the steering committee's agreement was binding, Citibank N.A. eventually signed the waiver. Accordingly, for that additional reason, Citibank's early termination of the Swap Agreement was a breach of contract.

38. By reason of the foregoing breach of contract, *i.e.*, the early termination of three long-term swap transactions having notional amounts of $100 million, $50 million, and $50 million, respectively, in which Citibank agreed to bear the risk for several years of certain fixed interest rates, in which USI had to pay and did pay amounts which, because interest rates under the swaps were for a time in Citibank's favor, which, because of the wrongful termination, USI will now no longer be able to recoup when interest rates are in USI's favor, and which transactions were a financial covenant which USI was required to meet under the Credit Agreement and therefore had

to be replaced and were in fact replaced, USI has been damaged in an amount to be determined at trial.

WHEREFORE, USI demands judgment against Citibank as follows: (a) judgment dismissing the Complaint; (b) on the First Counterclaim, judgment against Citibank in an amount to be determined at trial by the Court; and (c) such other and further relief as to the Court seems just and proper.

Dated: New York, New York
March 14, 2008

VANDENBERG & FELIU, LLP

By: _____
Robert B. Bernstein (RB 1934)
Morlan Ty Rogers (MR 3818)
Attorneys for defendant
  United Subcontractors Inc.
110 East 42nd Street, Suite 1502
New York, NY 10017
(212) 763-6800

To: Kramer Levin Naftalis & Frankel LLP
Attorneys for plaintiff Citibank, N.A.
1177 Avenue of the Americas
New York, NY 10036-2714
(212) 715-9100

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF NEW YORK  )

JESSICA L. MORAN, being duly sworn, deposes and says:

1. I am not a party to the within action; am over 18 years of age and am employed by Vandenberg & Feliu, LLP, 110 East 42nd Street, Suite 1502, New York, New York 10017.

2. On March 14, 2008, I served the within **ANSWER AND COUNTERCLAIM** upon plaintiff Citibank, N.A. by depositing on said date a true copy thereof, enclosed in a post-paid wrapper addressed to plaintiff's attorneys last known address:

> Kramer Levin Naftalis & Frankel LLP
> 1177 Avenue of the Americas
> New York, NY 10036-2714

into an official depository under the exclusive care and custody of the U.S. Postal Service within New York State.

_____
JESSICA L. MORAN

Sworn to before me this
14th day of March, 2008

_____
Notary Public

MORLAN TY ROGERS
Notary Public, State of New York
NO. 02RO6116188
Qualified in Queens County
Commission Expires September 20, 20_08_