UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

CITIBANK, N.A.,

No. 08-cv-00569 (MGC)

Plaintiff,

-against-

UNITED SUBCONTRACTORS INC.,

Defendant.

-------------------------------------------------------------------x

**DEFENDANT UNITED SUBCONTRACTORS INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF
CITIBANK, N.A.'S MOTION FOR SUMMARY JUDGMENT**

VANDENBERG & FELIU, LLP
110 East 42nd Street, Suite 1502
New York, NY 10017
(212) 763-6800

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

    A.    The Parties........................................................................................................ 2

    B.    USI Enters into the Credit Agreement and the Swap Agreement ..................................... 2

    C.    USI Anticipates a Technical Default Under the Credit Agreement ................................. 3

    D.    Citibank Purports to Terminate the Swaps Even Though the Requisite
          Lenders Had Agreed to Waive USI's Technical Default.................................................. 6

    E.    USI Obtains New Swaps and the Waiver and Amendment Agreement Is Signed .......... 8

ARGUMENT ....................................................................................................................... 9

POINT ONE:  Plaintiff Is Not Entitled to Summary Judgment...................................................... 9

    A.    The Standard for Summary Judgment............................................................................. 9

    B.    Citibank Improperly Terminated the Swap Agreements Because the
          Requisite Lenders Had Waived the Technical Default Under the Credit Agreement ... 10

    C.    At a Minimum, There Are Material Fact Issues Concerning Citibank's
          Violation of the Duty of Good Faith It Owed to USI .................................................... 14

        1.    New York Law Imposes a Duty of Good Faith and Fair Dealing on
             All Contracts, Including Swap Contracts ................................................................. 14

        2.    UCC § 1-208 Obligates Citibank to Demonstrate It Had a Good Faith
             Belief That Prospects of Repayment or Performance Were Impaired Before
             Terminating the Swaps ............................................................................................. 17

        3.    Citibank Did Not Act in Good Faith and Could Not Have
             Believed Its Prospects for Repayment or Performance Had Been Impaired............. 20

CONCLUSION .................................................................................................................... 22

i

## TABLE OF AUTHORITIES

### Federal Cases

Arbitron, Inc. v. Traylyn Broadcasting, Inc.
    400 F.3d 130 (2d Cir. 2005).................................................................... 14

Bank of China v. Chan
    937 F.2d 780 (2d Cir. 1991)...................................................................... 15

Big Horn Coal Co. v. Commonwealth Edison co.
    852 F.2d 1259 (10th Cir. 1988) ........................................................... 18, 19

Brown v. AVEMCO
    603 F.2d 1367 (9th Cir. 1979) ................................................................... 18

Carvel Corp. v. Diversified Management Group, Inc.
    930 F.2d 228, 231 (2d Cir. 1991)............................................................... 14

Chambers v. TRM Copy Ctrs. Corp.
    43 F.3d 29 (2d Cir. 1994).............................................................................. 9

Daiwa Special Assets Corp. v. Desnick
    2002 WL 1997922 (S.D.N.Y. Aug. 29, 2002)......................................... 12, 13

Grand Light & Supply Co., Inc. v. Honeywell, Inc.
    771 F.2d 672 (2d Cir. 1985)........................................................................ 17

Heyman v. Commerce & Indus. Ins. Co
    524 F.2d 1317 (2d Cir. 1975)........................................................................ 9

New Marine National Bank v. Liberty
    778 F. Supp. 86 (D. Me. 1991) .................................................................. 14

PaineWebber Inc. v. Bybyk
    81 F.3d 1193 (2d Cir. 1996)........................................................................ 10

Procter & Gamble v. Bankers Trust Co.
    925 F. Supp. 1270 (S.D. Ohio 1996) ..................................................... 15, 16

Suthers v. Amgen, Inc.
    441 F. Supp.2d 478 (S.D.N.Y. 2006)......................................................... 17

Thompson v. Metropolitan Life Ins. Co.
    149 F. Supp.2d 38 (S.D.N.Y. 2001)............................................................. 9

Travelers Int'l, A.G. v. Trans World Airlines
    41 F.3d 1570 (2d Cir. 1994)........................................................................ 16

ii

Veal v. Geraci
    23 F.3d 722 (2d Cir. 1994).................................................................................... 21

### State Cases

Canterbury Realty and Equip. v. Poughkeepsie Sav. Bank
    135 A.D.2d 102, 524 N.Y.S.2d 531 (3d Dep't 1988) ............................................. 16

Kirke La Sehlle Co. v. Paul Armstrong Co.
    263 N.Y. 79, 188 N.E. 163 (1933)......................................................................... 14

M. O'Neil Supply Co. v. Petroleum Heat & Power Co.
    280 N.Y. 50, 19 N.E.2d 767 (1939)....................................................................... 14

Norstar Leasing Services, Inc. v. Colonie Coliseum Enterprises, Inc.
    546 N.Y.S.2d 942 (Sup. Ct. Albany Cty. 1989) ..................................................... 18

Van Valkenburgh, Nooger, & Neville v. Hayden Pub. Co
    330 N.Y.S.2d 329, 281 N.E.2d 142 (N.Y.1972)..................................................... 14

### Statutes

Fed. R. Civ. Proc. 56(c) ...................................................................................................... 9

N.Y. U.C.C. § 1-101 et seq................................................................................................. 15

UCC § 1-203 ............................................................................................................ 15, 16, 18

UCC § 1-208 ................................................................................................................. *passim*

### Other

Restatement (Second) of Contracts § 205 (1981) ............................................................... 15

Defendant United Subcontractors Inc. ("USI") respectfully submits this memorandum of law in opposition to the motion for summary judgment submitted by plaintiff Citibank, N.A. ("Citibank").

## PRELIMINARY STATEMENT

Citibank's motion – filed without benefit of any discovery in this case – is based on its incorrect assumption that it was legally entitled as a matter of law to terminate the parties' interest-rate swap agreement by which USI hedged its interest rate exposure under a separate long-term credit agreement because USI was in default under that credit agreement. In fact, as shown below, that default was already waived by other lenders who had the power to waive that default under the credit agreement – and Citibank was legally bound by their waiver. Accordingly, Citibank had no legal right to terminate the swap agreement.

Citibank argues that it still had the right to terminate because signed agreements memorializing the waiver had not yet been received. However, as shown below, the waiver of a default under the parties' credit agreement did not require that agreements memorializing the waiver be signed and returned. To the contrary, all that was required was the "written concurrence" by lenders holding more than 50% of the outstanding indebtedness under that agreement that the waiver would be given. Here, as shown below, there is substantial written evidence to show that the requisite lenders gave their "written concurrence" well before Citibank terminated the swap agreement. Citibank's termination was therefore wrongful and its motion for summary judgment is not warranted.

Citibank's motion must also be denied because material fact issues exist concerning its bad faith in terminating the swaps. As set forth below, the duty of good faith adheres to all contracts, including swap contracts, as a matter of common law and under the

1

Uniform Commercial Code.  USI has submitted evidence that Citibank was trying to extort additional fees from USI to which it was not entitled.  There is also strong circumstantial evidence that Citibank could not have believed that USI's ability to pay or perform under the swap contracts had been impaired.  Citibank's motion should be denied for this reason as well

## STATEMENT OF FACTS

### A.  The Parties

Plaintiff Citibank is a National Banking Association organization with its principal place of business in New York City.  Complaint, ¶ 2.  Defendant USI, a Utah corporation, is a privately owned nationwide market leader in the installation of a wide range of residential and commercial products within the construction industry.  Based in Edina, Minnesota, USI has more than 50 branches and 2,500 employees across the country. Affidavit of Timothy J. Gallagher, dated July 25, 2008 ("Gallagher Aff."), ¶ 2.

### B.  USI Enters into the Credit Agreement and the Swap Agreement

On or about December 27, 2005, USI and certain of its affiliates entered into a First Lien and Credit and Guaranty Agreement ("the Credit Agreement") with a consortium of more than 100 lenders ("the Lenders").  Citicorp North America, Inc. acted as a lender, administrative agent, and collateral agent, and another Citibank affiliate, Citigroup Global Markets Inc., served as lead arranger, bookrunner, and syndication agent.  USI made certain financial covenants in the Credit Agreement, including that it would maintain particular ratios of its earnings compared to its interest payments and its consolidated debt.  *Id.*, ¶¶ 3-5, Exh. A.

USI agreed to pay interest at a floating interest rate on the amounts it borrowed but promised to hedge at least 50% of its interest rate risk pursuant to agreements deemed reasonably satisfactory to Citibank.  *Id.*, ¶ 6, Exh. A.  USI therefore entered into a Swap

2

Agreement with Citibank dated as of December 29, 2005, whereby the parties entered into three long term swap transactions with notional amounts of $100 million, $50 million, and $50 million, respectively. USI agreed to pay a fixed rate of interest on the notional amount in exchange for Citibank's payments, which were based on a floating interest rate. *Id.*, ¶ 8, Exh. B.

At all relevant times, USI made every payment required under either the Credit Agreement or the Swap Agreement. USI never defaulted on any payment obligation under the relevant agreements. *Id.*, ¶ 10.

### C. USI Anticipates a Technical Default Under the Credit Agreement

In or around July 2007, USI expected that by the end of the third or fourth quarter, its quarterly earnings would result in a default of certain financial covenant ratios. USI informed Citibank, as administrative agent, and asked that it take the lead in negotiating a modification of the Credit Agreement so that USI could avoid any such default. Citibank informed USI that its fee for arranging such a modification would be $1.5 million, which USI concluded was substantially above market. Citibank then informed USI that it could either pay the $1.5 million or negotiate the modification itself. *Id.*, ¶ 11.

USI chose the latter option because it could modify the terms of the Credit Agreement – without Citibank's assistance – upon the "written concurrence" of lenders who held more than 50% of the outstanding indebtedness. Section 10.04 of the Credit Agreement, entitled, "Amendments and Waivers," states in pertinent part that "no amendment, modification, termination or waiver of any provision of the [Credit Agreement] or consent to any departure by any [borrower] therefrom, shall in any event be effective without the written concurrence of the Requisite Lenders." *Id.* ¶ 12, Exh. A. The term "Requisite Lenders" is defined as lenders representing "more than 50%" of the outstanding indebtedness under the Credit Agreement.

3

Furthermore, the term "written concurrence" means a document reflecting terms that the Requisite Lenders would agree to, as opposed to a formal writing executed by each of them. Notably, the term "written concurrence" is used elsewhere in the Credit Agreement to mean the same thing. Thus, for example, Section 10.05 of the Credit Agreement authorizes Citibank, as agent, to execute formal amendments to the Credit Agreement on behalf of individual lenders, but only upon their "written concurrence." Accordingly, in order to obtain a modification of the credit terms, USI needed the "written concurrence" of the Requisite Lenders. *Id.*, ¶ 12, Exh. A.

USI identified nine lenders holding more than 50% of the outstanding indebtedness, formed a "steering committee" among them, and commenced negotiations to fix new financial covenant ratios. The Requisite Lenders were represented by Cahill Gordon & Reindel LLP ("Cahill Gordon"), who also served as Citibank's counsel. *Id.*, ¶ 13.

On November 12, 2007, while negotiations to modify the financial covenant ratios were underway, USI provided its lenders with a "Notice of Default" – as had been expected – in connection with the financial covenant ratios then in place under Section 6.08 of the Credit Agreement for the fiscal quarter ending September 30, 2007. However, USI also advised its lenders that:

> The Borrower is currently in the process of obtaining an amendment to the Credit Agreement to address the current non-compliance with the two Financial Covenants set forth above. Discussions with Lenders have and continue to take place and a Management Presentation to all Lenders is being given on November 13, 2007. The target is to finalize and execute an amendment by the end of November 2007.

*Id.*, ¶ 14, Exh. C.

On November 20, 2007, the Requisite Lenders gave USI its "written concurrence" to a default waiver. The default waiver was posted on the Internet in the form of a Term Sheet

4

entitled, "Amendment and Waiver to First Lien Credit Agreement." It provided for a waiver by the Requisite Lenders of "the default caused by the Borrower's failure to comply with the financial covenants set forth in Section 6.08 of the First Lien Credit Agreement for the Fiscal Quarter ending September 30, 2007." The Lenders were also informed that the Requisite Lenders had given their "written concurrence" to the default waiver. Thus, the Term Sheet was accompanied by a "Note to First Lien Term Loan Lenders" which stated, in pertinent part as follows: "The Term Sheet has been drafted by Lender counsel, Cahill Gordon & Reindel, and has been agreed with the First Lien Lender Steering Committee, which represents a majority of the First Lien Term Loan Lenders" (emphasis added). The Note and Term Sheet were distributed to all lenders, including Citibank.

The Requisite Lenders contemplated that the default waiver would then be memorialized in a writing to be signed by all lenders. Thus, the Note further stated that "Cahill Gordon is now working on drafting the amendment agreement document. The amendment will be posted in final form on Intralinks in the near future. Instructions on where to send the amendment agreement after you have signed it will accompany that posting." *Id.*, ¶ 15, Exh. D.

Notably, the default waiver required amendments to two other agreements, the Second Lien Credit Agreement and an Intercreditor Agreement. Citibank had a large stake in the Second Lien Credit Agreement and thus would have had to agree to these amendments. The Note to First Lien Term Loan Lenders stated in this regard that "[a]t present, the Company is working with the Second Lien Lenders to arrive at an amendment to the Second Lien Credit Agreement. That amendment will mirror the First Lien amendment for those items that are applicable to both agreements." *Id.*, ¶ 16, Exh. D.

### D. Citibank Purports to Terminate the Swaps Even Though the Requisite Lenders Had Agreed to Waive USI's Technical Default

On December 12, 2007, while amendments to the Second Lien Credit Agreement were being negotiated, Citibank notified USI that it was declaring an Event of Default under the cross-default provision of the Swap Agreement and that Citibank intended to terminate the three long-term swaps. *Id.*, ¶ 17, Exh. E. Even though written concurrence to a default waiver under the Credit Agreement had already been given by the Requisite Lenders, Citibank stated that the purported Event of Default was the Credit Agreement default identified in USI's November 12, 2007 Notice of Default.

Upon receipt of Citibank's December 12, 2007 notice, USI notified the Requisite Lenders of Citibank's action and, assuming that the problem was the default waiver having been tied to amending Second Lien Credit Agreement, asked for a default waiver that was not tied to any such amendment. *Id.,* ¶ 19, Exh. F. USI explained that conditioning the waiver on amendments to the Second Lien Credit Agreement had effectively resulted, at least as far as Citibank was concerned, in not there not being a default waiver, but a "forbearance agreement," in which lenders had voluntarily agreed to forbear from exercising rights under the November 12, 2007 default notice until agreement had been reached on the Second Lien Credit Agreement amendments, at which point the default would be waived. Consequently, because of Citibank's action, USI believed an unconditional default waiver was needed – and needed right away before the swaps were terminated. Thus, USI's December 12 e-mail to the Requisite Lenders stated in pertinent part as follows:

> Citi advised us today that since we are in default of the 1[st] Lien Term Loan and because there is a cross-default provision in our interest rate swap agreement, we

6

are in default of our swap agreement. As such, they want the swap agreement terminated now. Based on the value of the swap at the close of business on Tuesday, we would owe Citi an amount of $2.8M to wrap up the swap. In addition, we would be required to go find another swap arrangement which will likely be very costly.

Because of the significant cash outflow that the swap termination would require, we ask that you consider providing us with a 'default waiver' instead of a forbearance agreement for the same period of time as the forbearance agreement (i.e., 6-7 weeks). We would envision any 'default waiver' to include the same limitations we have today (i.e., limitations of borrowings from the revolver, etc.) and that are contemplated in the proposed forbearance agreement. The default waiver would terminate before we went into default on the second lien term loan.

*Id.,* Exh. F.

Upon receipt of USI's request, the Requisite Lenders immediately instructed Cahill Gordon to prepare a Default Waiver that was not tied to any amendment of the Second Lien Credit Agreement and the Intercreditor Agreement. Cahill Gordon presented this form of Default Waiver n writing to the Requisite Lenders on the evening of December 13, 2007, with instructions to sign off as soon as possible because Cahill Gordon intended to send it to USI by the following afternoon*, i.e.*, December 14, 2007. *Id.,* ¶ 20, Exh. G; Declaration of Robert B. Bernstein, July 25, 2008 ("Bernstein Decl."), Exh. A. A revised version of the Default Waiver was in fact sent to the Requisite Lenders on December 14, 2007, with instructions that Cahill Gordon would send it shortly thereafter to USI, which it did. The cover note to USI from Cahill Gordon identified the document as the Requisite Lenders' "initial draft the USI Waiver & Amendment." Gallagher Aff., ¶ 21, Exh. H. The form of Default Waiver that USI received was, as requested, not tied to any amendment of the Second Lien Credit Agreement and the Intercreditor Agreement.

Even though the Requisite Lenders had provided USI a second written concurrence to a default waiver, Citibank notified USI by facsimile on December 18, 2007, at

7

9:26 a.m., EST, that it was terminating the swaps anyway, and designating December 18, 2007 as the "Early Termination Date" under the Swap Agreement. Citibank thus advised that the three swap transactions would be terminated that day, and that a computation of amounts owed by USI would be sent under separate cover once the transactions had been terminated. *Id.,* ¶ 23, Exh. I. In response, USI promptly notified Citibank in writing that early termination would be improper because lenders holding more than 50% of the outstanding indebtedness had agreed to waive the default under the Credit Agreement. Thus, USI told Citibank that there was no default at the time, and that a formal memorialization of the default waiver was in the process of being executed. *Id.,* ¶ 24, Exh. J. USI's protest was unavailing. At 5:38 p.m. EST that same day, Citibank responded that "we have received your facsimile of today, December 18 advising that a waiver was in process but has not as yet been finalized. Please be advised that the Transactions were terminated as of 11:00 a.m. today prior to receipt of your letter and the finalization of any waiver." Citibank also demanded the immediate payment of $2,751,333, plus interest, to terminate the swaps. *Id.,* ¶ 25, Exh. K.

USI continued to argue that Citibank had acted improperly. By letter dated December 20, 2007, USI's counsel wrote Citibank in pertinent part: "In response to the Letters and as previously set forth in my letter to you dated as of December 18, 2007, the Event of Default referenced in the Letters was waived by the majority lenders under the Credit Agreement (the "Waiver")." Bernstein Decl., Exh. B.

### E. USI Obtains New Swaps and the Waiver and Amendment Agreement Is Signed

As a result of Citibank's wrongful termination of the three long-term swap transactions, USI had to enter into new swap transactions. On December 26, 2007, USI entered

into new swaps with a different counterparty.  Gallagher Aff., ¶ 27.  Once USI had the new

swaps in place, Cahill Gordon circulated the Waiver and Amendment Agreement to the other

lenders.[1]  On December 27, 2007, Cahill Gordon circulated a fully executed copy of the Waiver

and Amendment Agreement, which was signed by one of Citibank's affiliates.  *Id.,* ¶ 27, Exh. L.

     Not only did Citibank agree to the Waiver and Amendment of the Credit

Agreement on December 27, 2007, but it also renewed its obligation to support more than $17

million in outstanding USI letters of credit in January 2008.  *Id.,* ¶ 33.

**ARGUMENT**

**POINT ONE**

**Plaintiff Is Not Entitled to Summary Judgment**

### A.  The Standard for Summary Judgment

     A motion for summary judgment cannot be granted unless the court determines

that there is no genuine issue of material fact.  Fed. R. Civ. Proc. 56(c).  The burden of showing

that there is no genuine factual dispute rests with the party seeking summary judgment.

*Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir. 1994).  Courts have recognized that

"summary judgment is appropriate only in 'extreme circumstances.'"  *Thompson v. Metropolitan*

*Life Ins. Co.,* 149 F. Supp.2d 38, 49 (S.D.N.Y. 2001).  Moreover, the Second Circuit has stated

that summary judgment is a "drastic device since its prophylactic function, when exercised, cuts

off a party's right to present his case to the jury."  *Heyman v. Commerce & Indus. Ins. Co.,* 524

F.2d 1317, 1320 (2d Cir. 1975).  Accordingly, any inferences drawn from the underlying facts

must be viewed in the light most favorable to the party opposing summary judgment.  *Chambers,*

---

[1]  The termination of the Swap Agreement created a new default under the Credit Agreement but the new swaps cured that default.

43 F.3d at 36.  If there is any evidence in the record, from any source, from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.  *Id.* at 37.

### B.  Citibank Improperly Terminated the Swap Agreements Because the Requisite Lenders Had Waived the Technical Default Under the Credit Agreement

Citibank breached the Swap Agreement by improperly terminating it on December 18, 2007.  The documentary record establishes Citibank's breach of the agreement, or at a minimum, identifies a material fact issue whether Citibank was entitled to terminate the contract.[2]

While it is undisputed that the Swap Agreement gave Citibank the right to declare a default upon a default under the Credit Agreement, and it is undisputed that such a default occurred, Section 10.04 of the Credit Agreement provides that such default may be waived by "written concurrence" of the Requisite Lenders.  This waiver does not require a fully executed agreement.[3]  Here, the record shows that there was "written concurrence" and Citibank knew it.

Even without the benefit of discovery, USI has submitted evidence that: (i) on November 20, 2007, Cahill Gordon circulated a term sheet that reflected provisions agreed satisfactory to the Requisite Lenders, including the waiver of USI's technical default; (ii) on December 12, after Citibank declared a default under the Swap Agreement, USI asked the

---

[2]  These factual issues are also sufficient to defeat Citibank's motion for summary judgment on USI's counterclaims.

[3]  Other provisions of the Credit Agreement establish that "written concurrence" is different than a fully executed document.  For example, Section 10.05 provides that Citibank, as Administrative Agent, could execute "amendments, modifications, waivers or consents" on behalf of a Lender provided it had provided its "written concurrence."  Gallagher Aff., Exh. A.  In order for Section 10.05 to have any meaning, "written concurrence" cannot mean the same thing as a fully executed agreement.  *See, e.g., PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (New York follows common law rule that a contract must be construed to give full meaning and effect to all provisions) (citation omitted).

Requisite Lenders to provide a default waiver that was not tied to the amendment of any other agreement; (iii) on December 13, a form of waiver was drafted and circulated to the Requisite Lenders by their counsel with written instructions to execute and return it by December 14, at which time the waiver would be presented to USI; (iv) on December 14, counsel for the Requisite Lenders notified the Requisite Lenders, in writing, that the waiver would be sent to USI that afternoon; and (v) the form of waiver was circulated to USI on December 14. The documents clearly show that the Requisite Lenders – twice – gave their "written concurrence" to a waiver of the default that was the basis for the default that Citibank declared under the Swap Agreement.[4] Because the default had been waived on November 20, and again on December 14, facts known to Citibank's counsel, Citibank had no basis for terminating the Swap Agreement on December 18. Its termination was therefore a breach of those agreements.

Despite the overwhelming evidence of "written concurrence," Citibank makes the futile argument that "the Waiver and Amendment relied upon by USI had not been agreed to at the time that Citibank terminated the Swap Transactions." Pl. Br. at 8. As set forth above, Citibank could only be talking about the fully executed memorialization of the waiver for which the Requisite Lenders had already given their "written concurrence." As has been shown, under Section 10.04 of the Credit Agreement, the existence of a default waiver turns not on a fully executed memorialization of the waiver, but rather on whether there had been a "written concurrence" by the Requisite Lenders. Therefore, Citibank cannot justify its conduct by relying on the fact that the Waiver and Amendment Agreement was not fully executed by all Lenders until December 27, 2007, nine days after Citibank terminated the swaps. Because the Requisite

---

[4]  At a minimum, these documents create an issue of fact as to whether the Requisite Lenders gave "written concurrence."

11

Lenders had already provided their written concurrence to the waiver – twice, and both times known to Citibank – the execution date of the Waiver and Amendment Agreement is of no moment because there had been "written concurrence" before that agreement was signed.

Likewise, Citibank cannot rely on the fact that the language of the final Waiver and Amendment Agreement states that the defaults were "continuing" and "existing" as of December 27, 2007.  Pl. Br. at 8.  First of all, as set forth above, the operative waiver here was the "written concurrence" to the default waiver which was provided by the Requisite Lenders well before Citibank improperly terminated the swaps on December 18, 2007.  Furthermore, Citibank itself was responsible for the delay in getting the Waiver and Amendment Agreement signed because its wrongful termination of the swaps had created another default, which USI had to cure before everyone signed the Waiver and Amendment Agreement, and did so by entering into new swaps on December 26, 2007.

Lastly, Citibank's heavy reliance on *Daiwa Special Assets Corp. v. Desnick,* 2002 WL 1997922 (S.D.N.Y. Aug. 29, 2002), is misplaced.  Pl. Br. at 6-7.  Legally, *Daiwa* does not, as Citibank suggests, stand for the proposition that the existence of a cross-default clause must be the beginning and end of the Court's analysis; rather, the *Daiwa* decision contains a detailed examination of the factual circumstances surrounding the relationship between the creditor and borrower, including whether there was good faith.  Factually, *Daiwa* is completely inapposite, as there was no evidence that the default at issue in that case had been waived, and the only factual similarity to this case is the unremarkable fact that the contracts had cross-default provisions.

Indeed, the relationship between the hospital and its lender in *Daiwa* was very different than the relationship between Citibank and USI.  In *Daiwa,* a hospital pledged its receivables to a related entity, MMA Funding, which pledged those receivables to Daiwa in

12

exchange for a credit line of approximately $10 million. *Id.* at *1. Unlike USI, the debtor in *Daiwa* was in severe financial distress at the time of its default. By the time Daiwa declared MMA Funding to be in default, the hospital was in a financial death spiral: (i) the federal government had recently announced that the hospital had to repay more than $1 million in Medicare overpayments, which the company could not repay within 30 days; (ii) the hospital's audited financial statements were so late that it caused an uncured default for more than 90 days; (iii) it owed $445,000 to eleven creditors and other creditors had made demands exceeding $500,000; and (iv) there was a default judgment against the hospital for more than $90,000. *Id.* at *2. The hospital's rapid decline brought it from a $3.5 million operating profit in the prior year to a $11.5 million loss in the four months leading up to its bankruptcy. *Id.* at *11. Thus, there can be no fair comparison between the hospital in *Daiwa* and USI – which had always met its payment obligations throughout the history of the Credit Agreement and the Swap Agreement and had obtained written concurrence from lenders which was sufficient to waive the technical default.

Moreover, Daiwa made extraordinary efforts to help the struggling hospital. In spite of the hospital's severe financial distress, Daiwa advanced more than $1 million in discretionary funding <u>after</u> it terminated the line of credit. *Id.* at *11. Given the perilous state of the hospital's finances, Daiwa took a significant risk when it extended this additional credit. Unlike Citibank, Daiwa was actively trying to help its creditor, and there was no evidence that Daiwa took advantage of its position to increase its fees or revenues at the expense of its counterparty. After reviewing all the evidence carefully, the *Daiwa* court found that there was

no evidence of bad faith or unclean hands by the lender. *Id.* at *11-12.[5]  Consequently, *Daiwa* does not justify Citibank's wrongful termination of the Swap Agreement.

### C. At a Minimum, There Are Material Fact Issues Concerning Citibank's Violation of the Duty of Good Faith It Owed to USI

Even though USI has not obtained any discovery beyond cursory initial disclosures under Rule 26(a), the factual record is already replete with evidence that Citibank violated its duty of good faith to USI when it terminated the Swap Agreement.  Citibank did not have any reason to believe, let alone a good faith belief, that its prospects for repayment or performance had been impaired when it terminated the swaps.  Based on this record, Citibank's motion must fail and USI should receive full discovery about Citibank's breach of the Swap Agreement.

### 1. New York Law Imposes a Duty of Good Faith and Fair Dealing on All Contracts, Including Swap Contracts

As a matter of law, Citibank cannot disclaim the duty of good faith and fair dealing it owed to USI.  Indeed, it is well-settled that all contracts governed by New York law contain a covenant of good faith and fair dealing. *Arbitron, Inc. v. Traylyn Broadcasting, Inc.,* 400 F.3d 130, 138-39 (2d Cir. 2005); *Carvel Corp. v. Diversified Management Group, Inc.,* 930 F.2d 228, 231 (2d Cir. 1991); *Van Valkenburgh, Nooger, & Neville v. Hayden Pub. Co.,* 330 N.Y.S.2d 329, 333, 281 N.E.2d 142, 144 (N.Y. 1972); *Kirke La Sehlle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163, 166 (1933) ("[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring

---

[5] Nor does *New Marine National Bank v. Liberty,* 778 F. Supp. 86 (D. Me. 1991), also cited by Citibank, contain any discussion whether the lender acted in good faith or whether it had a good faith belief that its prospects for repayment or performance had been impaired.

14

the right of the other party to receive the fruits of the contract, which means that in every

contract there exists an implied covenant of good faith and fair dealing.") (citations omitted).

　　　　Older New York cases, such as *Kirke,* show that this duty has long been a part of

the common law of contracts in New York. *See also M. O'Neil Supply Co. v. Petroleum Heat

& Power Co.,* 280 N.Y. 50, 54-55, 19 N.E.2d 767 (1939). More recently, New York courts

have emphasized the continuing importance of this duty by adopting and applying § 205 of the

Restatement (Second) Contracts, which states that "[e]very contract imposes upon each party a

duty of good faith and fair dealing in its performance and its enforcement." Restatement

(Second) of Contracts § 205 (1981); *Bank of China v. Chan,* 937 F.2d 780, 799 (2d Cir. 1991)

(citing § 205 and reversing the district court's grant of summary judgment because of material

fact issues about bank's good faith). Thus, Citibank owed a duty of good faith under well-

settled principles of contract law.

　　　　Furthermore, New York has codified the duty of good faith by adopting § 1-203

of the Uniform Commercial Code, which states that "[e]very contract or duty within this Act

imposes an obligation of good faith in its performance or enforcement." N.Y. U.C.C. 1-203.

Citibank denies that any section of the UCC could apply to the Swap Agreement but does not

cite any legal authority to support this argument. Pl. Br. at 9 ("As a threshold issue, the UCC,

codified at N.Y. U.C.C. § 1-101 *et seq.,* does not apply to the Swap Agreement or the Swap

Transactions.").

　　　　However, one federal court applying New York law has explicitly held that an

interest rate swap agreement – the same form of agreement at issue in this case – includes the

UCC's obligation of good faith in the performance and enforcement of the contract. *See

Procter & Gamble v. Bankers Trust Co.,* 925 F. Supp. 1270, 1289-90 (S.D. Ohio 1996). In

15

*Procter & Gamble,* the court was forced to examine the nature of a swap agreement as a matter of first impression. In so doing, the court held that the defendant owed its counterparty a duty of good faith during the performance and enforcement of swap transactions under UCC § 1-203. *Id.* at 1290 (*citing* N.Y. U.C.C. 1-203). Thus, the UCC, including § 1-203, applies to swap transactions such as the ones at issue in this case.

Citibank's primary argument against applying a duty of good faith is the straw man argument that USI is somehow asking the Court to alter the terms of the Swap Agreement. Pl. Br. at 10 ("USI, by alleging that Citibank had to believe in good faith that USI's prospects for payment or performance were impaired in order to enforce the Cross Default provision, reads into the Swap Agreement provisions that do not exist."). To the contrary, USI is merely applying the common practice of holding parties who are afforded discretion by commercial contracts to a duty of good faith. *Carvel,* 930 F.2d at 231 ("While the distributorship agreement gave Carvel considerable discretion with regard to advertising, store location, wholesale sales, and other matters, this did not relieve Carvel of its duty to act in good faith."); *Travelers Int'l, A.G. v. Trans World Airlines,* 41 F.3d 1570, 1575 (2d Cir. 1994) ("Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith."). Furthermore, taking sudden adverse action in the midst of negotiations over a work-out can constitute evidence of bad faith. *See, e.g., Canterbury Realty and Equip. v. Poughkeepsie Sav. Bank,* 135 A.D.2d 102, 104, 107-08, 524 N.Y.S.2d 531 (3d Dep't 1988) (material fact issues about bank's bad faith precluded summary judgment when bank suddenly stopped honoring checks during negotiations about modification of credit agreement).

16

Citibank's cases are inapposite because, among other reasons, they contain no evidence whatsoever of bad faith. Pl. Br. at 10.[6] In fact, it is Citibank which is taking an extreme position, because it is asking this Court to effectively render the duty of good faith meaningless whenever a contract gives one party a right to take a particular action. Pl. Br. at 10-11 ("USI's invocation of Citibank's subjective beliefs would render meaningless Citibank's right to terminate pursuant to the Cross Default provision."). Based on the factual circumstances at issue, including, *inter alia*, the lack of any financial default by USI, the written concurrence by the Requisite Lenders, Citibank's desire to earn additional fees to the detriment of USI and its other lenders, and the unnecessary haste with which Citibank terminated the Swap Agreement, Citibank abused its discretion and violated its duty to act in good faith towards USI. Once again, at a bare minimum, there are material fact issues warranting discovery about Citibank's bad faith.

### 2. UCC § 1-208 Obligates Citibank to Demonstrate It Had a Good Faith Belief That Prospects of Repayment or Performance Were Impaired Before Terminating the Swaps

Citibank improperly terminated the Swap Agreement because it did not have a good faith belief that the prospects of payment or performance had been impaired. This duty

---

[6] *See, e.g., Grand Light & Supply Co., Inc. v. Honeywell, Inc.,* 771 F.2d 672, 675-76 (2d Cir. 1985) (no evidence of bad faith when manufacturer exercised right to terminate distributor's contract after complaining about distributor's sales for several years); *Suthers v. Amgen, Inc.,* 441 F. Supp.2d 478, 485 (S.D.N.Y. 2006) (pharmaceutical company exercised right to cancel clinical research trial after receiving studies showing toxicity in animals; participants could not use covenant of good faith to force pharmaceutical company to continue the trial.) *Barclays Business Credit, Inc. v. Inter Urban Broadcasting of Cincinnati, Inc.,* 1991 WL 258751 (S.D.N.Y. Nov. 27, 1991), at * 6 (debtor could not use covenant of good faith to force creditor to share collateral with another institution so debtor could obtain a letter of credit; no evidence of bad faith by the creditor); *National Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 681 (S.D.N.Y. 1991), *aff'd sub. nom. Yeager v. National Westminster,* 962 F.2d 1 (2d Cir. 1992) (no bad faith because "rather than terminate the lending relationship without notice, arbitrarily or capriciously call a demand obligation without notice, or refuse to advance an amount without notice, the Bank forbearing from exercising its full panoply of rights under the Loan Agreements" and gave ample notice of termination).

springs from UCC § 1-208, which applies § 1-203's duty of good faith to contracts that allow

one party to accelerate performance or payment. N.Y. U.C.C § 1-208, N.Y. cmt (2007) ("This

section is an application of Section 1-203 which imposes a general obligation of good faith in

performing or enforcing obligations.").[7] Section 1-208 of the UCC provides:

> A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

N.Y. U.C.C. § 1-208.

Courts have applied § 1-208 when parties have accelerated contracts because of

technical defaults. *See Brown v. AVEMCO,* 603 F.2d 1367 (9th Cir. 1979); *see also Norstar*

*Leasing Services, Inc. v. Colonie Coliseum Enterprises, Inc.,* 546 N.Y.S.2d 942, 945 (Sup. Ct.

Albany Cty. 1989) (leases accelerated upon financial default; court noted "[t]he UCC generally

permits acceleration clauses in agreements provided that the party having power to accelerate

payments exercises that power in the good faith belief that the prospect of repayment or

performance is impaired.") (citing UCC § 1-208). In *Brown,* a security agreement provided

that the creditor, AVEMCO, could accelerate the loan upon a payment default, an unauthorized

lease of the secured property (an airplane), or if the creditor deemed itself insecure. *Brown,* 603

F.2d at 1369. The creditor subsequently entered into an unauthorized lease with plaintiffs,

whereby plaintiffs could purchase the airplane after paying off the mortgage. Plaintiffs tendered

what it believed was the outstanding balance to AVEMCO, who refused to accept the money,

---

[7] Because § 1-208 is an application of the general duty set forth in § 1-203, even if § 1-208 did not apply, Citibank would still have a duty to act in good faith under § 1-203.

18

repossessed the airplane, and then sold it for more than 25% more than the loan's outstanding balance. *Id.* At trial, the jury was instructed that a "technical breach" caused by an unauthorized lease entitled the creditor to automatically enforce the acceleration clause without regard to whether there was a good faith belief that the security interest had been impaired. *Id*, at 1370, 1376.

The Ninth Circuit reversed, holding that this was prejudicial error because the jury should have been instructed that it could have examined AVEMCO's good or bad faith. *Id.* at 1380. AVEMCO argued that it did not need to show it had a good faith belief that its prospects for repayment had been impaired because it had declared a default based on the no-lease clause, not because of the creditor's insecurity. *Id.* at 1378. However, the Ninth Circuit rejected that argument, finding that the drafters of the UCC were not solely concerned by the potential abuse of acceleration clauses activated at the whim of a creditor. Rather, the court noted, abuse is possible in the case of acceleration upon a technical default, such as the "due on lease" provision. *Id.* at 1378-79. In other words, § 1-208 serves to combat the risk that a party could use a technical default to accelerate a contract, thereby using the default trigger as "a sword for commercial gain rather than as a shield against security impairment." *Id.* at 1379; *see also Big Horn Coal Co. v. Commonwealth Edison co.*, 852 F.2d 1259, 1269 n.14 (10th Cir. 1988) (equitable rationale of § 1-208 applied so that discretionary contract provisions should be not used as a sword, rather than a shield).

Finally, Citibank argues that § 1-208 does not apply because the <u>cross-default provision</u> is not an acceleration clause. Pl. Br. at 10 ("The Cross Default provision of the Swap Agreement is not an acceleration clause contemplated by the UCC and does not contain the language required under this section."). But this is a red herring because Section 6(a) of the

19

Swap Agreement is a classic acceleration clause, which states that a party "may" terminate the long-term swaps based on an event of default. Gallagher Aff., Exh. B. Section 6(d) provides that such payments would be due within two days of the Early Termination Date. *Id.* Here, there is no dispute that Citibank unilaterally exercised its discretion to terminate the swaps and cancel the swaps less than two hours after it declared the Termination Date. This draconian result is precisely the kind of scenario from which § 1-208 protects debtors when creditors do not have a good faith belief that their ability to receive payment or performance has been impaired.

### 3.    Citibank Did Not Act in Good Faith and Could Not Have Believed Its Prospects for Repayment or Performance Had Been Impaired

The factual record before the Court raises serious questions about Citibank's lack of good faith. These factual issues are more than sufficient to foreclose Citibank's ability to obtain a pre-discovery award of summary judgment.

Citibank tried to turn a technical default – which it knew all other lenders had agreed to waive – into an opportunity to extort more fees or profits at USI's expense. From the very beginning, when Citibank received notice that a technical default was likely to occur in the future, it tried to exact an above-market fee of $1.5 million to conduct negotiations to waive the default and amend the financial covenant ratios. Citibank made a take-it-or-leave-it offer of $1.5 million, which USI rejected and began to negotiate a waiver and amendment without Citibank's assistance, and without incurring a "negotiation fee." Later, when Citibank improperly terminated the swaps, it stood to earn nearly $3 million – money it would not necessarily have received under these long-term swap transactions depending on how interest rates fluctuated over

the next several years. Thus, rather than trying to make itself whole, Citibank tried to profit from USI's technical default.

Citibank also acted in bad faith because it knew that the Requisite Lenders were willing to waive the default. As early as November 12, 2007, Citibank knew that USI had been talking to the lenders about waiver and modification even before USI declared a default. And on November 20, 2007, Citibank's counsel, Cahill Gordon, distributed to all lenders, including Citibank, a term sheet acceptable to the Requisite Lenders which agreed to waive the default. Furthermore, immediately after Citibank issued its December 12, 2007 notice, Citibank's counsel drafted and circulated another waiver agreement which provided yet additional evidence of "written concurrence." Citibank can be charged with Cahill Gordon's knowledge about the two "written concurrences" USI received before Citibank's wrongful termination of the swaps. *Veal v. Geraci,* 23 F.3d 722 (2d Cir. 1994) (imputing attorney's knowledge to client as a matter of agency law).

Moreover, Citibank's rash behavior on December 18, 2007 also reflects its bad faith. On that morning, Citibank declared that the swaps would terminate that day, calculated the amounts owed, and terminated the swaps, all in a span of 90 minutes. There was no legitimate business reason to have acted so impetuously, particularly since the Requisite Lenders had concurred to waive the default. Citibank could easily have provided some reasonable notice of a Termination Date under the Swap Agreement. *See* Gallagher Aff., Exh. B, at § 6(a) (upon default, party "may" terminate the outstanding transactions and give up to 20 days notice to the counterparty). Citibank ultimately signed the modification to the Credit Agreement, thereby negating any claim that it had doubts about USI caused by the technical default in the financial covenant ratios. Finally, Citibank's decision to back more than $17 million in letters of credit for

21

USI beginning in January 2008, belies any claim that Citibank was worried about USI's ability to pay or perform.

Regardless of whether Citibank sought to earn additional revenues, obtain an advantage over the other Lenders, or just make life difficult for USI, Citibank unfairly abused contractual provisions that gave it substantial discretion and leverage over USI, thereby violating its obligation of good faith performance under the Swap Agreement.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment should be denied, and the parties should commence discovery concerning Citibank's claim and USI's counterclaims.

Dated: New York, New York
      July 25, 2008

VANDENBERG & FELIU, LLP

By: _____
      Robert B. Bernstein (RB 1934)
      Jeffrey E. Gross (JG 5200)
Attorneys for defendant
United Subcontractors Inc.
110 East 42nd Street, Suite 1502
New York, NY 10017
(212) 763-6800

To:    Kramer Levin Naftalis & Frankel LLP
      Attorneys for plaintiff Citibank, N.A.
      1177 Avenue of the Americas
      New York, NY 10036-2714
      (212) 715-9100