UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| CITIBANK, N.A., | : | 08 Civ. 00569 (MGC) |
| Plaintiff, | | |
| | : | |
| -against- | : | **AFFIDAVIT OF** |
| | | **TIMOTHY J. GALLAGHER** |
| UNITED SUBCONTRACTORS INC., | : | **IN OPPOSITION TO** |
| | | **PLAINTIFF'S MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| Defendant. | | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
District of Minnesota    )
                         ) ss:
County of Hennepin       )
```

Timothy J. Gallagher, being duly sworn, deposes and says:

1.       I am the Chief Financial Officer of defendant United Subcontractors, Inc.

("USI"). I have personal knowledge of the facts set forth herein and submit this affidavit in

opposition to plaintiff's motion for summary judgment.

**USI Enters into the Credit Agreement and the Swap Agreement**

2.       USI is a privately owned nation-wide market leader in the installation of a wide

range of residential and commercial products within the construction industry. Based in Edina,

Minnesota, we have more than 50 branches and 2,500 employees across the country.

3.       On or about December 27, 2005, USI and certain USI-affiliated entities entered

into a First Lien and Credit and Guaranty Agreement ("the Credit Agreement") with a

consortium of lenders ("the Lenders"). Citicorp North America, Inc. acted as a lender,

administrative agent, and collateral agent pursuant to the agreement. Another affiliate of

plaintiff Citibank, N.A. ("Citibank"), Citigroup Global Markets Inc., served as lead arranger,

1

bookrunner, and syndication agent for the Lenders. A copy of the Credit Agreement is attached as Exhibit A hereto.

4.    The Credit Agreement authorized USI to borrow up to $335 million for various corporate purposes, including refinancing its existing debt and supplying working capital. These obligations were guaranteed and secured by a first priority lien on all assets of USI's parent and subsidiaries, including a pledge of all capital stock of each of the subsidiaries.

5.    The Credit Agreement required USI to make certain financial covenants, including a requirement that USI maintain certain ratios of its earnings compared to its interest payments and its consolidated debt.

6.    Under the Credit Agreement, USI agreed to pay interest at a floating rate based on the greater of Citibank's prime rate or a federal funds rate. Because of the risk that interest rates might rise, the Credit Agreement required USI to promise to hedge at least 50% of its interest rate exposure under the Credit Agreement for a term of at least three years in a manner reasonably satisfactory to Citibank, the Administrative Agent.

7.    To comply with the obligation to hedge its interest rate risk, USI entered into a Swap Agreement with Citibank dated as of December 29, 2005. A copy of the Swap Agreement is attached hereto as Exhibit B. By this agreement, the parties entered into three long term swap transactions with notional amounts of $100 million, $50 million, and $50 million, respectively. The $100 million swap had a termination date of January 12, 2009, and the $50 million swaps had termination dates of January 12, 2010 and January 12, 2011.

8.    Under these swaps, USI agreed to make quarterly payments to Citibank on the 12th days of January, April, July, and October of each year until termination. USI agreed to pay a fixed rate of interest on the notional amount in exchange for Citibank's payments, which were

based on a floating interest rate tied to the London Interbank Offered Rate ("LIBOR"). The fixed interest rates were 4.8325% for the $100 million swap, 4.8650% for the first of the two $50 million swaps, and 4.9200% for the second $50 million swap.

9.    The prevailing interest rates on a payment date would determine which party owed money on a net basis under the swaps. For example, if LIBOR interest rates on January 12 of any year exceeded 4.8325%, Citibank would owe USI money on the $100 million swap. Conversely, if LIBOR were below 4.8325% on January 12, USI would owe Citibank money on that swap.

10.    At all relevant times, USI made every payment required under either the Credit Agreement or the Swap Agreement. In other words, USI never defaulted on any payment obligation under the relevant agreements.

**USI Begins to Negotiate with the Requisite Lenders Because It Anticipates a Technical Default Under the Credit Agreement**

11.    In or around July 2007, I expected that USI's future quarterly earnings would put USI in default of certain financial covenant ratios by the end of the third or fourth quarter of 2007. Consequently, I informed Citibank, as administrative agent, and asked that it take the lead in negotiating a modification of the Credit Agreement so that we could avoid any such default. Citibank advised me that its fee for arranging such a modification would be $1.5 million which, after looking into the matter, I learned was substantially above-market. Citibank then told me that we could either pay them the $1.5 million or negotiate the modification ourselves.

12.    Faced with that choice, we decided to negotiate the modification ourselves. In order to obtain a modification of terms, Section 10.04 of the Credit Agreement requires the "written concurrence" of lenders holding 50% of more of the outstanding indebtedness, which the Credit Agreement refers to and defines as the "Requisite Lenders." The term "written

concurrence" means a document reflecting agreement as to terms among the Requisite Lenders, as opposed to a formal writing executed by each of them. The term "written concurrence" is used elsewhere in the Credit Agreement to mean the same thing. Thus, for example, Section 10.05 of the Credit Agreement authorizes Citibank, as agent, to execute formal amendments to the Credit Agreement on behalf of individual lenders, but only after receiving their "written concurrence."

13.    In order to commence negotiations ourselves, we identified nine Lenders holding more than 50% of our outstanding indebtedness, formed a "steering committee" of these Requisite Lenders, and commenced negotiations to fix new financial covenant ratios. These Requisite Lenders were represented in the negotiations by Cahill Gordon & Reindel LLP ("Cahill Gordon") who, coincidentally also served as Citibank's counsel.

14.    On November 12, 2007, while negotiations to modify the financial covenant ratios were underway, I provided all lenders with a "Notice of Default" in connection with the financial covenant ratios then in place under Section 6.08 of the Credit Agreement. Specifically, as I had anticipated might happen, we had to advise all our lenders that the earnings-to-interest ratio as of September 30, 2007 had fallen below the required threshold and that our total debt-to-earnings ratio had exceeded the required level. However, because negotiations with the Requisite Lenders were already underway, I further represented as follows: "The Borrower is currently in the process of obtaining an amendment to the Credit Agreement to address the current non-compliance with the two Financial Covenants set forth above. Discussions with Lenders have and continue to take place and a Management Presentation to all Lenders is being given on November 13, 2007. The target is to finalize and execute an amendment by the end of

4

November 2007." A copy of USI's November 12, 2007 Notice, which I signed, is attached as Exhibit C hereto.

15.    As a result of our default notice, we needed the Requisite Lenders to give us their "written concurrence" to default waiver. On November 20, 2007, the Requisite Lenders gave us their "written concurrence" in the form of a term sheet, agreed to by the Requisite Lenders, which was circulated to all lenders, including Citibank. The term sheet, entitled "Amendment and Waiver to First Lien Credit Agreement," provided for a waiver by the Requisite Lenders of "the default caused by the Borrower's failure to comply with the financial covenants set forth in Section 6.08 of the First Lien Credit Agreement for the Fiscal Quarter ending September 30, 2007." A copy of the November 20, 2007 Notice to First Lien Term Loan Lenders, with the attached term sheet containing the default waiver, is attached hereto as Exhibit D.

16.    However, a condition precedent to the amendment's effectiveness was an amendment of two other agreements, *i.e.,* the Second Lien Credit Agreement and the Intercreditor Agreement, in form and substance reasonably satisfactory to the Requisite Lenders, "including without limitation, amendments to the financial covenants set forth in Section 6.08 of the Second Lien Credit Agreement to preserve the cushion set forth in Section 5.3(b) of the Intercreditor Agreement and acknowledgement that the cushion set forth in Section 5.3(a)(i) of the Intercreditor Agreement shall apply after giving effect to the amendment of the First Lien Credit Agreement." *See id.* Citibank was also one of our lenders under the Second Lien Credit Agreement. Because of Citibank's substantial stake as a lender under that agreement, Citibank would have to consent to any changes to it.

**Citibank Unilaterally Declares an Event of Default Under the Swap Agreement**

17.     On December 12, 2007, while we were working on amending the Second Lien Credit Agreement as the November 20, 2007 term sheet required, Citibank notified us that it was declaring an Event of Default under the Swap Agreement and that Citibank intended to terminate the three long-term swap agreements. The purported Event of Default was the November 12, 2007 notice of default under the First Lien Credit Agreement. Citibank's December 12, 2007 letter stated that it would send a separate letter to designate a date for the termination of the swaps. A copy of Citibank's December 12, 2007 letter to me is attached as Exhibit E.

18.     As of December 12, 2007, there was no money due or outstanding under the swap transactions. In fact, no money would have been due under the swap transactions until January 12, 2008. However, interest rates in late 2007 were below the fixed rates provided for in the swap transactions. Thus, Citibank stood to receive a cash payment from USI of nearly $3 million by terminating the swap transactions early.

19.     Upon receiving Citibank's December 12, 2007 letter, I immediately sent an e-mail to the Requisite Lenders informing them of Citibank's action and, because it was clear that Citibank was trying to obtain an unfair advantage over other lenders in our negotiations, asked for a "default waiver" that was no longer be tied to our reaching agreement on amending the Second Lien Credit Agreement and Intercreditor Agreement. My December 12, 2007 email is attached as Exhibit F.

20.     Upon receipt of my December 12 e-mail, I am informed that the Requisite Lenders immediately instructed Cahill Gordon to prepare a Default Waiver that was not tied to any amendment of the Second Lien Credit Agreement and the Intercreditor Agreement. I am further informed that such a form of Default Waiver was presented in writing to the Requisite

Lenders in writing the evening of December 13, 2007 and that the Requisite Lenders were advised that time was of the essence because Cahill Gordon intended to get the form of Default Waiver to USI by the following afternoon, i.e., on December 14, 2007.  To that end, I am further informed that on December 14, 2007, at 2:54 p.m., Cahill Gordon sent a revised version of the Default Waiver to the Requisite Lenders for their approval with instructions that if no objection was heard, a copy would immediately be forward to USI that afternoon.  A copy of an email chain among Cahill Gordon and the Requisite Lenders, dated December 13-14, 2007, and forwarded to USI's counsel, is attached as Exhibit G.

21.    On December 14, 2007, at 3:51 p.m., Cahill Gordon sent USI a Waiver and Amendment Agreement on behalf of the Requisite Lenders which, unlike the term sheet we received on November 20, 2007, was, as I had asked, not tied to any agreement to amend either the Second Lien Agreement or the Intercreditor Agreement.  Thus, Section 3.2 of the draft agreement stated that the Requisite Lenders "agree to waive the Existing Defaults" through January 18, 2008.  A copy of Cahill Gordon's email and the attached draft agreement, dated December 14, 2007, is attached as Exhibit H.

22.    Cahill Gordon's e-mail and the enclosed form of Default Waiver thus  reflected the required "written concurrence" to waive the default that had been the subject of my November 12, 2007 Notice of Default, and my December 12, 2007 e-mail request.

23.    On December 18, 2007, at approximately 9:26 a.m. EST, Citibank notified USI by facsimile that it was designating that day, December 18, 2007, as the "early termination date" under the Swap Agreement.  Citibank also stated that it would send its computation of the amounts owed by USI under the swap transactions.  A copy of Citibank's notice is attached as Exhibit I.

24.    Because the default had been waived, on December 18, 2007, at 2:50 p.m. CST, we notified Citibank that we objected to the early termination of the swap transaction. My fax to Citibank specifically stated that lenders who held more than 50% of the outstanding debt had agreed to waive the default, and as such, there was no default at the time. A copy of the facsimile I sent to Citibank on December 18, 2007 is attached as Exhibit J.

25.    On December 18, 2007, at 5:38 p.m. EST, Citibank replied by fax that it had already terminated the swaps as of 11:00 am EST that day. Citibank told us that it was justified in terminating the swaps because all lenders had not yet signed and returned a Waiver and Amendment Agreement. However, Section 10.04 of the Credit Agreement did not require signatures from all lenders for the Waiver and Amendment Agreement to be effective. Section 10.04 merely required the "written concurrence" of the Requisite Lenders, which is what was given. I therefore believe Citibank's action was wrongful and in breach of our Swap Agreement because the Requisite Lenders had waived the default upon which Citibank's action was predicated. A copy of the facsimile Citibank sent to me on December 18, 2007 at 5:38 p.m. EST is attached as Exhibit K.

**USI Is Harmed by Citibank's Wrongful Conduct but the Waiver and Amendment Agreement Is Signed**

26.    USI was harmed by Citibank's conduct. As a result of Citibank's wrongful conduct in terminating the three long-term swap transactions, USI had to enter into new swap transactions. Moreover, Citibank's wrongful termination of the Swap Agreement caused another default under the Credit Agreement.

27.    Thus, because the nearly completed Waiver and Amendment Agreement only addressed the Notice of Default given on November 12, 2007, and not the default caused by Citibank's termination of the swaps, the Requisite Lenders would not circulate the Waiver and

Amendment Agreement to the other lenders until USI replaced the swaps. On December 26, 2007, USI entered into new swaps with a different counterparty. Cahill Gordon then circulated the Waiver and Amendment Agreement for signature by the other lenders later that day. Thus, any delay in getting the signatures needed for the Waiver and Amendment Agreement was caused by Citibank itself.

28.     On December 27, 2007, Cahill Gordon circulated a fully executed copy of the Waiver and Amendment Agreement. One of Citibank's affiliates signed the agreement. A copy of the Waiver and Amendment Agreement is attached as Exhibit L.

**Citibank Acted in Bad Faith When It Terminated the Swap Agreement**

29.     At the time I believed, and I continue to believe, that Citibank acted in bad faith when it terminated the Swap Agreement and the three swap transactions we had entered into with them.

30.     *First,* Citibank had no reason to believe its prospects for payment or performance under the Swap Agreement were ever impaired. USI never defaulted on any payments owed under either the Credit Agreement or the Swap Agreement. The only basis Citibank arguably had for terminating the Swap Agreement was the November 12, 2007 Notice of Default. However, the Requisite Lenders gave their "written concurrence" to waive that default several days before the termination of the swap agreements on December 18. Citibank was legally bound under the Credit Agreement to accept that determination, and Citibank had no legal right under the Swap Agreement or the Credit Agreement to insist that before the Default Waiver became legally effective, there had to be a signed writing by all the lenders.

31.     *Second,* based on Citibank's having unsuccessfully demanded from us an above market fee of $1.5 million to handle the Credit Agreement modification, it appears that its

9

termination of the swap transactions was motivated not by a concern about Citibank getting paid, but rather by a desire to increase its own fees, obtain an advantage over other lenders, and/or possibly destroy the prospects of a successful renegotiation.

32.    *Third,* the fact that Citibank ultimately signed the Waiver and Amendment Agreement demonstrates that it was not prejudiced by the November 12, 2007 Notice of Default and that it had no reason to believe that USI would not honor its obligations under the Swap Agreement.  It also shows that there was no legitimate reason for Citibank's haste in establishing an Early Termination Date and demanding immediate payment.

33.    *Fourth,* Citibank had more than $17 million in outstanding letters of credit ("LCs"), which supported USI's liability insurance program.  The LCs were due to expire on January 31, 2008, but would renew automatically unless Citibank advised USI by December 31, 2007 that it would not renew them.  Even after Citibank terminated the swap transactions, it did not send USI notice of non-renewal, and in fact, renewed the LCs in early 2008.  This demonstrates that Citibank did not believe that USI would default on its financial obligations when Citibank precipitously terminated the Swap Agreement.

Timothy J. Gallagher

Subscribed and sworn to before me
this 25th day of July, 2008.

Notary Public

CONSTANCE MARIE TUSLER
Notary Public
Minnesota
My Commission Expires January 31, 2010

11

FIRST LIEN CREDIT AND GUARANTY AGREEMENT

dated as of December 27, 2005

among

UNITED SUBCONTRACTORS, INC.,

USI SENIOR HOLDINGS, INC.,

USI INTERMEDIATE HOLDINGS, INC.,

CERTAIN SUBSIDIARIES OF UNITED SUBCONTRACTORS, INC.,
as Guarantors,

VARIOUS LENDERS,

CITIGROUP GLOBAL MARKETS INC.,
as Sole Lead Arranger, Sole Bookrunner and
Syndication Agent,

and

CITICORP NORTH AMERICA, INC.,
as Administrative Agent and Collateral Agent,

$335,000,000 Senior Secured Credit Facilities

Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005

739030

U 00166

TABLE OF CONTENTS

<u>Page</u>

ARTICLE ONE

DEFINITIONS

| | | |
|---|---|---|
| Section 1.01 | Definitions...................................................................... | 2 |
| Section 1.02 | Accounting Terms............................................................. | 33 |
| Section 1.03 | Interpretation, etc. .......................................................... | 33 |
| Section 1.04 | Construction .................................................................... | 34 |
| Section 1.05 | Reference to Laws............................................................ | 34 |

ARTICLE TWO

LOANS AND LETTERS OF CREDIT

| | | |
|---|---|---|
| Section 2.01 | Tranche B Term Loan Commitments ................................ | 34 |
| Section 2.02 | Borrowing Mechanics for Tranche B Term Loans. ........... | 35 |
| Section 2.03 | Revolving Commitments. ................................................. | 35 |
| Section 2.04 | Borrowing Mechanics for Revolving Loans..................... | 35 |
| Section 2.05 | Swing Line Loans Commitments. .................................... | 36 |
| Section 2.06 | Borrowing Mechanics for Swing Line Loans. .................. | 36 |
| Section 2.07 | Letters of Credit .............................................................. | 38 |
| Section 2.08 | Notice of Issuance........................................................... | 39 |
| Section 2.09 | Responsibility of Issuing Bank with Respect to Requests for Drawings and Payments.................................................. | 39 |
| Section 2.10 | Reimbursement by the Borrower of Amounts Drawn or Paid Under Letters of Credit. ................................................... | 40 |
| Section 2.11 | Lenders' Purchase of Participations in Letters of Credit. ... | 40 |
| Section 2.12 | Obligations Absolute. ...................................................... | 41 |
| Section 2.13 | Indemnification................................................................ | 41 |
| Section 2.14 | Pro Rata Shares................................................................ | 42 |
| Section 2.15 | Availability of Funds. ...................................................... | 42 |
| Section 2.16 | Use of Proceeds................................................................ | 43 |
| Section 2.17 | Lenders' Evidence of Debt. ............................................. | 43 |
| Section 2.18 | Notes. .............................................................................. | 43 |
| Section 2.19 | Interest Rate on Loans. .................................................... | 43 |
| Section 2.20 | Interest Rate. ................................................................... | 44 |
| Section 2.21 | Conversion/Continuation................................................. | 45 |
| Section 2.22 | Default Interest................................................................ | 46 |
| Section 2.23 | Fees. ................................................................................ | 46 |
| Section 2.24 | Scheduled Installments. ................................................... | 47 |
| Section 2.25 | Voluntary Prepayments.................................................... | 48 |
| Section 2.26 | Voluntary Commitment Reductions. ................................ | 50 |
| Section 2.27 | Mandatory Prepayments. ................................................. | 50 |

U 00167

Section 2.28     Mandatory Commitment Reductions of Revolving Loans ...........................52
Section 2.29     Prepayment Certificate.................................................................................52
Section 2.30     Application of Prepayments/Reductions.....................................................52
Section 2.31     General Provisions Regarding Payments......................................................54
Section 2.32     Sharing of Payments by Lenders ................................................................55
Section 2.33     Making or Maintaining Eurodollar Rate Loans.........................................55
Section 2.34     Compensation for Increased Costs..............................................................57
Section 2.35     Capital Requirements; Certificates for Reimbursement; Delay in
                 Requests. .........................................................................................58
Section 2.36     Taxes. ...........................................................................................................59
Section 2.37     Mitigation Obligations; Replacement of Lenders......................................61
Section 2.38     Defaulting Lenders......................................................................................62

## ARTICLE THREE

## CONDITIONS PRECEDENT

Section 3.01     Closing Date.................................................................................................63
Section 3.02     Conditions to Each Credit Extension..........................................................67

## ARTICLE FOUR

## REPRESENTATIONS AND WARRANTIES

Section 4.01     Organization; Requisite Power and Authority; Qualification...................68
Section 4.02     Capital Stock and Ownership.......................................................................68
Section 4.03     Due Authorization........................................................................................68
Section 4.04     No Conflict....................................................................................................69
Section 4.05     Governmental Consents. ..............................................................................69
Section 4.06     Binding Obligation. ......................................................................................69
Section 4.07     Historical Financial Statements ..................................................................69
Section 4.08     Projections....................................................................................................70
Section 4.09     No Material Adverse Change........................................................................70
Section 4.10     No Restricted Junior Payments....................................................................70
Section 4.11     Adverse Proceedings, etc. ............................................................................70
Section 4.12     Payment of Taxes.........................................................................................70
Section 4.13     Properties. ....................................................................................................71
Section 4.14     Environmental Matters.................................................................................71
Section 4.15     No Defaults. ..................................................................................................72
Section 4.16     Material Contracts........................................................................................72
Section 4.17     Governmental Regulation. ...........................................................................72
Section 4.18     Margin Stock.................................................................................................72
Section 4.19     Employee Matters.........................................................................................72
Section 4.20     Employee Benefit Plans. ..............................................................................73
Section 4.21     Certain Fees. .................................................................................................74
Section 4.22     Solvency........................................................................................................74
Section 4.23     Compliance with Statutes, etc.....................................................................74

U 00168

Section 4.24    Disclosure. ...................................................................................................74
Section 4.25    Intellectual Property..........................................................................................74
Section 4.26    Investigations, Audits, etc................................................................................75
Section 4.27    Agreements with Managers. .............................................................................75
Section 4.28    Foreign Assets Control Regulations. ................................................................75
Section 4.29    Patriot Act. .......................................................................................................75
Section 4.30    Second Lien Documents. ..................................................................................75

## ARTICLE FIVE

## AFFIRMATIVE COVENANTS

Section 5.01    Financial Statements and Other Reports.............................................................76
Section 5.02    Existence. ..........................................................................................................80
Section 5.03    Payment of Taxes and Claims............................................................................81
Section 5.04    Maintenance of Properties. ...............................................................................81
Section 5.05    Insurance. ..........................................................................................................81
Section 5.06    Inspections. ........................................................................................................82
Section 5.07    Lenders Meetings...............................................................................................82
Section 5.08    Compliance with Laws. .....................................................................................82
Section 5.09    Environmental Disclosure. ................................................................................82
Section 5.10    Hazardous Materials Activities, etc. ..................................................................83
Section 5.11    Subsidiaries........................................................................................................84
Section 5.12    Additional Material Real Estate Assets. .............................................................84
Section 5.13    Interest Rate Protection. ....................................................................................84
Section 5.14    Further Assurances. ...........................................................................................85
Section 5.15    Cash Management Systems ...............................................................................85
Section 5.16    Books and Records.............................................................................................85
Section 5.17    Certain Post Closing Obligations.......................................................................85

## ARTICLE SIX

## NEGATIVE COVENANTS

Section 6.01    Indebtedness......................................................................................................86
Section 6.02    Liens..................................................................................................................87
Section 6.03    Equitable Lien....................................................................................................89
Section 6.04    No Further Negative Pledges..............................................................................89
Section 6.05    Restricted Junior Payments................................................................................89
Section 6.06    Restrictions on Subsidiary Distributions ...........................................................90
Section 6.07    Investments .......................................................................................................91
Section 6.08    Financial Covenants...........................................................................................92
Section 6.09    Fundamental Changes; Disposition of Assets; Acquisitions ...............................94
Section 6.10    Disposal of Subsidiary Interests.........................................................................95
Section 6.11    Sales and Lease-Backs.......................................................................................95
Section 6.12    Transactions with Shareholders and Affiliates. ..................................................96
Section 6.13    Conduct of Business. .........................................................................................96

-iii-

Section 6.14    Permitted Activities of Holdings and Intermediate Holdings.......................96
Section 6.15    Amendments or Waivers of Certain Related Agreements.............................97
Section 6.16    Amendments or Waivers of Certain Agreements with Respect to
               Second Lien Documents ...............................................................................97
Section 6.17    [Reserved]...................................................................................................97
Section 6.18    Fiscal Year. ................................................................................................97
Section 6.19    No Foreign Subsidiaries..............................................................................97

ARTICLE SEVEN

GUARANTY

Section 7.01    Guaranty of the Obligations........................................................................98
Section 7.02    Contribution by Guarantors ........................................................................98
Section 7.03    Payment by Guarantors...............................................................................99
Section 7.04    Liability of Guarantors Absolute. ...............................................................99
Section 7.05    Waivers by Guarantors...............................................................................101
Section 7.06    Guarantors' Rights of Subrogation, Contribution, etc. ...............................102
Section 7.07    Subordination of Other Obligations.............................................................102
Section 7.08    Continuing Guaranty...................................................................................103
Section 7.09    Authority of Guarantors or the Borrower .....................................................103
Section 7.10    Financial Condition of the Borrower. ..........................................................103
Section 7.11    Bankruptcy, etc. .........................................................................................103
Section 7.12    Discharge of Guaranty upon Sale of Guarantor...........................................104

ARTICLE EIGHT

EVENTS OF DEFAULT

Section 8.01    Events of Default ........................................................................................104

ARTICLE NINE

AGENTS

Section 9.01    Appointment of Agents.................................................................................108
Section 9.02    Rights as a Lender......................................................................................108
Section 9.03    Exculpatory Provisions ...............................................................................108
Section 9.04    Reliance by Agents .....................................................................................109
Section 9.05    Delegation of Duties ...................................................................................109
Section 9.06    Resignation of Administrative Agent ...........................................................110
Section 9.07    Non-Reliance on Agents and Other Lenders ...............................................111
Section 9.08    No Other Duties, etc ...................................................................................112
Section 9.09    Collateral Documents and Guaranty............................................................112
Section 9.10    Intercreditor Agreement..............................................................................112

U 00170

ARTICLE TEN

MISCELLANEOUS

| | | |
|---|---|---|
| Section 10.01 | Notices; Effectiveness; Electronic Communication. | 113 |
| Section 10.02 | Expenses; Indemnity; Damage Waiver | 114 |
| Section 10.03 | Right of Set-Off | 116 |
| Section 10.04 | Amendments and Waivers | 116 |
| Section 10.05 | Execution of Amendments, etc. | 118 |
| Section 10.06 | Successors and Assigns | 118 |
| Section 10.07 | Independence of Covenants. | 122 |
| Section 10.08 | Survival of Representations, Warranties and Agreements | 122 |
| Section 10.09 | No Waiver; Remedies Cumulative. | 122 |
| Section 10.10 | Marshalling; Payments Set Aside. | 122 |
| Section 10.11 | Severability. | 123 |
| Section 10.12 | Obligations Several; Independent Nature of Lenders' Rights. | 123 |
| Section 10.13 | Headings. | 123 |
| Section 10.14 | Governing Law; Jurisdiction; Etc. | 123 |
| Section 10.15 | USA PATRIOT Act | 124 |
| Section 10.16 | WAIVER OF JURY TRIAL. | 124 |
| Section 10.17 | Treatment of Certain Information; Confidentiality | 124 |
| Section 10.18 | Usury Savings Clause. | 125 |
| Section 10.19 | Counterparts; Integration; Effectiveness | 126 |
| Section 10.20 | Electronic Execution of Assignments. | 126 |
| Section 10.21 | Entire Agreement. | 126 |

**U 00171**

**SCHEDULES**:

1.01:       Certain Adjustments to Financial Covenant Definitions
3.01(d):  Closing Date Mortgaged Properties
4.01:       Jurisdictions of Organization and Qualification
4.02:       Capital Stock and Ownership
4.13:       Real Estate Assets
4.16:       Material Contracts
5.15        Cash Management Systems
5.17        Post-Closing Obligations
6.01:       Certain Indebtedness
6.02:       Certain Liens
6.07:       Certain Investments
6.12:       Certain Affiliate Transactions

**EXHIBITS**:

A-1:   Funding Notice
A-2:   Conversion/Continuation Notice
A-3:   Issuance Notice
B-1:   Tranche B Term Loan Note
B-2:   Revolving Loan Note
C:       Compliance Certificate
D:       Opinions of Counsel
E:       Assignment and Assumption Agreement
F-1:   Closing Date Certificate
F-2:   Solvency Certificate
G:       Counterpart Agreement
H:       Pledge and Security Agreement
I:        Mortgage
J:        Landlord Waiver and Consent Agreement
K:       Landlord Personal Property Collateral Access Agreement
L:        Intercreditor Agreement

U 00172

## CREDIT AND GUARANTY AGREEMENT

This FIRST LIEN CREDIT AND GUARANTY AGREEMENT, dated as of December 27, 2005, is entered into by and among UNITED SUBCONTRACTORS, INC., a Utah corporation (the "Borrower"), USI SENIOR HOLDINGS, INC., a Delaware corporation ("Holdings"), USI INTERMEDIATE HOLDINGS, INC., a Delaware corporation ("Intermediate Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, as Guarantors, the Lenders party hereto from time to time, CITIGROUP GLOBAL MARKETS INC. ("CGMI"), as Sole Lead Arranger, Sole Bookrunner and Syndication Agent (in such capacity, "Lead Arranger", "Bookrunner" and "Syndication Agent") and CITICORP NORTH AMERICA, INC. ("CNAI"), as Administrative Agent and Collateral Agent (in such capacity, the "Administrative Agent" and the "Collateral Agent").

## RECITALS

WHEREAS, capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.01 hereof;

WHEREAS, the Lenders have agreed to extend up to $295.0 million aggregate principal amount of Tranche B Term Loans and up to $40.0 million aggregate principal amount of Revolving Commitments;

WHEREAS, simultaneously herewith, the Loan Parties will enter into the Second Lien Credit Agreement and borrow $65.0 million thereunder;

WHEREAS, the proceeds of such credit facilities will be used (i) to refinance the outstanding principal amount of Existing Indebtedness of the Borrower and its Subsidiaries; (ii) to consummate the Redemption; (iii) to pay the Dividend; and (iv) to provide ongoing working capital and for other general corporate purposes of the Borrower and its Domestic Subsidiaries;

WHEREAS, the Borrower has agreed to secure all of its Obligations by granting to Collateral Agent, for the benefit of the Secured Parties, a First Priority Lien on its assets, including a pledge of all of the Capital Stock of each of its Domestic Subsidiaries; and

WHEREAS, Guarantors have agreed to guarantee the obligations of the Borrower hereunder and to secure their respective Obligations by granting to Collateral Agent for the benefit of the Secured Parties, a First Priority Lien on their respective assets, including a pledge of all of the Capital Stock of each of their respective Domestic Subsidiaries (including the Borrower).

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

U 00173

# ARTICLE ONE

# DEFINITIONS

**Section 1.01** <u>Definitions</u>.

The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"<u>Accounting Firm</u>" means any of Ernst & Young LLP, PricewaterhouseCoopers LLP, Deloitte & Touche LLP or KPMG LLP or such other accounting firm as is approved by the Administrative Agent.

"<u>Adjusted Eurodollar Rate</u>" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate per annum obtained by dividing (and rounding upward to the next whole multiple of 1/100 of 1%) (i) (a) the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate which appears on the page of the Telerate Screen which displays an average British Bankers Association Interest Settlement Rate (such page currently being page number 3740 or 3750, as applicable) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (b) in the event the rate referenced in the preceding clause (a) does not appear on such page or service or if such page or service shall cease to be available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate on such other page or other service which displays an average British Bankers Association Interest Settlement Rate for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the offered quotation rate to first class banks in the London interbank market by CNAI for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loan of Administrative Agent, in its capacity as a Lender, for which the Adjusted Eurodollar Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (ii) an amount equal to (a) one <u>minus</u> (b) the Applicable Reserve Requirement.

"<u>Administrative Agent</u>" as defined in the preamble hereto.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by Administrative Agent.

"<u>Adverse Proceeding</u>" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending

U 00174

or, to the knowledge of Holdings or any of its Subsidiaries, threatened against or affecting Holdings or any of its Subsidiaries or any property of Holdings or any of its Subsidiaries.

"Affected Lender" as defined in Section 2.33(b).

"Affected Loans" as defined in Section 2.33(b).

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided that no Agent or Lender shall be deemed to be an "Affiliate" of any Loan Party.

"Agent" means each of the Syndication Agent, the Administrative Agent and the Collateral Agent.

"Aggregate Payments" as defined in Section 7.02.

"Agreement" means this Credit and Guaranty Agreement, dated as of December 27, 2005, as it may be amended, supplemented, restated or otherwise modified from time to time.

"Applicable Margin" means, as of any date of determination, 2.75% per annum in the case of Eurodollar Rate Loans and 1.75% per annum in the case of Base Rate Loans.

"Applicable Percentage" means with respect to any Lender, the percentage of the total Commitments represented by such Lender's Commitment. If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments.

"Applicable Reserve Requirement" means, at any time, for any Eurodollar Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including, without limitation, any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors of the Federal Reserve System or other applicable banking regulator. Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted Eurodollar Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include Eurodollar Rate Loans. A Eurodollar Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender. The rate of interest on Eurodollar Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"Applicable Revolving Commitment Fee Percentage" means 0.50% per annum.

U 00175

"Approved Fund" means any Fund that is administered, managed or advised by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, manages or advises a Lender.

"Asset Sale" means a sale, lease or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person (other than Holdings, Intermediate Holdings, the Borrower or any Guarantor Subsidiary), in one transaction or a series of transactions, of all or any part of Holdings' or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including, without limitation, the Capital Stock of any of Holdings' Subsidiaries, other than (i) inventory (or other assets) sold or leased in the ordinary course of business (excluding any such sales by operations or divisions discontinued or to be discontinued), (ii) sales of other assets for aggregate consideration of less than $1,000,000 with respect to any transaction or series of related transactions and less than $2,000,000 in the aggregate during any Fiscal Year, and (iii) exchanges of machinery or motor vehicles for like-kind property for use in substantially the same manner as the property exchanged was used in an aggregate amount of less than $3,000,000 during any Fiscal Year.

"Assignment and Assumption" means an Assignment and Assumption Agreement entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06), and accepted by (if required) Administrative Agent, in substantially the form of Exhibit E or any other form approved by Administrative Agent.

"Authorized Officer" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer or treasurer.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Base Rate" means, for any day, a rate per annum equal to the greater of (i) the Prime Rate in effect on such day and (ii) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"Base Rate Loan" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"Beneficiary" means each Agent, the Issuing Bank, each Lender and any Lender Counterparty.

"Bookrunner" as described in the preamble hereto.

"Borrower" as described in the preamble hereto.

"Business Day" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking

-4-

institutions located in such state are authorized or required by law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term "Business Day" shall mean any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"Cash" means money, currency or a credit balance in any demand or Deposit Account.

"Cash Equivalents" means, as at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $500,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

"CGMI" as defined in the preamble hereto.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

U 00177

"Change of Control" means, at any time, (i) Sponsor, either directly or indirectly through a wholly-owned Subsidiary together with Ontario Teachers' Pension Plan Board, shall (a) cease to beneficially own and control at least 40% on a fully diluted basis of the economic and voting interests in the Capital Stock of Holdings or (b) cease to maintain power to elect a majority of the members of the board of directors (or similar governing body) of Holdings; (ii) any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) other than Sponsor (a) shall have acquired beneficial ownership of 35% or more on a fully diluted basis of the voting and/or economic interest in the Capital Stock of Holdings or (b) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of Holdings; (iii) (a) Holdings shall cease to beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of Intermediate Holdings or (b) Intermediate Holdings shall cease to beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of the Borrower; or (iv) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of the Borrower cease to be occupied by Persons who either (a) were members of the board of directors of the Borrower on the Closing Date or (b) were nominated for election by the board of directors of the Borrower, a majority of whom were directors on the Closing Date or whose election or nomination for election was previously approved by a majority of such directors.

"Class" means (i) with respect to Lenders, each of the following classes of Lenders: (a) Lenders having Tranche B Term Loan Exposure and (b) Lenders having Revolving Exposure (including Swing Line Lender) and (ii) with respect to Loans, each of the following classes of Loans: (a) Tranche B Term Loans and (b) Revolving Loans (including Swing Line Loans).

"Closing Date" means the date on which the Tranche B Term Loans are made.

"Closing Date Certificate" means a Closing Date Certificate substantially in the form of Exhibit F-1.

"Closing Date Mortgaged Property" as defined in Section 3.01(d)(i).

"CNAI" as defined in the preamble hereto.

"Collateral" means, collectively, all of the real, personal and mixed property (including Capital Stock) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"Collateral Agent" as defined in the preamble hereto.

"Collateral Documents" means the Pledge and Security Agreement, the Mortgages, the Landlord Personal Property Collateral Access Agreements, Landlord Consent and Estoppels, the Control Agreements, IP Security Agreements, if any, and all other instruments, documents and agreements delivered by any Loan Party pursuant to this Agreement or any of the other Loan Documents in order to grant to Collateral Agent, for the benefit of Lenders, a Lien on any real, personal or mixed property of that Loan Party as security for the Obligations.

U 00178

"Collateral Questionnaire" means a certificate in form satisfactory to the Collateral Agent that provides information with respect to the personal or mixed property of each Loan Party.

"Commitment" means any Revolving Commitment or Tranche B Term Loan Commitments.

"Compliance Certificate" means a Compliance Certificate substantially in the form of Exhibit C.

"Consolidated Adjusted EBITDA" means, for any period, an amount determined for Holdings and its Subsidiaries on a consolidated basis equal to (i) the sum, without duplication, of the amounts for such period of (a) Consolidated Net Income, (b) Consolidated Interest Expense, (c) provisions for taxes based on income, (d) total depreciation expense, (e) total amortization expense, (f) Management Fees paid or accruing in such period (to the extent not added back in a prior period) in an amount not to exceed $1,250,000 per Fiscal Year, (g) Transaction Costs incurred and paid in the period (to the extent expensed), (h) non-Cash losses in connection with dispositions of equipment having a basis at the time of disposition, other non-Cash items reducing Consolidated Net Income (excluding any such non-Cash item to the extent that it represents an accrual or reserve for potential Cash items in any future period or amortization of a prepaid Cash item that was paid in a prior period) and (i) restructuring expenses in an amount not to exceed $1,000,000 in the aggregate during the term of this Agreement minus (ii) other non-Cash items increasing Consolidated Net Income for such period (excluding any such non-Cash item to the extent it represents the reversal of an accrual or reserve for potential Cash item in any prior period); provided that with respect to any calculation period prior to the first anniversary of the Closing Date the foregoing shall be subject to adjustment as set forth in Schedule 1.01.

"Consolidated Capital Expenditures" means, for any period, the aggregate of all expenditures of Holdings and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items reflected in the consolidated statement of cash flows of Holdings and its Subsidiaries.

"Consolidated Cash Interest Expense" means, for any period, Consolidated Interest Expense for such period, excluding any amount not payable in Cash for such period.

"Consolidated Current Assets" means, as at any date of determination, the total assets of Holdings and its Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding Cash and Cash Equivalents.

"Consolidated Current Liabilities" means, as at any date of determination, the total liabilities of Holdings and its Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding the current portion of long term debt.

"Consolidated Excess Cash Flow" means, for any period, an amount (if positive) equal to: (i) the sum, without duplication, of the amounts for such period of (a) Consolidated Adjusted EBITDA, plus (b) the Consolidated Working Capital Adjustment, minus (ii) the sum,

U 00179

without duplication, of the amounts for such period of (a) voluntary and scheduled repayments of Consolidated Total Debt permitted under the terms of this Agreement (excluding repayments of Revolving Loans or Swing Line Loans except to the extent the Revolving Commitments are permanently reduced in connection with such repayments), (b) Consolidated Capital Expenditures permitted under the terms of this Agreement (net of any proceeds of (y) any related financings with respect to such expenditures and (z) any sales of assets used to finance such expenditures), (c) Consolidated Cash Interest Expense to the extent paid in accordance with the terms of this Agreement, (d) provisions for current taxes based on income of Holdings and its Subsidiaries and payable in cash with respect to such period, (e) Management Fees permitted under the terms of this Agreement to the extent actually paid in Cash, (f) cash consideration paid in connection with Earnout Obligations other than cash held in the CSCI Earnout Escrow Fund and the CSCI Catchup Escrow Fund and (g) Cash consideration paid in connection with Permitted Acquisitions including the CSCI Acquisition and any capitalized transaction expenses (net of any proceeds of (y) any related financings with respect to such expenditures and (z) any sales of assets used to finance such expenditures and net of equity contributions used to finance such Permitted Acquisitions).

"Consolidated Fixed Charges" means, for any period, the sum, without duplication, of the amounts determined for Holdings and its Subsidiaries on a consolidated basis equal to (i) Consolidated Cash Interest Expense, (ii) scheduled payments of principal on Consolidated Total Debt, (iii) the portion of Taxes based on income actually paid in Cash and provisions for Cash income Taxes in such period, (iv) Management Fees paid in such period (to the extent not included in a prior period), (v) Earnout Obligations paid in such period (it being hereby understood that Earnout Obligations shall include all amounts paid by the Borrower into the CSCI Earnout Escrow Fund and the CSCI Catchup Escrow Fund solely when and if such amounts are actually paid to the CSCI Seller), and (vi) Transaction Costs incurred and paid in the period (to the extent expensed); provided that, with respect to any calculation period prior to the first anniversary of the Closing Date, the foregoing shall be subject to adjustment as set forth in Schedule 1.01.

"Consolidated Interest Expense" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Holdings and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of Holdings and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Interest Rate Agreements, but excluding, however, any amounts referred to in Section 2.23(d) payable on or before the Closing Date; provided that, with respect to any calculation period prior to the first anniversary of the Closing Date, the foregoing shall be subject to adjustment as set forth in Schedule 1.01.

"Consolidated Net Income" means, for any period, (i) the net income (or loss) of Holdings and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, minus (ii) (a) the income (or loss) of any Person (other than a Subsidiary of Holdings) in which any other Person (other than Holdings or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to Holdings or any of its Subsidiaries by such Person during such period, (b) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Hold-

-8-

U 00180

ings or is merged into or consolidated with Holdings or any of its Subsidiaries or that Person's assets are acquired by Holdings or any of its Subsidiaries, (c) the income of any Subsidiary of Holdings to the extent the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (d) any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan, and (e) (to the extent not included in clauses (a) through (d) above) any net extraordinary gains or net extraordinary losses.

"Consolidated Total Debt" means, as at any date of determination, the aggregate stated balance sheet amount of all Indebtedness of Holdings and its Subsidiaries determined on a consolidated basis in accordance with GAAP.

"Consolidated Working Capital" means, as at any date of determination, the excess of Consolidated Current Assets over Consolidated Current Liabilities.

"Consolidated Working Capital Adjustment" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period.

"Construction Services" means Construction Services & Consultants, Inc., a Delaware corporation f/k/a CSCI, Inc., a Delaware corporation.

"Contractual Obligation" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Contributing Guarantors" as defined in Section 7.02.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreements" means each control agreement executed and delivered to the Collateral Agent for the benefit of the Secured Parties, a securities intermediary or depositary bank and by the applicable Loan Party on the Closing Date and each control agreement to be executed and delivered by the Collateral Agent, a securities intermediary or depositary bank and the applicable Loan Party pursuant to the terms of the Pledge and Security Agreement with such modifications as the Collateral Agent may reasonably request or approve.

"Conversion/Continuation Date" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"Conversion/Continuation Notice" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

U 00181

"Core Business" means, collectively, (i) the business of installing commercial and residential insulation, shelving, glass windows and doors, fireplaces and woodstoves, weatherproofing, fire proofing/stopping, reinforced paneling, shower enclosures, acoustic ceilings, garage doors and drywall, (ii) the business of commercial and residential shell construction and (iii) the provision of services in connection with either.

"Counterpart Agreement" means a Counterpart Agreement substantially in the form of Exhibit G delivered by a Loan Party pursuant to Section 5.11.

"Credit Date" means the date of a Credit Extension.

"Credit Extension" means the making of a Loan or the issuing of a Letter of Credit.

"CSCI Acquisition" means the purchase by the Borrower of all of the issued and outstanding Capital Stock of Construction Services from the Sponsor.

"CSCI Catchup Escrow Agreement" means the catchup escrow agreement, by and among Construction Services, Goldmark and LaSalle Bank National Association to be executed as needed, as it may be amended, supplemented, restated or otherwise modified from time to time in accordance with the provisions of Section 6.15 hereof.

"CSCI Catchup Escrow Fund" as defined in the CSCI Catchup Escrow Agreement.

"CSCI Earnout Escrow Agreement" means the earnout escrow agreement dated as of June 1, 2005 by and among Goldmark, Construction Services, certain shareholders of Goldmark and LaSalle Bank National Association, as it may be amended, supplemented, restated or otherwise modified from time to time in accordance with the provisions of Section 6.15 hereof.

"CSCI Earnout Escrow Fund" as defined in the CSCI Earnout Escrow Agreement.

"CSCI Joinder and Release Agreement" means the joinder and release agreement dated as of the Closing Date by and among Construction Services, the Borrower, the Sponsor, Goldmark and certain shareholders of Goldmark as it may be amended, supplemented, restated or otherwise modified from time to time in accordance with the provisions of Section 6.15 hereof.

"CSCI Noteholders" means Ronald Goldburg, Mark Nuccilli and Yenko, LLC, a Virginia limited liability company.

"CSCI Purchase Escrow Agreement" means the purchase escrow agreement dated as of June 1, 2005 by and among the Sponsor, Goldmark, Construction Services and certain shareholders of Goldmark attached hereto as Exhibit L, as it may be amended, supplemented, restated or otherwise modified from time to time in accordance with Section 6.15 hereof.

"CSCI Purchase and Sale Agreement" means the purchase and sale agreement dated as of June 1, 2005 by and among Goldmark, Construction Services, certain shareholders of

U 00182

Goldmark and LaSalle Bank National Association, as it may be amended, supplemented, restated or otherwise modified from time to time in accordance with Section 6.15 hereof.

"CSCI Seller" means the "Seller" as that term is defined in the CSCI Purchase and Sale Agreement.

"CSCI Related Agreements" means, collectively,

    (a)    the CSCI Stock Purchase Agreement;

    (b)    the CSCI Purchase and Sale Agreement;

    (c)    the CSCI Purchase Escrow Agreement;

    (d)    the CSCI Earnout Escrow Agreement;

    (e)    the CSCI Catchup Escrow Agreement;

    (f)    the CSCI Joinder and Release Agreement; and

    (g)    any agreement which evidences or relates to any Earnout Obligation to the CSCI Seller.

"CSCI Stock Purchase Agreement" means the stock purchase agreement, dated July 14, 2005, entered into by and among the Borrower, Construction Services and the Sponsor, as it may be amended, supplemented, restated or otherwise modified from time to time in accordance with the provisions of Section 6.15 hereof.

"Currency Agreement" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"Default" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"Default Excess" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of Loans of all Lenders (calculated as if all Defaulting Lenders (other than such Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of all Loans of such Defaulting Lender.

"Default Period" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (i) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable, (ii) the date on which (a) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the

-11-

U 00183

non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms of <u>Sections 2.25</u>, <u>2.26</u> and <u>2.27</u> or by a combination thereof) and (b) such Defaulting Lender shall have delivered to the Borrower and Administrative Agent a written reaffirmation of its intention to honor its obligations hereunder with respect to its Commitments, and (iii) the date on which the Borrower, Administrative Agent and Requisite Lenders waive all Funding Defaults of such Defaulting Lender in writing.

"<u>Defaulted Loan</u>" as defined in <u>Section 2.38</u>.

"<u>Defaulting Lender</u>" as defined in <u>Section 2.38</u>.

"<u>Deposit Account</u>" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"<u>Dividend</u>" means the dividend payment on or prior to the 120th day following the Closing Date on the common stock of Holdings in an aggregate amount not to exceed $20,000,000.

"<u>Dollars</u>" and the sign "<u>$</u>" mean the lawful money of the United States of America.

"<u>Domestic Subsidiary</u>" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"<u>Earnout Obligation</u>" means the maximum amount of an obligation to pay the seller in an acquisition (including, without limitation, Permitted Acquisitions) a future payment that is contingent upon the financial performance of the business acquired in such acquisition exceeding a specified benchmark level and that becomes payable when such excess financial performance is achieved. The definition of Earnout Obligation shall include, but not be limited to, the Earnout Obligations to be paid to the CSCI Seller pursuant to the CSCI Purchase and Sale Agreement.

"<u>Eligible Assignee</u>" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, or (d) any other Person (other than a natural person) approved by (i) Administrative Agent, and (ii) in the case of any assignment of a Revolving Commitment, the Issuing Bank; <u>provided</u> that notwithstanding the foregoing, none of the following Persons may be an "Eligible Assignee": (A) the Borrower or any of Holdings, Intermediate Holdings or any Equity Investor's Affiliates or Subsidiaries and (B) so long as there does not then exist an Event of Default hereunder, a business competitor of the Borrower or any of its Subsidiaries (but not the shareholders or investors therein) in the business of providing insulation services to the residential and commercial industry.

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates.

U 00184

"Environmental Claim" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"Environmental Laws" means any and all applicable foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to Holdings or any of its Subsidiaries or any Facility.

"Equity Investors" means the Sponsor, the Management Investors, Ontario Teachers' Pension Plan Board, the CSCI Noteholders and other investors approved by the Administrative Agent.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"ERISA Affiliate" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Holdings or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Holdings or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Holdings or such Subsidiary and with respect to liabilities arising after such period for which Holdings or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"ERISA Event" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate

-13-

U 00185

such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Holdings, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"Eurodollar Rate Loan" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

"Event of Default" means each of the conditions or events set forth in Section 8.01.

"Excess Amount" as defined in Section 2.30.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"Excluded Taxes" means, with respect to Administrative Agent, any Lender, the Swing Line Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any

-14-

Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.37), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new lending office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 2.36(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.36(a).

"Existing Credit Agreement" means that certain credit and guaranty agreement, dated as of July 14, 2005, among the Borrower, Holdings, Intermediate Holdings, certain subsidiaries of the Borrower as guarantors, RBS Securities Corporation, as joint lead arranger and joint bookrunner, CGMI as joint lead arranger, joint bookrunner and syndication agent, The Royal Bank of Scotland plc, as administrative agent and collateral agent and CIT Lending Services Corporation, as the documentation agent.

"Existing Indebtedness" means (i) Indebtedness and other obligations outstanding under the Existing Credit Agreement, and (ii) all other Indebtedness of the Borrower.

"Facility" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Holdings or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"Fair Share" as defined in Section 7.02.

"Fair Share Contribution Amount" as defined in Section 7.02.

"Fair Share Shortfall" as defined in Section 7.02.

"Federal Funds Effective Rate" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to Administrative Agent, in its capacity as a Lender, on such day on such transactions as determined by Administrative Agent.

"Fee Letter" means the Fee Letter, dated November 22, 2005, among USI, Citigroup Global Markets Inc. and Citcorp North America, Inc.

"Financial Officer Certification" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of Holdings that such financial statements fairly present, in all material respects, the financial condition of

-15-

U 00187

Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"Financial Plan" as defined in Section 5.01(i).

"First Priority" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the most senior Lien to which such Collateral is subject, other than Permitted Liens (except in the case of Liens permitted under Section 6.02(p)).

"Fiscal Quarter" means a fiscal quarter of any Fiscal Year.

"Fiscal Year" means the fiscal year of Holdings and its Subsidiaries ending on December 31 of each calendar year.

"Fixed Charge Coverage Ratio" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Adjusted EBITDA less Consolidated Capital Expenditures for the four-Fiscal Quarter period then ending to (ii) (x) Consolidated Fixed Charges for such four-Fiscal Quarter period and (y) any restructuring expenses to the extent included in Consolidated Adjusted EBITDA; provided that, with respect to any calculation period prior to the first anniversary of the Closing Date, the foregoing shall be subject to adjustment as set forth in Schedule 1.01.

"Flood Hazard Property" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of Lenders, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"Funding Default" as defined in Section 2.38.

"Funding Guarantors" as defined in Section 7.02.

"Funding Notice" means a notice substantially in the form of Exhibit A-1.

"GAAP" means, subject to the limitations on the application thereof set forth in Section 1.02, United States generally accepted accounting principles in effect as of the date of determination thereof.

-16-

U 00188

"Goldmark" means Goldmark Holdings, Inc., a Florida corporation, f/k/a Construction Services & Consultants, Inc., a Florida corporation.

"Governmental Acts" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Governmental Authorization" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Grantor" as defined in the Pledge and Security Agreement.

"Guaranteed Obligations" as defined in Section 7.01.

"Guarantor" means each of Holdings and each Domestic Subsidiary of Holdings (other than the Borrower).

"Guarantor Subsidiary" means each Guarantor other than Holdings.

"Guaranty" means the guaranty of each Guarantor set forth in Article 7.

"Hazardous Materials" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"Hedge Agreement" means an Interest Rate Agreement or a Currency Agreement entered into with a Lender Counterparty in order to satisfy the requirements of this Agreement or otherwise in the ordinary course of Holdings' or any of its Subsidiaries' businesses.

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

U 00189

"Historical Financial Statements" means as of the Closing Date, (i) the audited financial statements of USI and its Subsidiaries, for the immediately preceding five (5) Fiscal Years, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Years, and (ii) the unaudited financial statements of USI and its Subsidiaries as at the most recently ended Fiscal Quarter, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the three-, six- or nine-month period, as applicable, ending on such date, and, in the case of clauses (i) and (ii), and certified by the chief financial officer of the Borrower that they fairly present, in all material respects, the financial condition of USI and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"Holdings" as defined in the preamble hereto.

"Indebtedness", as applied to any Person, means, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA or any Earnout Obligation), which purchase price is (a) due more than six (6) months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument; (v) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vi) the face amount of any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (vii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (viii) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (ix) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (ix), the primary purpose or intent thereof is as described in clause (viii) above; and (x) obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including, without limitation, any Interest Rate Agreement and Currency Agreement, whether entered into for hedging or speculative purposes; provided, in no event shall obligations under any Interest Rate Agreement and any Currency Agreement be deemed "Indebtedness" for any purpose under Section 6.08.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

U 00190

"Indemnitee" as defined in Section 10.02.

"Installment" as defined in Section 2.24.

"Installment Date" as defined in Section 2.24.

"Intellectual Property" means (a) all inventions and discoveries (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names and corporate names, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, (c) all copyrightable works, all copyrights and all applications, registrations and renewals in connection therewith, (d) all broadcast rights, (e) all mask works and all applications, registrations and renewals in connection therewith, (f) all know-how, trade secrets and confidential business information, whether patentable or unpatentable and whether or not reduced to practice (including ideas, research and development, know-how, formulas, compositions and manufacturing and production process and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information and business and marketing plans and proposals), (g) all computer software (including data and related documentation), (h) all other proprietary rights, (i) all copies and tangible embodiments thereof (in whatever form or medium) and (j) all licenses and agreements in connection therewith.

"Intercreditor Agreement" means an Intercreditor Agreement dated as of the date hereof substantially in the form of Exhibit L, as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Interest Coverage Ratio" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period then ended, to (ii) Consolidated Cash Interest Expense for such four-Fiscal Quarter period; provided that with respect to any calculation period prior to the first anniversary of the Closing Date the foregoing shall be subject to adjustment as set forth in Schedule 1.01.

"Interest Payment Date" means with respect to (i) any Base Rate Loan, each March 31, June 30, September 30 and December 31 of each year, subject to availability, commencing on the first such date to occur after the Closing Date and the final maturity date of such Loan; and (ii) any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; provided, in the case of each Interest Period of longer than three months, "Interest Payment Date" shall also include each date that is three months, or an integral multiple thereof, after the commencement of such Interest Period.

"Interest Period" means, in connection with a Eurodollar Rate Loan, an interest period of one- , two, three or six months, subject to availability, as selected by the Borrower in the applicable Funding Notice or Conversion/Continuation Notice, (i) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest

-19-

U 00191

Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clauses (c) and (d) of this definition, end on the last Business Day of a calendar month; (c) no Interest Period with respect to any portion of the Tranche B Term Loans shall extend beyond the Tranche B Term Loan Maturity Date; and (d) no Interest Period with respect to any portion of the Revolving Loans shall extend beyond the Revolving Commitment Termination Date.

"Interest Rate Agreement" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"Interest Rate Determination Date" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"Intermediate Holdings" as defined in the preamble hereto.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"Investment" means (i) any direct or indirect purchase or other acquisition by Holdings or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than a Guarantor Subsidiary); (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Holdings from any Person (other than Holdings or any Guarantor Subsidiary), of any Capital Stock of such Person; and (iii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution by Holdings or any of its Subsidiaries to any other Person (other than Holdings and any Guarantor Subsidiary), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"IP Security Agreement" means each IP Security Agreement (as defined in the Pledge and Security Agreement).

"Issuance Notice" means an Issuance Notice substantially in the form of Exhibit A-3.

"Issuing Bank" means Citibank N.A. as Issuing Bank hereunder, together with its permitted successors and assigns in such capacity, or such other Lender from time to time designated by the Borrower and the Administrative Agent which has agreed in writing to act as Issuing Bank hereunder.

-20-

U 00192

"Joint Venture" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"Landlord Consent and Estoppel" means, with respect to any Leasehold Property, a letter, certificate or other instrument in writing from the lessor under the related lease, such Landlord Consent and Estoppel to be in form and substance acceptable to each of the Collateral Agent substantially in the form of Exhibit J.

"Landlord Personal Property Collateral Access Agreement" means a Landlord Waiver and Consent Agreement substantially in the form of Exhibit K with such amendments or modifications as may be approved by Collateral Agent.

"Lead Arranger" as defined in the preamble hereto.

"Leasehold Property" means any leasehold interest of any Loan Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by Collateral Agent in its sole discretion as not being required to be included in the Collateral.

"Lender" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment and Assumption.

"Lender Counterparty" means each Lender or any Affiliate of a Lender counterparty to a Hedge Agreement (including any Person who is a Lender as of the Closing Date but subsequently, whether before or after entering into a Hedge Agreement, ceases to be a Lender).

"Letter of Credit" means a standby letter of credit issued or to be issued by Issuing Bank pursuant to this Agreement.

"Letter of Credit Sublimit" means the lesser of (i) $17,500,000 and (ii) the aggregate unused amount of the Revolving Commitments then in effect.

"Letter of Credit Usage" means, as at any date of determination, the sum of (i) the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Letters of Credit then outstanding, and (ii) the aggregate amount of all drawings under Letters of Credit honored by Issuing Bank and not theretofore reimbursed by or on behalf of the Borrower.

"Lien" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"Loan" means a Tranche B Term Loan, a Revolving Loan or a Swing Line Loan.

-21-

U 00193

"Loan Document" means any of this Agreement, the Notes, if any, the Collateral Documents, the Intercreditor Agreement, any documents or certificates executed by the Borrower in favor of Issuing Bank relating to Letters of Credit, solely for purposes of paragraph (e) of Section 8.01, the confidential Fee Letter, and all other documents, instruments or agreements executed and delivered by a Loan Party for the benefit of any Agent, Issuing Bank or any Lender in connection herewith.

"Loan Party" means each Person (other than any Agent, Issuing Bank or any Lender or any other representative thereof) from time to time party to a Loan Document.

"Management Agreement" means the Professional Services Agreement, dated as of July 14, 2005, by and between the Borrower and Wind Point Partners V, L.P. in form and substance reasonably acceptable to Administrative Agent, as it may be amended, supplemented, restated or otherwise modified from time to time in accordance with the provisions of Section 6.15.

"Management Investors" means the directors, officers or employees of Holdings and its Subsidiaries (but expressly excluding Sponsor and its Affiliates (other than Holdings and its Subsidiaries) and their directors, officers or employees).

"Management Fees" means any and all fees, expenses and other monies due and payable, from time to time, by the Borrower to Wind Point Partners V, L.P., which shall not, in the aggregate, exceed $1,250,000 per Fiscal Year plus amounts sufficient to reimburse the reasonable out-of-pocket expenses of Wind Point Partners V, L.P. in connection with its services rendered under the Management Agreement in an aggregate amount not to exceed $250,000 per Fiscal Year.

"Margin Stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"Material Adverse Effect" means a material adverse effect on and/or material adverse developments with respect to (i) the business, operations, properties, assets or condition (financial or otherwise) of Holdings and its Subsidiaries taken as a whole; (ii) the ability of any Loan Party to fully and timely perform its Obligations; (iii) the legality, validity, binding effect or enforceability (including, without limitation, the perfection or priority of the Liens granted to the Collateral Agent (for the benefit of the Secured Parties) on the Collateral pursuant to the Collateral Documents) against a Loan Party of a Loan Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Loan Document.

"Material Contract" means any contract or other arrangement to which Holdings or any of its Subsidiaries is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"Material Real Estate Asset" means (i) (a) any fee-owned Real Estate Asset having a fair market value in excess of $500,000 as of the date of the acquisition thereof and (b) all Leasehold Properties other than those with respect to which the aggregate payments under the term of the lease are less than $300,000 per annum or (ii) any Real Estate Asset that the Requi-

U 00194

site Lenders have reasonably determined is material to the business, operations, properties, assets or condition (financial or otherwise) of Holdings or any Subsidiary thereof, including the Borrower.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means a Mortgage substantially in the form of Exhibit I, as it may be amended, supplemented, restated or otherwise modified from time to time.

"Multiemployer Plan" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"Narrative Report" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of Holdings and its Subsidiaries in the form prepared for presentation to senior management thereof for the applicable month, Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate.

"Net Asset Sale Proceeds" means, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Holdings or any of its Subsidiaries from such Asset Sale, minus (ii) any bona fide direct costs incurred in connection with such Asset Sale, including (a) reasonable costs and expenses related to the Asset Sale such as accounting, legal, environmental, consulting and similar expenses, (b) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (c) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and (d) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Holdings or any of its Subsidiaries in connection with such Asset Sale.

"Net Insurance/Condemnation Proceeds" means an amount equal to: (i) any Cash payments or proceeds received by Holdings or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of Holdings or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by Holdings or any of its Subsidiaries in connection with the repair or replacement of damaged property or the adjustment or settlement of any claims of Holdings or such Subsidiary in respect thereof, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes payable as a result of any gain recognized in connection therewith.

"Note" means a Tranche B Term Note, a Revolving Loan Note or a Swing Line Note.

U 00195

"Notice" means a Funding Notice, an Issuance Notice or a Conversion/Continuation Notice.

"Obligations" means (a) obligations of the Borrower and any and all of the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each payment required to be made by the Borrower and any and all of the other Loan Parties under this Agreement in respect of any Letter of Credit, when and as due, including payments in respect of reimbursement obligations under Section 2.07, interest thereon and obligations to provide cash collateral and (iii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Borrower and any and all of the other Loan Parties under this Agreement and the other Loan Documents owing to the Secured Parties (in their capacity as such), (b) the due and punctual payment of all monetary obligations of the Borrower and any and all of the other Loan Parties under each Hedge Agreement assigned or entered into with any counterparty that was a Lender or Affiliate of a Lender at the time such Hedge Agreement was entered into and (c) so long as this Agreement is in effect, the due and punctual payment of all monetary obligations in respect of overdrafts and related liabilities owed to any Lender, any Affiliate of a Lender, Administrative Agent or the Collateral Agent arising from treasury, depositary and cash management services or in connection with any automated clearinghouse transfer of funds.

"Obligee Guarantor" as defined in Section 7.07.

"Organizational Documents" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its bylaws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Participant" as defined in Section 10.06(d).

-24-

U 00196

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"Permitted Acquisition" means any acquisition by the Borrower or any of its wholly-owned Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, all of the Capital Stock of, or a business line or unit or a division of, any Person (the "Target"); provided,

     (a)     at the time of such acquisition and after giving effect thereto, the amount, if any, by which the Revolving Commitment exceeds the Total Utilization of Revolving Commitments shall not be less than $15,000,000;

     (b)     Requisite Lenders shall have consented in writing to all such acquisitions other than any acquisition in respect of which (i) total consideration (including any Earnout Obligations) to be paid in respect thereof when aggregated with the total consideration paid in respect of all prior acquisitions made since the Closing Date is less than $100,000,000, (ii) total consideration (including any Earnout Obligations) to be paid in respect thereof when aggregated with the total consideration paid in respect of all prior acquisitions made is less than $35,000,000 in any Fiscal Year; provided, in the event the Borrower or any Subsidiary does not enter into Permitted Acquisitions to the full amount permitted in any Fiscal Year, the Borrower may carry over into the next succeeding Fiscal Year any unused portion of the Permitted Acquisition basket of the prior Fiscal Year up to $5,000,000; and (iii) total consideration (including any Earnout Obligations) to be paid in respect of any single acquisition is less than $25,000,000; provided that in each case the aggregate consideration of (A) the $7.4 million (plus any working capital adjustment) with respect to the acquisition by the Borrower of all or substantially all of the assets of Reflection Glass and Mirror, Inc. and (B) the $7.35 million with respect to the acquisition by the Borrower of all or substantially all of the assets of Hutchins Insulations, Inc. shall not be applied to the aggregate permitted amounts set forth in this clause (b); provided, further, that Earnout Obligations shall not be applied to (x) the aggregate permitted amounts set forth in clause (b)(i) to the extent such Earnout Obligations are less than $20,000,000 and (y) the aggregate permitted amounts set forth in clauses (b)(ii) and (b)(iii) to the extent such Earnout Obligations for any for any Fiscal Year or for any single acquisition, as the case may be, are less than $5,000,000.

     (c)     after giving effect to an acquisition, the Borrower shall demonstrate a pro forma Total Leverage Ratio of at least 0.25 less than the Total Leverage Ratio required by Section 6.08 as of the most recently ended Fiscal Quarter (without giving effect to any direct or indirect amendment to Section 6.08 (including related definitions) after the Closing Date);

     (d)     immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

U 00197

(e)     all transactions in connection therewith shall be consummated, in all material respects, in accordance with all applicable laws and in conformity with all applicable Governmental Authorizations;

(f)     in the case of the acquisition of Capital Stock, all of the Capital Stock (except for any such Securities in the nature of directors' qualifying shares required pursuant to applicable law) acquired or otherwise issued by the Target or any newly formed Subsidiary of Holdings in connection with such acquisition shall be owned 100% by Holdings or a Guarantor Subsidiary thereof, and the Borrower shall have taken, or caused to be taken, as of the date such Person becomes a Subsidiary of Holdings, each of the actions set forth in Sections 5.11 and/or 5.12, as applicable, and such other actions necessary to grant or confirm to each Collateral Agent a Lien on or security interest in the assets so acquired subject to no Liens other than Permitted Liens;

(g)     Holdings and its Subsidiaries shall be in compliance with the financial covenants set forth in Section 6.08 on a pro forma basis after giving effect to such acquisition as of the last day of the Fiscal Quarter most recently ended (as determined in accordance with Section 6.08(e)); and shall provide revised projections showing Holdings and its Subsidiaries to be in compliance with all operating and financial covenants set forth in this Agreement on a pro forma basis after giving effect to such acquisition as of the last day of each Fiscal Quarter ending prior to the Tranche B Term Loan Maturity Date;

(h)     the Borrower shall have delivered to Administrative Agent at least fifteen (15) Business Days prior to such proposed acquisition, (x) a Compliance Certificate evidencing compliance with Section 6.08 as required under clause (d) above, together with all relevant financial information with respect to such acquired assets, including, without limitation, the aggregate consideration for such acquisition and any other information required to demonstrate compliance with Section 6.08 and (y) in the event that any Loan Party is obligated to pay any Earnout Obligation in connection with such Permitted Acquisition, a certificate of the Borrower, in form and substance reasonably satisfactory to the Administrative Agent, setting forth in reasonable detail the estimated projected amount and the maximum amount of such Earnout Obligations; and

(i)     the Target (x) shall have generated positive cash flow (with such adjustments reasonably acceptable to the Administrative Agent) for the twelve-month period most recently ended prior to the date of such acquisition, (y) shall be domiciled in, and have substantially all of its business operations in, the continental United States and/or Canada, and (z) shall be in the business of any part of the Core Business or any residential or commercial installation services business ancillary to the Core Business.

"Permitted Investments" means each of the Investments permitted pursuant to Section 6.07.

"Permitted Liens" means each of the Liens permitted pursuant to Section 6.02.

U 00198

"Permitted Seller Consideration" means any promissory note or other Indebtedness issued or incurred by the Borrower or its Domestic Subsidiaries in connection with an acquisition; provided that such promissory note or Indebtedness is unsecured and subordinated to the Obligations and expressly approved in writing by the Administrative Agent.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Phase I Report" means, with respect to any Facility, a report that (i) conforms to the ASTM Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process, E 1527-00 and (ii) was conducted no more than six (6) months prior to the date such report is required to be delivered hereunder, by one or more environmental consulting firms reasonably satisfactory to Administrative Agent.

"Pledge and Security Agreement" means the Pledge and Security Agreement to be executed by the Borrower and each Guarantor substantially in the form of Exhibit H, as it may be amended, supplemented, restated or otherwise modified from time to time.

"Prime Rate" means the rate of interest per annum that CNAI announces from time to time as its prime lending rate, as in effect from time to time at its principal office in New York City. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. CNAI or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate. Any change in such rate announced by the CNAI shall take effect at the opening of business on the day specified in the public announcement of such change.

"Principal Office" means, for each of Administrative Agent, Swing Line Lender and Issuing Bank, such Person's "Principal Office" as set forth in Section 10.01, or such other office as such Person may from time to time designate in writing to the Borrower, Administrative Agent and each Lender.

"Pro Rata Share" means (i) with respect to all payments, computations and other matters relating to the Tranche B Term Loan of any Lender, the percentage obtained by dividing (a) the Tranche B Term Loan Exposure of that Lender by (b) the aggregate Tranche B Term Loan Exposure of all Lenders, and (ii) with respect to all payments, computations and other matters relating to the Revolving Commitment or Revolving Loans of any Lender or any Letters of Credit issued or participations purchased therein by any Lender or any participations in any Swing Line Loans purchased by any Lender, the percentage obtained by dividing (a) the Revolving Exposure of that Lender by (b) the aggregate Revolving Exposure of all Lenders. For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (A) an amount equal to the sum of the Tranche B Term Loan Exposure and the Revolving Exposure of that Lender by (B) an amount equal to the sum of the aggregate Tranche B Term Loan Exposure and the aggregate Revolving Exposure of all Lenders.

"Projections" as defined in Section 4.08.

"Real Estate Asset" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Loan Party in any real property.

U 00199

"Record Document" means, with respect to any Leasehold Property, (i) the lease evidencing such Leasehold Property or a memorandum thereof, executed and acknowledged by the owner of the affected real property, as lessor, or (ii) if such Leasehold Property was acquired or subleased from the holder of a Recorded Leasehold Interest, the applicable assignment or sub-lease document, executed and acknowledged by such holder, in each case in form sufficient to give such constructive notice upon recordation and otherwise in form reasonably satisfactory to Collateral Agent.

"Recorded Leasehold Interest" means a Leasehold Property with respect to which a Record Document has been recorded in all places necessary or desirable, in Administrative Agent's reasonable judgment, to give constructive notice of such Leasehold Property to third-party purchasers and encumbrancers of the affected real property.

"Redemption" means the redemption on or prior to December 31, 2005 of the pre-ferred stock (including accrued and unpaid dividends) of Holdings in an aggregate amount not to exceed $70.0 million.

"Refunded Swing Line Loans" as defined in Section 2.06(d).

"Register" as defined in Section 10.06(c).

"Regulation D" means Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Reimbursement Date" as defined in Section 2.10.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the directors, trustees, officers, employees, agents and advisors of such Person and of such Per-son's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, injec-tion, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or dis-posal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"Requisite Class Lenders" means, at any time of determination, (i) for the Class of Lenders having Tranche B Term Loan Exposure, Lenders holding more than 50% of the ag-gregate Tranche B Term Loan Exposure of all Lenders and (ii) for the Class of Lenders having Revolving Exposure, Lenders holding more than 50% of the aggregate Revolving Exposure of all Lenders.

"Requisite Lenders" means one or more Lenders having or holding Tranche B Term Loan Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Tranche B Term Loan Exposure of all Lenders and (ii) the aggregate Revolving Exposure of all Lenders.

U 00200

"Restricted Junior Payment" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Holdings or the Borrower now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Holdings, Intermediate Holdings or the Borrower now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of Holdings, Intermediate Holdings or the Borrower now or hereafter outstanding; and (iv) management or similar fees payable to Sponsor or any of its Affiliates.

"Revolving Commitment" means the commitment of a Lender to make or otherwise fund any Revolving Loan and to acquire participations in Letters of Credit and Swingline Loans hereunder and "Revolving Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Revolving Commitment, if any, is set forth on its respective signature page or in the applicable Assignment and Assumption subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Revolving Commitments as of the Closing Date is $40.0 million.

"Revolving Commitment Period" means the period from the Closing Date to but excluding the Revolving Commitment Termination Date.

"Revolving Commitment Termination Date" means the earliest to occur of (i) December 27, 2005, if the Tranche B Term Loans are not made on or before that date; (ii) the sixth anniversary of the Closing Date, (iii) the date the Revolving Commitments are permanently reduced to zero pursuant to Section 2.26, and (iv) the date of the termination of the Revolving Commitments pursuant to Section 8.01.

"Revolving Exposure" means, with respect to any Lender as of any date of determination, (i) prior to the termination of the Revolving Commitments, that Lender's Revolving Commitment; and (ii) after the termination of the Revolving Commitments, the sum of (a) the aggregate outstanding principal amount of the Revolving Loans of that Lender, (b) in the case of Issuing Bank, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by that Lender (net of any participations by Lenders in such Letters of Credit), (c) the aggregate amount of all participations by that Lender in any outstanding Letters of Credit or any unreimbursed drawing under any Letter of Credit, (d) in the case of Swing Line Lender, the aggregate outstanding principal amount of all Swing Line Loans (net of any participations therein by other Lenders), and (e) the aggregate amount of all participations therein by that Lender in any outstanding Swing Line Loans.

"Revolving Loan" means a Loan made by a Lender to the Borrower pursuant to Sections 2.03 and/or 2.37.

"Revolving Loan Note" means a promissory note in the form of Exhibit B-3, as it may be amended, supplemented, restated or otherwise modified from time to time.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw Hill Companies, Inc.

-29-

U 00201

"Second Lien Collateral Agent" means the "Collateral Agent" as defined in the Second Lien Credit Agreement.

"Second Lien Credit Agreement" means the Second Lien Credit Agreement, dated as of the Closing Date, among the Borrower, Holdings, Intermediate Holdings, CNAI as administrative agent and the lenders party thereto, as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the Intercreditor Agreement.

"Second Lien Documents" means the Second Lien Credit Agreement, the Intercreditor Agreement, the notes, security documents and all other material documents and agreements executed or delivered in connection with the Second Lien Term Loans, as each such document may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the Intercreditor Agreement.

"Second Lien Obligations" has the meaning assigned to the term "Obligations" in the Second Lien Credit Agreement.

"Second Lien Loans" means the terms loans issued pursuant to the Second Lien Credit Agreement.

"Secured Parties" means the Agents, each Lender and each Lender Counterparty that shall have been a Lender or an Affiliate of a Lender at the time an Interest Rate Agreement was entered into by such person (in its capacity as such).

"Securities" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Solvency Certificate" means a Solvency Certificate of the chief financial officer of Holdings substantially in the form of Exhibit F-2.

"Solvent" means, with respect to any Loan Party, that as of the date of determination both (i) (a) the sum of such Loan Party's debt (including contingent liabilities) does not exceed the present fair saleable value of such Loan Party's present assets; (b) such Loan Party's capital is not unreasonably small in relation to its business as contemplated on the Closing Date and reflected in the Projections or with respect to any transaction contemplated or undertaken after the Closing Date; and (c) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise); and (ii) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent

-30-

U 00202

transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standards No. 5).

"Sponsor" means Wind Point Partners V, L.P.

"Subject Transaction" as defined in Section 6.08(e).

"Subordinated Indebtedness" means Indebtedness of Borrower or any Subsidiary Loan Party that is by its terms subordinated in right of payment to the Obligations of Borrower or such Subsidiary Loan Party, as applicable.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"Swing Line Lender" means CNAI in its capacity as Swing Line Lender hereunder, together with its permitted successors and assigns in such capacity.

"Swing Line Loan" means a Loan made by Swing Line Lender to the Borrower pursuant to Section 2.05.

"Swing Line Sublimit" means the lesser of (i) $5,000,000, and (ii) the aggregate unused amount of Revolving Commitments then in effect.

"Syndication Agent" as defined in the preamble hereto.

"Target" as defined in the definition of "Permitted Acquisition".

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Title Company" as defined in Section 3.01(h)(iv).

"Title Policy" as defined in Section 3.01(h)(iv).

"Total Leverage Ratio" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Total Debt as of such day to (ii) Consolidated Adjusted EBITDA for the four-

U 00203

Fiscal Quarter period ending on such date (or for all other purposes hereunder other than Section 6.08, for the twelve-month period most recently ended); provided that with respect to any calculation period prior to the first anniversary of the Closing Date the foregoing shall be subject to adjustment as set forth in Schedule 1.01.

"Total Utilization of Revolving Commitments" means, as at any date of determination, the sum of (i) the aggregate principal amount of all outstanding Revolving Loans (other than Revolving Loans made for the purpose of repaying any Refunded Swing Line Loans or reimbursing Issuing Bank for any amount drawn under any Letter of Credit, but not yet so applied), (ii) the aggregate principal amount of all outstanding Swing Line Loans, and (iii) the Letter of Credit Usage.

"Tranche B Term Loan" means a Tranche B Term Loan made by a Lender to the Borrower pursuant to Section 2.01.

"Tranche B Term Loan Commitment" means the commitment of a Lender to make or otherwise fund a Tranche B Term Loan and "Tranche B Term Loan Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Tranche B Term Loan Commitment, if any, is set forth on its respective signature page or in the applicable Assignment and Assumption, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Tranche B Term Loan Commitments as of the Closing Date is $295.0 million.

"Tranche B Term Loan Exposure" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Tranche B Term Loans of such Lender; provided at any time prior to the making of the Tranche B Term Loans, the Tranche B Term Loan Exposure of any Lender shall be equal to such Lender's Tranche B Term Loan Commitment.

"Tranche B Term Loan Maturity Date" means the earlier of (i) the seventh anniversary of the Closing Date, and (ii) the date that all Tranche B Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"Tranche B Term Loan Note" means a promissory note in the form of Exhibit B-1, as it may be amended, supplemented, restated or otherwise modified from time to time.

"Transaction Costs" means the fees, costs and expenses payable by Holdings, the Borrower or any of the Borrower's Subsidiaries on or before the Closing Date in connection with the transactions contemplated by the Loan Documents.

"Transactions" means the Dividend, the Redemption, the entering into and funding of the Tranche B Term Loans and the Revolving Loans, the entering into of the Second Lien Documents and funding of the Second Lien Loans, the repayment of certain Existing Indebtedness of Holdings and its Subsidiaries and all related transactions.

U 00204

"Type of Loan" means (i) with respect to either Tranche B Term Loans or Revolving Loans, a Base Rate Loan or a Eurodollar Rate Loan, and (ii) with respect to Swing Line Loans, a Base Rate Loan.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"Unadjusted Eurodollar Rate Component" means that component of the interest costs to the Borrower in respect of a Eurodollar Rate Loan that is based upon the rate obtained pursuant to clause (i) of the definition of "Adjusted Eurodollar Rate".

"Unpaid Management Fees" as defined in Section 6.05(f).

"USI" means United Subcontractors, Inc., a Utah corporation.

## Section 1.02    Accounting Terms.

Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Holdings to Lenders pursuant to Sections 5.01(a), 5.01(b) and 5.01(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.01(e), if applicable). Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements. To the extent there are any changes in GAAP from the date of this Agreement, if at any time such change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and the Borrower or Administrative Agent shall so request, Administrative Agent and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided that, until so amended, such ratio or requirement shall continue to be computed in accordance with such GAAP prior to such change therein.

## Section 1.03    Interpretation, etc.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections

-33-

U 00205

of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

### Section 1.04  Construction.

Each of the parties hereto acknowledges that (i) it has been represented by counsel in the negotiation and documentation of the terms of this Agreement; (ii) it has had full and fair opportunity to review and revise the terms of this Agreement; (iii) this Agreement has been drafted jointly by all of the parties hereto; and (iv) neither Administrative Agent nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Administrative Agent and the Lenders, on the one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor.  Accordingly, each of the parties hereto acknowledges and agrees that the terms of this Agreement shall not be construed against or in favor of another party.

### Section 1.05  Reference to Laws.

References to any laws, statutes, regulations and orders of, and applicable restriction imposed by, Governmental Authorities, including all applicable Environmental Laws, are to those applicable laws, statutes, regulations and orders of, and applicable restriction imposed by, Governmental Authorities as amended, supplemented or replaced from time to time; provided, however, that with respect to any representation and warranty hereunder, such references are to the laws, statutes, regulations and orders in effect on the date such representation and warranty is made.

## ARTICLE TWO

## LOANS AND LETTERS OF CREDIT

### Section 2.01  Tranche B Term Loan Commitments.

Subject to the terms and conditions hereof, each Lender severally agrees to make, on the Closing Date, a Tranche B Term Loan to the Borrower in an amount equal to such Lender's Tranche B Term Loan Commitment.

The Borrower may make only one borrowing under the Tranche B Term Loan Commitment, which shall be on the Closing Date.  Any amount borrowed under this Section 2.01 and subsequently repaid or prepaid may not be reborrowed.  Subject to Sections 2.24 and 2.27, all amounts owed hereunder with respect to the Tranche B Term Loans shall be paid in full no later than the Tranche B Term Loan Maturity Date.  Each Lender's Tranche B Term Loan Commitment shall terminate immediately and without further action on the Closing Date after giving effect to the funding of such Lender's Tranche B Term Loan Commitment on such date.

U 00206

**Section 2.02    Borrowing Mechanics for Tranche B Term Loans.**

The Borrower shall deliver to Administrative Agent a fully executed Funding Notice no later than one day prior to the Closing Date.  Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the proposed borrowing.

Each Lender shall make its Tranche B Term Loan available to Administrative Agent not later than 12:00 p.m. (New York City time) on the Closing Date, by wire transfer of same day funds in Dollars, at Administrative Agent's Principal Office.  Upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of the Tranche B Term Loans available to the Borrower on the Closing Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from Lenders to be credited to the account of the Borrower at Administrative Agent's Principal Office or to such other account as may be designated in writing to Administrative Agent by the Borrower.

**Section 2.03    Revolving Commitments.**

During the Revolving Commitment Period, subject to the terms and conditions hereof, each Lender severally agrees to make Revolving Loans to the Borrower in the aggregate amount up to but not exceeding such Lender's Revolving Commitment; provided that after giving effect to the making of any Revolving Loans in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect.  Amounts borrowed pursuant to this Section 2.03 may be repaid and reborrowed during the Revolving Commitment Period.  Each Lender's Revolving Commitment shall expire on the Revolving Commitment Termination Date and all Revolving Loans and all other amounts owed hereunder with respect to the Revolving Loans and the Revolving Commitments shall be paid in full no later than such date.  Notwithstanding anything else herein to the contrary, the Borrower shall not request Revolving Loans on the Closing Date in an amount in excess of $2,000,000.

**Section 2.04    Borrowing Mechanics for Revolving Loans.**

(a)    Except pursuant to Section 2.10, Revolving Loans that are Base Rate Loans shall be made in an aggregate minimum amount of $1,000,000  and integral multiples of $100,000 in excess of that amount, and Revolving Loans that are Eurodollar Rate Loans shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount.

(b)    Whenever the Borrower desires that Lenders make Revolving Loans, the Borrower shall deliver to Administrative Agent a fully executed and delivered Funding Notice no later than 10:00 a.m. (New York City time) at least three Business Days in advance of the proposed Credit Date in the case of a Eurodollar Rate Loan, and at least one Business Day in advance of the proposed Credit Date in the case of a Revolving Loan that is a Base Rate Loan.  Except as otherwise provided herein, a Funding Notice for a Revolving Loan that is a Eurodollar Rate Loan shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower shall be bound to make a borrowing in accordance therewith.

U 00207

(c)    Notice of receipt of each Funding Notice in respect of Revolving Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by Administrative Agent to each applicable Lender by telefacsimile with reasonable promptness, but (provided Administrative Agent shall have received such notice by 10:00 a.m. (New York City time)) not later than 2:00 p.m. (New York City time) on the same day as Administrative Agent's receipt of such Notice from the Borrower.

(d)    Each Lender shall make the amount of its Revolving Loan available to Administrative Agent not later than 12:00 p.m. (New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at the Administrative Agent's Principal Office.  Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Revolving Loans available to the Borrower on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Revolving Loans received by Administrative Agent from Lenders to be credited to the account of the Borrower at the Administrative Agent's Principal Office or such other account as may be designated in writing to Administrative Agent by the Borrower.

**Section 2.05    Swing Line Loans Commitments.**

During the Revolving Commitment Period, subject to the terms and conditions hereof, Swing Line Lender hereby agrees to make Swing Line Loans to the Borrower in the aggregate amount up to but not exceeding the Swing Line Sublimit; provided, after giving effect to the making of any Swing Line Loan, in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect.  Amounts borrowed pursuant to this Section 2.05 may be repaid and reborrowed during the Revolving Commitment Period.  Swing Line Lender's Revolving Commitment shall expire on the Revolving Commitment Termination Date and all Swing Line Loans and all other amounts owed hereunder with respect to the Swing Line Loans and the Revolving Commitments shall be paid in full no later than such date.

**Section 2.06    Borrowing Mechanics for Swing Line Loans.**

(a)    Swing Line Loans shall be made in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount.

(b)    Whenever the Borrower desires that Swing Line Lender make a Swing Line Loan, the Borrower shall deliver to Administrative Agent a Funding Notice no later than 12:00 p.m. (New York City time) on the proposed Credit Date.

(c)    Swing Line Lender shall make the amount of its Swing Line Loan available to Administrative Agent not later than 2:00 p.m.(New York City time) on the applicable Credit Date by wire transfer of same day funds in Dollars, at the Administrative Agent's Principal Office.  Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Swing Line Loans available to the Borrower on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Swing Line Loans received by Administrative Agent from Swing Line Lender to be credited to the account of the Borrower at the Administrative

-36-

U 00208

Agent's Principal Office, or to such other account as may be designated in writing to Administrative Agent by the Borrower.

(d)    With respect to any Swing Line Loans which have not been voluntarily prepaid by the Borrower pursuant to Section 2.25, Swing Line Lender may at any time in its sole and absolute discretion, deliver to Administrative Agent (with a copy to the Borrower), no later than 11:00 a.m. (New York City time) at least one (1) Business Day in advance of the proposed Credit Date, a notice (which shall be deemed to be a Funding Notice given by the Borrower) requesting that each Lender holding a Revolving Commitment make Revolving Loans that are Base Rate Loans to the Borrower on such Credit Date in an amount equal to the amount of such Swing Line Loans (the "Refunded Swing Line Loans") outstanding on the date such notice is given which the Swing Line Lender requests Lenders to prepay.  Anything contained in this Agreement to the contrary notwithstanding, (1) the proceeds of such Revolving Loans made by the Lenders other than Swing Line Lender shall be immediately delivered by the Administrative Agent to Swing Line Lender (and not to the Borrower) and applied to repay a corresponding portion of the Refunded Swing Line Loans and (2) on the day such Revolving Loans are made, Swing Line Lender's Pro Rata Share of the Refunded Swing Line Loans shall be deemed to be paid with the proceeds of a Revolving Loan made by Swing Line Lender to the Borrower, and such portion of the Swing Line Loans deemed to be so paid shall no longer be outstanding as Swing Line Loans and shall no longer be due under the Swing Line Note of Swing Line Lender but shall instead constitute part of Swing Line Lender's outstanding Revolving Loans to the Borrower and shall be due under the Revolving Loan Note issued by the Borrower to Swing Line Lender.  The Borrower hereby authorizes Administrative Agent and Swing Line Lender to charge the Borrower's accounts with Administrative Agent and Swing Line Lender (up to the amount available in each such account) in order to immediately pay Swing Line Lender the amount of the Refunded Swing Line Loans to the extent the proceeds of such Revolving Loans made by Lenders, including the Revolving Loan deemed to be made by the Swing Line Lender, are not sufficient to repay in full the Refunded Swing Line Loans.  If any portion of any such amount paid (or deemed to be paid) to Swing Line Lender should be recovered by or on behalf of the Borrower from Swing Line Lender in bankruptcy, by assignment for the benefit of creditors or otherwise, the loss of the amount so recovered shall be ratably shared among all Lenders in the manner contemplated by Section 2.32.

(e)    If for any reason Revolving Loans are not made pursuant to Section 2.06(d) in an amount sufficient to repay any amounts owed to Swing Line Lender in respect of any outstanding Swing Line Loans on or before the third Business Day after demand for payment thereof by Swing Line Lender, each Lender holding a Revolving Commitment shall be deemed to, and hereby agrees to, have purchased a participation in such outstanding Swing Line Loans, and in an amount equal to its Pro Rata Share of the applicable unpaid amount together with accrued interest thereon.  Upon one (1) Business Day's notice from Swing Line Lender, each Lender holding a Revolving Commitment shall deliver to Swing Line Lender an amount equal to its respective participation in the applicable unpaid amount in same day funds at the Principal Office of Swing Line Lender. In order to evidence such participation each Lender holding a Revolving Commitment agrees to enter into a participation agreement at the request of Swing Line Lender in form and substance reasonably satisfactory to Swing Line Lender.  In the event any Lender holding a Revolving Commitment fails to make available to Swing Line Lender the amount of such Lender's participation as provided in this paragraph, Swing Line

U 00209

Lender shall be entitled to recover such amount on demand from such Lender together with interest thereon for three Business Days at the rate customarily used by Swing Line Lender for the correction of errors among banks and thereafter at the Base Rate, as applicable.

(f)    Notwithstanding anything contained herein to the contrary, (1) each Lender's obligation to make Revolving Loans for the purpose of repaying any Refunded Swing Line Loans pursuant to the second preceding paragraph and each Lender's obligation to purchase a participation in any unpaid Swing Line Loans pursuant to the immediately preceding paragraph shall be absolute and unconditional and shall not be affected by any circumstance, including without limitation (A) any set-off, counterclaim, recoupment, defense or other right which such Lender may have against Swing Line Lender, any Loan Party or any other Person for any reason whatsoever; (B) the occurrence or continuation of a Default or Event of Default; (C) any adverse change in the business, operations, properties, assets or condition (financial or otherwise) of any Loan Party; (D) any breach of this Agreement or any other Loan Document by any party thereto; or (E) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing; provided that such obligations of each Lender are subject to the condition that Swing Line Lender believed in good faith that all conditions under Section 3.02 to the making of the applicable Refunded Swing Line Loans or other unpaid Swing Line Loans, were satisfied at the time such Refunded Swing Line Loans or unpaid Swing Line Loans were made, or the satisfaction of any such condition not satisfied had been waived by Requisite Lenders prior to or at the time such Refunded Swing Line Loans or other unpaid Swing Line Loans were made; and (2) Swing Line Lender shall not be obligated to make any Swing Line Loans (A) if it has elected not to do so after the occurrence and during the continuation of a Default or Event of Default or (B) at a time when a Funding Default exists unless Swing Line Lender has entered into arrangements satisfactory to it and the Borrower to eliminate Swing Line Lender's risk with respect to the Defaulting Lender's participation in such Swing Ling Loan, including by cash collateralizing such Defaulting Lender's Pro Rata Share of the outstanding Swing Line Loans.

### Section 2.07    Letters of Credit.

During the Revolving Commitment Period, subject to the terms and conditions hereof, Issuing Bank agrees to issue Letters of Credit for the account of the Borrower in the aggregate amount up to but not exceeding the Letter of Credit Sublimit; provided, (i) each Letter of Credit shall be denominated in Dollars; (ii) the stated amount of each Letter of Credit shall not be less than $100,000 or such lesser amount as is acceptable to Issuing Bank; (iii) after giving effect to such issuance, in no event shall the Total Utilization of Revolving Commitments exceed the Revolving Commitments then in effect; (iv) after giving effect to such issuance, in no event shall the Letter of Credit Usage exceed the Letter of Credit Sublimit then in effect; and (v) in no event shall any Letter of Credit have an expiration date later than the earlier of (1) the Revolving Commitment Termination Date and (2) the date which is one year from the date of issuance of such Letter of Credit.  Subject to the foregoing, Issuing Bank may agree that a Letter of Credit will automatically be extended for one or more successive periods not to exceed one year each, unless Issuing Bank elects not to extend for any such additional period; provided, Issuing Bank shall not extend any such Letter of Credit if it has received written notice that an Event of Default has occurred and is continuing at the time Issuing Bank must elect to allow such extension; provided, further, in the event a Funding Default exists, Issuing Bank shall not be required to issue any Letter of Credit unless Issuing Bank has entered into arrangements satisfactory to it and

-38-

U 00210

the Borrower to eliminate Issuing Bank's risk with respect to the participation in Letters of Credit of the Defaulting Lender, including by cash collateralizing such Defaulting Lender's Pro Rata Share of the Letter of Credit Usage.

Section 2.08    Notice of Issuance.

Whenever the Borrower desires the issuance of a Letter of Credit, it shall deliver to Administrative Agent an Issuance Notice no later than 12:00 p.m. (New York City time) at least three Business Days, or in each case such shorter period as may be agreed to by Issuing Bank in any particular instance, in advance of the proposed date of issuance. Upon satisfaction or waiver of the conditions set forth in Section 3.02, Issuing Bank shall issue the requested Letter of Credit only in accordance with Issuing Bank's standard operating procedures. Upon the issuance of any Letter of Credit or amendment or modification to a Letter of Credit, Issuing Bank shall promptly notify each Lender of such issuance, which notice shall be accompanied by a copy of such Letter of Credit or amendment or modification to a Letter of Credit and the amount of such Lender's respective participation in such Letter of Credit pursuant to Section 2.11.

Section 2.09    Responsibility of Issuing Bank with Respect to Requests for Drawings and Payments.

In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, Issuing Bank shall be responsible only to examine the documents delivered under such Letter of Credit with reasonable care so as to ascertain whether they appear on their face to be in accordance with the terms and conditions of such Letter of Credit. As between the Borrower and Issuing Bank, the Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit issued by Issuing Bank, by the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, Issuing Bank shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Issuing Bank, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of Issuing Bank's rights or powers hereunder. Without limiting the foregoing and in furtherance thereof, any action taken or omitted by Issuing Bank under or in connection with the Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not give rise to any liability on the part of Issuing Bank to the Borrower. Notwithstanding anything to the contrary contained in this Section 2.09, the Borrower shall retain

-39-

U 00211

any and all rights it may have against Issuing Bank for any liability arising solely out of the gross negligence or willful misconduct of Issuing Bank.

**Section 2.10    Reimbursement by the Borrower of Amounts Drawn or Paid Under Letters of Credit.**

In the event Issuing Bank has determined to honor a drawing under a Letter of Credit, it shall immediately notify the Borrower and Administrative Agent, and the Borrower shall reimburse Issuing Bank on or before the Business Day immediately following the date on which such drawing is honored (the "Reimbursement Date") in an amount in Dollars and in same day funds equal to the amount of such honored drawing; provided, anything contained herein to the contrary notwithstanding, (i) unless the Borrower shall have notified Administrative Agent and Issuing Bank prior to 10:00 a.m. (New York City time) on the date such drawing is honored that the Borrower intends to reimburse Issuing Bank for the amount of such honored drawing with funds other than the proceeds of Revolving Loans, the Borrower shall be deemed to have given a timely Funding Notice to Administrative Agent requesting Lenders to make Revolving Loans that are Base Rate Loans on the Reimbursement Date in an amount in Dollars equal to the amount of such honored drawing, and (ii) subject to satisfaction or waiver of the conditions specified in Section 3.02, Lenders shall, on the Reimbursement Date, make Revolving Loans that are Base Rate Loans in the amount of such honored drawing, the proceeds of which shall be applied directly by Administrative Agent to reimburse Issuing Bank for the amount of such honored drawing; and provided, further, if for any reason proceeds of Revolving Loans are not received by Issuing Bank on the Reimbursement Date in an amount equal to the amount of such honored drawing, the Borrower shall reimburse Issuing Bank, on demand, in an amount in same day funds equal to the excess of the amount of such honored drawing over the aggregate amount of such Revolving Loans, if any, which are so received.  Nothing in this Section 2.10 shall be deemed to relieve any Lender from its obligation to make Revolving Loans on the terms and conditions set forth herein, and the Borrower shall retain any and all rights it may have against any Lender resulting from the failure of such Lender to make such Revolving Loans under this Section 2.10.

**Section 2.11    Lenders' Purchase of Participations in Letters of Credit.**

Immediately upon the issuance of each Letter of Credit, each Lender having a Revolving Commitment shall be deemed to have purchased, and hereby agrees to irrevocably purchase, from Issuing Bank a participation in such Letter of Credit and any drawings honored thereunder in an amount equal to such Lender's Pro Rata Share (with respect to the Revolving Commitments) of the maximum amount which is or at any time may become available to be drawn thereunder.  In the event that the Borrower shall fail for any reason to reimburse Issuing Bank as provided in Section 2.10, Issuing Bank shall promptly notify each Lender of the unreimbursed amount of such honored drawing and of such Lender's respective participation therein based on such Lender's Pro Rata Share of the Revolving Commitments.  Each Lender shall make available to Issuing Bank an amount equal to its respective participation, in Dollars and in same day funds, at the office of Issuing Bank specified in such notice, not later than 12:00 p.m. (New York City time) on the first business day (under the laws of the jurisdiction in which such office of Issuing Bank is located) after the date notified by Issuing Bank.  In the event that any Lender fails to make available to Issuing Bank on such business day the amount of such Lender's par-

-40-

ticipation in such Letter of Credit as provided in this Section 2.11, Issuing Bank shall be entitled to recover such amount on demand from such Lender together with interest thereon for three Business Days at the rate customarily used by Issuing Bank for the correction of errors among banks and thereafter at the Base Rate. Nothing in this Section 2.11 shall be deemed to prejudice the right of any Lender to recover from Issuing Bank any amounts made available by such Lender to Issuing Bank pursuant to this Section in the event that it is determined that the payment with respect to a Letter of Credit in respect of which payment was made by such Lender constituted gross negligence or willful misconduct on the part of Issuing Bank. In the event Issuing Bank shall have been reimbursed by other Lenders pursuant to this Section 2.11 for all or any portion of any drawing honored by Issuing Bank under a Letter of Credit, such Issuing Bank shall distribute to each Lender which has paid all amounts payable by it under this Section 2.11 with respect to such honored drawing such Lender's Pro Rata Share of all payments subsequently received by Issuing Bank from the Borrower in reimbursement of such honored drawing when such payments are received. Any such distribution shall be made to a Lender at its primary address set forth in Section 10.01 or at such other address as such Lender may request.

### Section 2.12   Obligations Absolute.

The obligation of the Borrower to reimburse Issuing Bank for drawings honored under the Letters of Credit issued by it and to repay any Revolving Loans made by Lenders pursuant to Section 2.10 and the obligations of Lenders under Section 2.11 shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances: (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set-off, defense or other right which the Borrower or any Lender may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), Issuing Bank, Lender or any other Person or, in the case of a Lender, against the Borrower, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between the Borrower or one of its Subsidiaries and the beneficiary for which any Letter of Credit was procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by Issuing Bank under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit; (v) any adverse change in the business, operations, properties, assets or condition (financial or otherwise) of Holdings or any of its Subsidiaries; (vi) any breach hereof or any other Loan Document by any party thereto; (vii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; or (viii) the fact that an Event of Default or a Default shall have occurred and be continuing; provided, in each case, that payment by Issuing Bank under the applicable Letter of Credit shall not have constituted gross negligence or willful misconduct of Issuing Bank under the circumstances in question.

### Section 2.13   Indemnification.

Without duplication of any obligation of the Borrower under Section 10.02, in addition to amounts payable as provided herein, the Borrower hereby agrees to protect, indemnify, pay and save harmless Issuing Bank from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable fees, expenses and disburse-

-41-

U 00213

ments of outside counsel) which Issuing Bank may incur or be subject to as a consequence, direct or indirect, of (i) the issuance of any Letter of Credit by Issuing Bank, other than as a result of (1) the gross negligence or willful misconduct of Issuing Bank or (2) the wrongful dishonor by Issuing Bank of a proper demand for payment made under any Letter of Credit issued by it, or (ii) the failure of Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act.

### Section 2.14    Pro Rata Shares.

All Loans shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Term Loan Commitment or any Revolving Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

### Section 2.15    Availability of Funds.

(a)    Funding by Lenders; Presumption by Administrative Agent.  Unless Administrative Agent shall have received notice from a Lender prior to the applicable Credit Date that such Lender will not make available to Administrative Agent such Lender's share of such Loans, Administrative Agent may assume that such Lender has made such share available on such applicable Credit Date and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Loans available to Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation and (ii) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans.  If the Borrower and such Lender shall pay such interest to Administrative Agent for the same or an overlapping period, Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays such amount to Administrative Agent, then such amount shall constitute such Lender's Loan included on such Credit Date.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to Administrative Agent.

(b)    Payments by the Borrower; Presumptions by Administrative Agent.  Unless Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to Administrative Agent for the account of the Lenders or the Issuing Bank hereunder that the Borrower will not make such payment, Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of

-42-

U 00214

the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender or the Issuing Bank, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 2.16    <u>Use of Proceeds</u>.

The proceeds of the Tranche B Term Loans (together with the proceeds of Second Lien Loans) made on the Closing Date shall be applied by the Borrower (i) to refinance the Existing Indebtedness of Holdings and its Subsidiaries; (ii) to consummate the Redemption; (iii) to pay the Dividend; and (iv) to pay any fees and expenses incurred in connection with the Transactions.  The proceeds of the Revolving Loans, Swing Line Loans and Letters of Credit made on or after the Closing Date shall be applied by the Borrower for working capital and general corporate purposes of Holdings and its Subsidiaries, including Permitted Acquisitions.  No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

Section 2.17    <u>Lenders' Evidence of Debt</u>.

Each Lender shall maintain on its internal records an account or accounts evidencing the Indebtedness of the Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; <u>provided</u>, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Commitments or the Borrower's Obligations in respect of any applicable Loans; and <u>provided further</u>, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

Section 2.18    <u>Notes</u>.

If so requested by any Lender by written notice to the Borrower (with a copy to Administrative Agent) at least two Business Days prior to the Closing Date, or at any time thereafter, the Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to <u>Section 10.06)</u> on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after the Borrower's receipt of such notice) a Note or Notes (in the form of <u>Exhibit B-1</u> or <u>B-2</u> as applicable) to evidence such Lender's Tranche B Term Loan, Revolving Loan or Swing Line Loan, as the case may be.

Section 2.19    <u>Interest Rate on Loans</u>.

Except as otherwise set forth herein, each Class of Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

U 00215

(i)  if a Base Rate Loan, at the Base Rate plus the Applicable Margin; or

(ii)  if a Eurodollar Rate Loan, at the Adjusted Eurodollar Rate plus the Applicable Margin.

**Section 2.20  Interest Rate.**

(a)  The basis for determining the rate of interest with respect to any Loan (except a Swing Line Loan which can be made and maintained as Base Rate Loans only), and the Interest Period with respect to any Eurodollar Rate Loan, shall be selected by the Borrower and notified to Administrative Agent and Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be; provided, the Tranche B Term Loans initially shall be made as Base Rate Loans until the date which is 11 Business Days following the Closing Date. If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

(b)  In connection with Eurodollar Rate Loans there shall be no more than ten (10) Interest Periods outstanding at any time. In the event the Borrower fails to specify between a Base Rate Loan or a Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a Eurodollar Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then-current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan). In the event the Borrower fails to specify an Interest Period for any Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, the Borrower shall be deemed to have selected an Interest Period of one month. As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender.

(c)  Interest payable pursuant to Section 2.20(a) shall be computed (i) in the case of Base Rate Loans on the basis of a 365-day or 366-day year, as the case may be, and (ii) in the case of Eurodollar Rate Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

U 00216

(d)     Except as otherwise set forth herein, interest on each Loan shall be payable in arrears on and to (i) each Interest Payment Date applicable to that Loan; (ii) any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) at maturity, including final maturity; provided, however, with respect to any voluntary prepayment of a Base Rate Loan, accrued interest shall instead be payable on the applicable Interest Payment Date.

(e)     The Borrower agrees to pay to Issuing Bank, with respect to drawings honored under any Letter of Credit, interest on the amount paid by Issuing Bank in respect of each such honored drawing from the date such drawing is honored to but excluding the date such amount is reimbursed by or on behalf of the Borrower at a rate equal to (i) for the period from the date such drawing is honored to but excluding the applicable Reimbursement Date, the rate of interest otherwise payable hereunder with respect to Revolving Loans that are Base Rate Loans, and (ii) thereafter, a rate which is 2% per annum in excess of the rate of interest otherwise payable hereunder with respect to Revolving Loans that are Base Rate Loans.

(f)     Interest payable pursuant to Section 2.21(e) shall be computed on the basis of a 365/366-day year for the actual number of days elapsed in the period during which it accrues, and shall be payable on demand or, if no demand is made, on the date on which the related drawing under a Letter of Credit is reimbursed in full. Promptly upon receipt by Issuing Bank of any payment of interest pursuant to Section 2.21(e), Issuing Bank shall distribute to each Lender, out of the interest received by Issuing Bank in respect of the period from the date such drawing is honored to but excluding the date on which Issuing Bank is reimbursed for the amount of such drawing (including any such reimbursement out of the proceeds of any Revolving Loans), the amount that such Lender would have been entitled to receive in respect of the letter of credit fee that would have been payable in respect of such Letter of Credit for such period if no drawing had been honored under such Letter of Credit. In the event Issuing Bank shall have been reimbursed by Lenders for all or any portion of such honored drawing, Issuing Bank shall distribute to each Lender which has paid all amounts payable by it under Section 2.11 with respect to such honored drawing such Lender's Pro Rata Share of any interest received by Issuing Bank in respect of that portion of such honored drawing so reimbursed by Lenders for the period from the date on which Issuing Bank was so reimbursed by Lenders to but excluding the date on which such portion of such honored drawing is reimbursed by the Borrower.

### Section 2.21     Conversion/Continuation.

(a)     Subject to Section 2.33 and so long as no Default or Event of Default shall have occurred and then be continuing, the Borrower shall have the option:

(i)     to convert at any time all or any part of any Tranche B Term Loan or Revolving Loan equal to $1,000,000 and integral multiples of $100,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a Eurodollar Rate Loan may only be converted on the expiration of the Interest Period applicable to such Eurodollar Rate Loan unless the Borrower shall pay all amounts due under Section 2.35 in connection with any such conversion; or

U 00217

(ii)    upon the expiration of any Interest Period applicable to any Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $100,000 in excess of that amount as a Eurodollar Rate Loan.

(b)    The Borrower shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 10:00 a.m. (New York City time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan).  Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any Eurodollar Rate Loans (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower shall be bound to effect a conversion or continuation in accordance therewith.

### Section 2.22    Default Interest.

Upon the occurrence and during the continuance of an Event of Default under Section 8.01(a), Section 8.01(f) or Section 8.01(g), automatically, or upon the occurrence and during the continuance of any other Event of Default, at the Requisite Lenders' option, the principal amount of all Loans outstanding or any fees or other amounts owed hereunder shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws) payable on demand at a rate that is 2% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans); provided, in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Eurodollar Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.22 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

### Section 2.23    Fees.

(a)    The Borrower agrees to pay to Lenders having Revolving Exposure:

(i)    commitment fees equal to (1) the average of the daily difference between (a) the Revolving Commitments, and (b) the sum of (x) the aggregate principal amount of outstanding Revolving Loans (but not any outstanding Swing Line Loans) plus (y) the Letter of Credit Usage, times (2) the Applicable Revolving Commitment Fee Percentage; and

(ii)    letter of credit fees equal to (1) the Applicable Margin for Revolving Loans that are Eurodollar Rate Loans, times (2) the average aggregate daily maximum amount available to be drawn under all such Letters of Credit (regardless of whether any condi-

U 00218

tions for drawing could then be met and determined as of the close of business on any date of determination).

All fees referred to in this Section 2.23(a) shall be paid to Administrative Agent at its Principal Office and upon receipt, Administrative Agent shall promptly distribute to each Lender its Pro Rata Share thereof.

(b)    The Borrower agrees to pay directly to Issuing Bank, for its own account, the following fees:

(i)    a fronting fee equal to 0.250%, per annum, times the average aggregate daily maximum amount available to be drawn under all Letters of Credit (determined as of the close of business on any date of determination); and

(ii)    such documentary and processing charges for any issuance, amendment, transfer or payment of a Letter of Credit as are in accordance with Issuing Bank's standard schedule for such charges and as in effect at the time of such issuance, amendment, transfer or payment, as the case may be.

(c)    All fees referred to in Section 2.23(a) and 2.23(b)(i) shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable quarterly in arrears on March 31, June 30, September 30 and December 31 of each year during the Revolving Commitment Period, commencing on the first such date to occur after the Closing Date, and on the Revolving Commitment Termination Date.

(d)    In addition to any of the foregoing fees, the Borrower agrees to pay to Agents (i) all accrued fees and expenses of each Agent, the Lead Arranger and the Lenders (including the reasonable fees and expenses of counsel for each Agent and Lead Arranger and any local counsel for Administrative Agent and Lead Arranger), (ii) all fees as set forth in the Fee Letter and (iii) such other reasonable fees in the amounts and at the times separately agreed upon.

**Section 2.24    Scheduled Installments.**

(a)    The principal amounts of the Tranche B Term Loans shall be repaid in consecutive quarterly installments (each, an "Installment") in the aggregate amounts set forth below on the last day of each Fiscal Quarter (each, an "Installment Date"), commencing March 31, 2006:

| Fiscal Quarter | Tranche B Term Loan Installments |
|---|---|
| March 31, 2006 | $737,500.00 |
| June 30, 2006 | $737,500.00 |
| September 30, 2006 | $737,500.00 |
| December 31, 2006 | $737,500.00 |
| March 31, 2007 | $737,500.00 |
| June 30, 2007 | $737,500.00 |

U 00219

| FISCAL QUARTER | Tranche B Term Loan Installments |
|---|---|
| September 30, 2007 | $737,500.00 |
| December 31, 2007 | $737,500.00 |
| March 31, 2008 | $737,500.00 |
| June 30, 2008 | $737,500.00 |
| September 30, 2008 | $737,500.00 |
| December 31, 2008 | $737,500.00 |
| March 31, 2009 | $737,500.00 |
| June 30, 2009 | $737,500.00 |
| September 30, 2009 | $737,500.00 |
| December 31, 2009 | $737,500.00 |
| March 31, 2010 | $737,500.00 |
| June 30, 2010 | $737,500.00 |
| September 30, 2010 | $737,500.00 |
| December 31, 2010 | $737,500.00 |
| March 31, 2011 | $737,500.00 |
| June 30, 2011 | $737,500.00 |
| September 30, 2011 | $737,500.00 |
| December 31, 2011 | $737,500.00 |
| March 31, 2012 | $737,500.00 |
| June 30, 2012 | $737,500.00 |
| September 30, 2012 | $737,500.00 |
| Tranche B Term Loan Maturity Date | $275,087,500 |

(b)     Notwithstanding the foregoing, (x) such Installments shall be reduced in connection with any voluntary or mandatory prepayments of the Tranche B Term Loans, as the case may be, in accordance with Sections 2.25 through 2.30, as applicable; and (y) the Tranche B Term Loans, together with all other amounts owed hereunder with respect thereto, shall, in any event, be paid in full no later than the Tranche B Term Loan Maturity Date.

**Section 2.25    Voluntary Prepayments.**

(a)     Any time and from time to time, subject to Section 2.33 and this Section 2.25, in whole or in part, without premium or penalty:

(i)     with respect to Base Rate Loans, the Borrower may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $100,000 and integral multiples of $100,000 in excess of that amount;

(ii)     with respect to Eurodollar Rate Loans, the Borrower may prepay any such Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount; and

-48-

U 00220

(iii)    with respect to Swing Line Loans, the Borrower may prepay any such Loans on any Business Day in whole or in part in an aggregate minimum amount of $100,000, and in integral multiples of $100,000 in excess of that amount.

(b)    All such prepayments shall be made:

(i)    upon not less than one Business Day's prior written or telephonic notice in the case of Base Rate Loans;

(ii)    upon not less than three Business Days' prior written or telephonic notice in the case of Eurodollar Rate Loans;  and

(iii)    upon written or telephonic notice on the date of prepayment, in the case of Swing Line Loans;

in each case given to Administrative Agent or Swing Line Lender, as the case may be, by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to Administrative Agent (and Administrative Agent will promptly transmit such telephonic or original notice for Tranche B Term Loans or Revolving Loans, as the case may be, by telefacsimile or telephone to each Lender or Swing Line Lender, as the case may be).  Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein.

(c)    In the event that, on or prior to the first anniversary of the Closing Date, any Lender receives a Repricing Prepayment (as defined below) or otherwise consents to a Repricing Amendment, then, at the time thereof, Borrower shall pay to such Lender a prepayment premium equal to 1.0% of (i) the amount of such Repricing Prepayment or (ii) the amount of such Lender's Tranche B Term Loans outstanding immediately prior to such Repricing Amendment.  As used herein, with respect to any Lender, a "Repricing Prepayment" is the amount of principal of the Tranche B Term Loans of such Lender that is either (a) prepaid by Borrower pursuant to Section 2.25 or Section 2.27 substantially concurrently with the incurrence by Holdings or any of its Subsidiaries of new or additional term loans under this Agreement or a new financing agreement (other than in connection with an acquisition or a Change of Control) that have interest rate margins or weighted average yields (to be determined by the Administrative Agent consistent with generally accepted financial practice, after giving effect to, among other factors margins, upfront or similar fees or original issue discount shared with all lenders or holders thereof, but excluding the effect of any arrangement, structuring, syndication or other fees payable in connection therewith that are not shared with all lenders or holders thereof) lower than the Applicable Margin or weighted average yield (to be determined by the Administrative Agent on the same basis) then in effect for the Tranche B Term Loans so prepaid  or (b) received by such Lender as a result of the mandatory assignment of such Lender's Tranche B Term Loans in the circumstances described in Section 2.37(b) following the failure of such Lender to consent to an amendment of this Agreement that had the effect of reducing any of the Applicable Margin or weighted average yield (to be determined by the Administrative Agent on the same basis) with respect to such Tranche B Term Loans.  As used herein, with respect to any Lender, a "Repricing Amendment" means the repricing by Borrower of the Tranche B Term Loans under this Agreement in connection with any amendment to this Agreement, resulting in an interest rate margin

-49-

U 00221

or weighted average yield (to be determined by the Administrative Agent on the same basis) on the Tranche B Term Loans as so repriced that is less than the Applicable Margin for, or weighted average yield (to be determined by the Administrative Agent on the same basis) of the Tranche B Term Loans immediately prior to such repricing.

### Section 2.26 **Voluntary Commitment Reductions**.

(a)     The Borrower may, upon not less than three Business Days' prior written or telephonic notice confirmed in writing to Administrative Agent (which original written or telephonic notice Administrative Agent will promptly transmit by facsimile or telephone to each applicable Lender), at any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, the Revolving Commitments in an amount up to the amount by which the Revolving Commitments exceed the Total Utilization of Revolving Commitments at the time of such proposed termination or reduction; provided, any such partial reduction of the Revolving Commitments shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount.

(b)     The Borrower's notice to Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Revolving Commitments shall be effective on the date specified in the Borrower's notice and shall reduce the Revolving Commitment of each Lender proportionately to its Pro Rata Share thereof.

### Section 2.27 **Mandatory Prepayments**.

(a)     Asset Sales.  No later than the first Business Day following the date of receipt by Holdings or any of its Subsidiaries of any Net Asset Sale Proceeds, the Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.30(b) in an aggregate amount equal to such Net Asset Sale Proceeds; provided, (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Asset Sale Proceeds do not exceed $1,000,000 in any Fiscal Year and $3,000,000 from the Closing Date through the applicable date of determination, the Borrower shall have the option, directly or through one or more of its Subsidiaries, to invest Net Asset Sale Proceeds within one hundred eighty (180) days of receipt thereof in long-term productive assets of the general type used in the business of the Borrower and its Subsidiaries; provided, further, within the time period set forth above, any Net Asset Sale Proceeds not so used or, committed pursuant to a binding agreement to so reinvest within three hundred sixty (360) days, shall, by the first Business Day immediately following such period, be applied to prepay Loans as provided in Section 2.30(b); provided, further, any Net Asset Sale Proceeds so used to make Capital Expenditures shall not be included for the purpose of calculating compliance with Section 6.08(d) nor shall such amount be included for the purpose of calculating the Fixed Charge Coverage Ratio in accordance with Section 6.08(b).

(b)     Insurance/Condemnation Proceeds.  No later than the first Business Day following the date of receipt by Holdings or any of its Subsidiaries, or Administrative Agent as

U 00222

loss payee, of any Net Insurance/Condemnation Proceeds, the Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.30(b) in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; provided that (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Insurance/Condemnation Proceeds from the Closing Date through the applicable date of determination do not exceed $1,000,000, the Borrower shall have the option, directly or through one or more of its Subsidiaries to invest such Net Insurance/Condemnation Proceeds within one hundred eighty (180) days of receipt thereof in long term productive assets of the general type used in the business of Holdings and its Subsidiaries, which investment may include the repair, restoration or replacement of the applicable assets thereof; provided, further, within the time period set forth above, any Net Insurance/Condemnation Proceeds not so used or, committed pursuant to a binding agreement to so reinvest within three hundred sixty (360) days, shall, by the first Business Day immediately following such period, be applied to prepay Loans as provided in Section 2.30(b); provided, further, any Net Insurance/Condemnation Proceeds so used to make Capital Expenditures shall not be included for the purpose of calculating compliance with Section 6.08(d) nor shall such amount be included for the purpose of calculating the Fixed Charge Coverage Ratio in accordance with Section 6.08(b).

(c)    Issuance of Equity Securities.  On the date of receipt by Holdings of any Cash proceeds from a capital contribution to, or the issuance of any Capital Stock of, Holdings or any of its Subsidiaries (other than (i) equity issued to management and other employees, directors, consultants and advisors of Holdings and its Subsidiaries in connection with employment agreements, stock option plans or other compensation based arrangements, (ii) equity issued to management pursuant to stock purchase agreements, provided the Cash proceeds from such issuances do not exceed in the aggregate $2,000,000 during the term of this Agreement, (iii) equity issued as a dividend or pursuant to any stock split or replacement of then existing shares of Capital Stock and (iv) equity issued to Sponsor, Sponsor's Affiliates or any other existing holder of the Capital Stock of Holdings prior to the date of such issuance (other than holders of the Capital Stock of Holdings as a result of any public offering of such Capital Stock), all or substantially all of the Cash proceeds of which are utilized by the Borrower to consummate Permitted Acquisitions), the Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.30(b) in an aggregate amount equal to 50% (100% in the case of an initial public offering of the Capital Stock of Holdings or any of its Subsidiaries occurring within 180 days after the Closing Date) of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(d)    Issuance of Debt.  On the date of receipt by Holdings or any of its Subsidiaries of any Cash proceeds from incurrence of any Indebtedness of Holdings or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.01), the Borrower shall prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.30(b) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(e)    Consolidated Excess Cash Flow.  Beginning in Fiscal Year 2006, in the event that there shall be Consolidated Excess Cash Flow for any Fiscal Year, the Borrower shall,

-51-

U 00223

no later than ninety (90) days after the end of such Fiscal Year, prepay the Loans and/or the Revolving Commitments shall be permanently reduced as set forth in Section 2.30(b) in an aggregate amount equal to 50% of such Consolidated Excess Cash Flow.

### Section 2.28    Mandatory Commitment Reductions of Revolving Loans.

The Borrower shall from time to time prepay *first*, the Swing Line Loans, and *second*, the Revolving Loans to the extent necessary so that the Total Utilization of Revolving Commitments shall not at any time exceed the Revolving Commitments then in effect.

### Section 2.29    Prepayment Certificate.

Concurrently with any prepayment of the Loans and/or reduction of the Revolving Commitments pursuant to Section 2.27, the Borrower shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds or Consolidated Excess Cash Flow, as the case may be.  In the event that the Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Borrower shall promptly make an additional prepayment of the Loans and/or the Revolving Commitments shall be permanently reduced in an amount equal to such excess, and the Borrower shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

### Section 2.30    Application of Prepayments/Reductions.

(a)    Application of Voluntary Prepayments by Type of Loans.  Any prepayment of any Loan pursuant to Section 2.25 shall be applied as specified by the Borrower in the applicable notice of prepayment; provided, in the event the Borrower fails to specify the Loans to which any such prepayment shall be applied, such prepayment shall be applied as follows:

First, to prepay the Tranche B Term Loans on a pro rata basis; and

Second, to repay outstanding Revolving Loans to the full extent thereof.

Any prepayment of any Tranche B Term Loan pursuant to Section 2.25 shall be further applied on a pro rata basis to reduce the scheduled remaining Installments of principal on such Tranche B Term Loan.

For the avoidance of doubt, Revolving Commitments need not be reduced before prepayment of a Loan pursuant to Section 2.25 of the Second Lien Credit Agreement.

(b)    Application of Mandatory Prepayments by Type of Loans.  Any amount required to be paid pursuant to Section 2.27 shall be applied as follows:

First, to prepay Tranche B Term Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof) and shall be further applied on a pro rata basis to the remaining scheduled Installments of principal of the Tranche B Term Loans;

U 00224

> *Second*, to prepay the Swing Line Loans to the full extent thereof and to permanently reduce the Revolving Commitments by the amount of such prepayment;

> *Third*, to prepay the Revolving Loans to the full extent thereof; and

> *Fourth*, to prepay outstanding reimbursement obligations with respect to Letters of Credit and to further permanently reduce the Revolving Commitments by the amount of such prepayment;

> *Fifth*, to cash collateralize Letters of Credit and to further permanently reduce the Revolving Commitments by the amount of such cash collateralization;

> *Sixth*, to prepay the Second Lien Loans as set forth in the Second Lien Credit Agreement to the full extent thereof; and

> *Seventh*, so long as no Second Lien Loans are outstanding, to further permanently reduce the Revolving Commitments to the full extent thereof.

Notwithstanding the foregoing or the provisions of Section 2.27(c), for 180 days following the Closing Date, any prepayment with the proceeds from an initial public offering of the Capital Stock of Holdings or any of its Subsidiaries (other than in connection with a Change of Control) shall be applied *first* to prepay the Second Lien Obligations.

    (c)    Application of Prepayments of Loans to Base Rate Loans and Eurodollar Rate Loans. Considering each Class of Loans being prepaid separately, any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans in each case in a manner which minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.33(c).

    (d)    Application of Certain Proceeds. In the event that the amount of any prepayment required to be made above under this Section 2.30 shall exceed the aggregate principal amount of the Base Rate Loans outstanding under the respective Class required to be prepaid (the amount of any such excess being called the "Excess Amount"), the Borrower shall have the right, in lieu of making such prepayment in full, to prepay all the outstanding applicable Base Rate Loans and to deposit an amount equal to the Excess Amount with the Collateral Agent or other financial institution approved by it in a cash collateral account maintained (pursuant to documentation reasonably satisfactory to the Administrative Agent) thereby and in the sole dominion and control of the Collateral Agent, subject to the terms of the Pledge and Security. Any amounts so deposited shall be held by the Collateral Agent as collateral for the Obligations and applied to the prepayment of the applicable Eurodollar Rate Loans at the end of the current Interest Periods applicable thereto. On any Business Day on which (i) collected amounts remain on deposit in or to the credit of such cash collateral account after giving effect to the payments made on such day pursuant to this Section 2.30 and (ii) the Borrower shall have delivered to the Collateral Agent a written request or a telephonic request (which shall be promptly confirmed in writing) that such remaining collected amounts be invested in the Permitted Investments specified in such request, the Collateral Agent shall use its reasonable efforts to invest such remaining collected amounts in such Permitted Investments; provided, however, that the Collateral Agent, subject to the terms of the Pledge and Security, shall have continuous dominion and full control

U 00225

over any such investments (and over any interest that accrues thereon) to the same extent that it has dominion and control over such cash collateral account and no Permitted Investment shall mature after the end of the Interest Period for which it is to be applied. The Borrower shall not have the right to withdraw any amount from such cash collateral account until the applicable Eurodollar Rate Loans and accrued interest thereon are paid in full or if a Default or Event of Default then exists or would result therefrom.

### Section 2.31    General Provisions Regarding Payments.

(a)    All payments by the Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, set-off or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 12:00 p.m. (New York City time) on the date due at the Administrative Agent's Principal Office for the account of Lenders; funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by the Borrower on the next succeeding Business Day.

(b)    All payments in respect of the principal amount of any Loan (other than voluntary prepayments of Revolving Loans) shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest before application to principal.

(c)    Administrative Agent shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable with respect thereto, to the extent received by Administrative Agent.

(d)    Notwithstanding the foregoing provisions hereof, if any Conversion/Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e)    Subject to the provisos set forth in the definition of "Interest Period", whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the Revolving Commitment fees hereunder.

(f)    The Borrower hereby authorizes Administrative Agent to charge the Borrower's accounts with Administrative Agent in order to cause timely payment to be made to Administrative Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

(g)    Administrative Agent shall deem any payment by or on behalf of the Borrower hereunder that is not made in same day funds prior to 12:00 p.m. (New York City time) to be a non-conforming payment. Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii)

-54-

U 00226

the applicable next Business Day.  Administrative Agent shall give prompt telephonic notice to the Borrower and each applicable Lender (confirmed in writing) if any payment is non-conforming.  Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.01(a).  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.22 from the date such amount was due and payable until the date such amount is paid in full.

        (h)     If an Event of Default shall have  occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 8.01, all payments or proceeds received by Agents hereunder in respect of any of the Obligations, shall be applied in accordance with the application arrangements described in Section 7.02 of the Pledge and Security Agreement.

### Section 2.32   <u>Sharing of Payments by Lenders</u>.

        Except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on Collateral if any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its Pro Rata Share, then the Lender receiving such greater proportion shall (a) notify Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; <u>provided</u> that

        (i)     if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and

        (ii)     the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in Letters of Credit to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).

        The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

### Section 2.33   <u>Making or Maintaining Eurodollar Rate Loans</u>.

U 00227

(a)     <u>Inability to Determine Applicable Interest Rate</u>.  In the event that Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Adjusted Eurodollar Rate, Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to the Borrower and each Lender of such determination, whereupon (i) no Loans may be made as, or converted to, Eurodollar Rate Loans until such time as Administrative Agent notifies the Borrower and Lenders that the circumstances giving rise to such notice no longer exist, and (ii) any Funding Notice or Conversion/Continuation Notice given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower.

(b)     <u>Illegality or Impracticability of Eurodollar Rate Loans</u>.  In the event that on any date any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with the Borrower and Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Lender in that market, then, and in any such event, such Lender shall be an "<u>Affected Lender</u>" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to the Borrower and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender). Thereafter (1) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Rate Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, (2) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by the Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Affected Lender shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (3) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans (the "<u>Affected Loans</u>") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by the Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Borrower shall have the option, subject to the provisions of <u>Section 2.33(c)</u>, to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving notice (by telefacsimile or by telephone confirmed in writing) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this <u>Section 2.33(b)</u> shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms hereof.

U 00228

(c)    <u>Compensation for Breakage or Non-Commencement of Interest Periods</u>.
The Borrower shall compensate each Lender, upon written request by such Lender (which re-
quest shall set forth the basis for requesting such amounts), for all reasonable losses, expenses
and liabilities (including any interest paid by such Lender to lenders of funds borrowed by it to
make or carry its Eurodollar Rate Loans and any loss, expense or liability sustained by such
Lender in connection with the liquidation or re-employment of such funds but excluding loss of
anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by
Administrative Agent or such Lender) a borrowing of any Eurodollar Rate Loan does not occur
on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a con-
version to or continuation of any Eurodollar Rate Loan does not occur on a date specified there-
for in a Conversion/Continuation Notice or a telephonic request for conversion or continuation;
(ii) if any prepayment or other principal payment or any conversion of any of its Eurodollar Rate
Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if
any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice
of prepayment given by the Borrower.

(d)    <u>Booking of Eurodollar Rate Loans</u>.  Any Lender may make, carry or trans-
fer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an
Affiliate of such Lender.

(e)    <u>Assumptions Concerning Funding of Eurodollar Rate Loans</u>.  Calculation
of all amounts payable to a Lender under this <u>Section 2.33</u> and under <u>Sections 2.34</u> and <u>2.35</u>
shall be made as though such Lender had actually funded each of its relevant Eurodollar Rate
Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant
to clause (i) of the definition of "Adjusted Eurodollar Rate" in an amount equal to the amount of
such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and
through the transfer of such Eurodollar deposit from an offshore office of such Lender to a do-
mestic office of such Lender in the United States of America; <u>provided</u>, <u>however</u>, each Lender
may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assump-
tions shall be utilized only for the purposes of calculating amounts payable under this <u>Section
2.33</u> and under <u>Section 2.34</u> and <u>2.35</u>.

Section 2.34    <u>**Compensation for Increased Costs**</u>.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compul-
sory loan, insurance charge or similar requirement against assets of, deposits with or for
the account of, or credit extended by, any Lender (except any reserve requirement re-
flected in the definition of Adjusted Eurodollar Rate) or the Issuing Bank;

(ii)    subject any Lender or the Issuing Bank to any tax of any kind whatsoever
with respect to this Agreement, any Letter of Credit, any participation in a Letter of
Credit or any Eurodollar Rate Loan made by it, or change the basis of taxation of pay-
ments to such Lender or the Issuing Bank in respect thereof (except for Indemnified
Taxes or Other Taxes covered by <u>Section 2.36</u> and changes in the rate of any Excluded
Tax payable by such Lender or the Issuing Bank); or

U 00229

(iii)    impose on any Lender or the Issuing Bank or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or any other amount), then upon request of such Lender the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

**Section 2.35    Capital Requirements; Certificates for Reimbursement; Delay in Requests**.

(a)    Capital Requirements.  If any Lender or the Issuing Bank determines that any Change in Law affecting such Lender or the Issuing Bank or any lending office of such Lender or such Lender's or the Issuing Bank's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(b)    Certificates for Reimbursement.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in Sections 2.34 and 2.35(a) and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(c)    Delay in Requests.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to Sections 2.34 and 2.35(a) shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor (except that, if the Change in Law giving

U 00230

rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

### Section 2.36    Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) Administrative Agent, Lender or Issuing Bank, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    Payment of Other Taxes by the Borrower.  Without limiting the provisions of paragraph (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Indemnification by the Borrower.  The Borrower shall indemnify Administrative Agent, each Lender and the Issuing Bank, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by Administrative Agent, such Lender, the Swing Line Lender  or the Issuing Bank, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or the Issuing Bank (with a copy to Administrative Agent), or by Administrative Agent on its own behalf or on behalf of a Lender, the Swing Line Lender or the Issuing Bank, shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Administrative Agent.

(e)    Status of Lenders.  Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower or Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by the Borrower or Admin-

-59-

U 00231

istrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or Administrative Agent as will enable the Borrower or Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that the Borrower is resident for tax purposes in the United States of America, any Foreign Lender shall deliver to the Borrower and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)     duly completed copies of Internal Revenue Service Form W-8BEN or any successor form claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(ii)     duly completed copies of Internal Revenue Service Form W-8ECI,

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, or

(iv)     any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

(f)     <u>Treatment of Certain Refunds</u>.  If Administrative Agent, a Lender or the Issuing Bank determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of Administrative Agent, such Lender, the Swing Line Lender or the Issuing Bank, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that the Borrower, upon the request of Administrative Agent, such Lender, the Swing Line Lender or the Issuing Bank, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Agent, such Lender, the Swing Line Lender or the Issuing Bank in the event Administrative Agent, such Lender or the Issuing Bank is required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require Administrative Agent, any Lender,

U 00232

the Swing Line Lender or the Issuing Bank to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

Section 2.37  Mitigation Obligations; Replacement of Lenders.

(a)  Designation of a Different Lending Office.  If any Lender requests compensation under Section 2.33, 2.34 or 2.35, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.38, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.33, 2.34, 2.35 or 2.36, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)  Replacement of Lenders.  If (i) any Lender requests compensation under Section 2.33, 2.34 or 2.35, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.38, (iii) any Lender refuses to consent to an amendment, modification or waiver required pursuant to Section 10.05(b) with respect to any Loan Document which has otherwise been approved by Requisite Lenders or (iv) any Lender becomes a Defaulting Lender pursuant to Section 2.38, then the Borrower may, at its sole expense and effort, upon notice to such Lender and Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that

(i)  the Borrower shall have paid to Administrative Agent the assignment fee specified in Section 10.06;

(ii)  such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in Letters of Credit, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including, if applicable, any amounts under Section 2.33, 2.25(c) and 2.25(d)) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)  in the case of any such assignment resulting from a claim for compensation under Section 2.33, 2.34 or 2.35 or payments required to be made pursuant to Section 2.36, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)  such assignment does not conflict with applicable law; and

-61-

U 00233

(v)    all Lenders that have requested compensation, required payment by the Bor-
rower, refused consent to such amendment, modification or waiver, or become Defaulting
Lenders at such time are required substantially simultaneously to assign their respective
interests, rights and obligations.

A Lender shall not be required to make any such assignment or delegation if,
prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the
Borrower to require such assignment and delegation cease to apply.

Section 2.38    Defaulting Lenders.

Anything contained herein to the contrary notwithstanding, in the event that any
Lender, at the direction or request of any regulatory agency or authority, defaults (a "Defaulting
Lender") in its obligation to fund (a "Funding Default") any Revolving Loan or its portion of any
unreimbursed payment under Section 2.06(d) (in each case, a "Defaulted Loan"), then (a) during
any Default Period with respect to such Defaulting Lender, such Defaulting Lender shall be
deemed not to be a "Lender" for purposes of voting on any matters (including the granting of any
amendments, consents or waivers) with respect to any of the Loan Documents; (b) to the extent
permitted by applicable law, until such time as the Default Excess with respect to such Default-
ing Lender shall have been reduced to zero, (i) any voluntary prepayment of the Revolving
Loans shall, if the Borrower so directs at the time of making such voluntary prepayment, be ap-
plied to the Revolving Loans of other Lenders as if such Defaulting Lender had no Revolving
Loans outstanding and the Revolving Exposure of such Defaulting Lender were zero, and
(ii) any mandatory prepayment of the Revolving Loans shall, if the Borrower so directs at the
time of making such mandatory prepayment, be applied to the Revolving Loans of other Lenders
(but not to the Revolving Loans of such Defaulting Lender) as if such Defaulting Lender had
funded all Defaulted Loans of such Defaulting Lender, it being understood and agreed that the
Borrower shall be entitled to retain any portion of any mandatory prepayment of the Revolving
Loans that is not paid to such Defaulting Lender solely as a result of the operation of the provi-
sions of this clause (b); (c) such Defaulting Lender's Revolving Commitment and outstanding
Revolving Loans and such Defaulting Lender's Pro Rata Share of the Letter of Credit Usage
shall be excluded for purposes of calculating the Revolving Commitment fee payable to Lenders
in respect of any day during any Default Period with respect to such Defaulting Lender, and such
Defaulting Lender shall not be entitled to receive any Revolving Commitment fee pursuant to
Section 2.23 with respect to such Defaulting Lender's Revolving Commitment in respect of any
Default Period with respect to such Defaulting Lender; and (d) the Total Utilization of Revolving
Commitments as at any date of determination shall be calculated as if such Defaulting Lender
had funded all Defaulted Loans of such Defaulting Lender.  No Revolving Commitment of any
Lender shall be increased or otherwise affected, and, except as otherwise expressly provided in
this Section 2.38, performance by the Borrower of its obligations hereunder and the other Loan
Documents shall not be excused or otherwise modified as a result of any Funding Default or the
operation of this Section 2.38.  The rights and remedies against a Defaulting Lender under this
Section 2.38 are in addition to other rights and remedies which the Borrower may have against
such Defaulting Lender with respect to any Funding Default and which Administrative Agent or
any Lender may have against such Defaulting Lender with respect to any Funding Default.

-62-

U 00234

## ARTICLE THREE

## CONDITIONS PRECEDENT

**Section 3.01   Closing Date.**

The obligation of any Lender to make a Credit Extension on the Closing Date is subject to the satisfaction, or waiver in accordance with Section 10.04, of the following conditions on or before the Closing Date:

(a)    Loan Documents.  Lead Arranger shall have received sufficient copies of each Loan Document and each Second Lien Document, in each case originally executed and delivered by each applicable Loan Party for each Lender.

(b)    Organizational Documents; Incumbency.  Lead Arranger shall have received (i) sufficient copies of each Organizational Document executed and delivered by each Loan Party, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, for each Lender, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Person executing the Loan Documents to which it is a party; (iii) resolutions of the board of directors (or similar governing body) of each Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date; and (v) such other documents as Lead Arranger may reasonably request.

(c)    Existing Indebtedness.  On the Closing Date, Holdings and its Subsidiaries shall have (i) repaid in full all Existing Indebtedness, (ii) terminated any commitments to lend or make other extensions of credit thereunder, (iii) delivered to Administrative Agent all documents or instruments necessary to release all Liens securing Existing Indebtedness or other obligations of Holdings and its Subsidiaries thereunder being repaid on the Closing Date, and (iv) made arrangements satisfactory to Lead Arranger with respect to the cancellation of any letters of credit outstanding thereunder or the issuance of Letters of Credit to support the obligations of Holdings and its Subsidiaries with respect thereto.

(d)    Real Estate Assets.  In order to create in favor of the Collateral Agent, for the benefit of the Secured Parties,  a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in certain Real Estate Assets, the Collateral Agent shall have received from the Borrower and each applicable Guarantor:

U 00235

(i)       fully executed and notarized Mortgages, in proper form for re-cording in all appropriate places in all applicable jurisdictions, encumbering each Real Estate Asset listed in Schedule 3.01(d) (each, a "Closing Date Mortgaged Property");

(ii)       an opinion of counsel (which counsel shall be reasonably satisfac-tory to Collateral Agent) in each state in which a Closing Date Mortgaged Prop-erty is located with respect to the enforceability of the form(s) of Mortgages to be recorded in such state and such other matters as Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to Collateral Agent;

(iii)       in the case of each Leasehold Property a Landlord Consent and Es-toppel.

(iv)       (A) ALTA mortgagee title insurance policies issued by one or more title companies reasonably satisfactory to Collateral Agent with respect to each Closing Date Mortgaged Property (each, a "Title Policy"), in amounts not less than 125% of the fair market value of each Closing Date Mortgaged Property, which policy (the "Title Policy") shall (x) be issued by the a title company rea-sonably acceptable to the Collateral Agent (the "Title Company"), (y) have been supplemented by such endorsements as shall be reasonably requested by the Col-lateral Agent (including endorsements on matters relating to usury, first loss, last dollar, zoning, contiguity, revolving credit, doing business, non-imputation, pub-lic road access, survey, variable rate, environmental lien and so-called compre-hensive coverage over covenants and restrictions), and (z) contain no exceptions to title other than exceptions acceptable to the Collateral. Such Title Policy shall be delivered together with a title report issued by a title company with respect thereto, dated not more than thirty (30) days prior to the Closing Date and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, each in form and substance reasonably satisfactory to Collateral Agent and (B) evidence satisfactory to Collateral Agent that such Loan Party has paid to the title company or to the appropriate governmental authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mort-gage recording and intangible taxes) payable in connection with recording the Mortgages for each Closing Date Mortgaged Property in the appropriate real es-tate records; evidence of flood insurance with respect to each Flood Hazard Prop-erty that is located in a community that participates in the National Flood Insur-ance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, in form and substance rea-sonably satisfactory to Collateral Agent.

(e)       Personal Property Collateral.  In order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a valid, perfected First Priority security in-terest in the personal property Collateral, the Collateral Agent shall have received:

U 00236

      (i)      evidence satisfactory to the Collateral Agent of the compliance by each Loan Party of their obligations under the Pledge and Security Agreement and the other Collateral Documents (including, without limitation, their obligations to authorize and deliver UCC financing statements, originals of securities, instruments and chattel paper and any agreements governing deposit and/or securities accounts as provided therein);

      (ii)      a completed Collateral Questionnaire dated the Closing Date and executed by an Authorized Officer of each Loan Party, together with all attachments contemplated thereby, including (A) the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal or mixed property of any Loan Party in the jurisdictions specified in the Collateral Questionnaire, together with copies of all such filings disclosed by such search, and (B) UCC termination statements (or similar documents) duly authorized for filing by all applicable Persons for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements (or equivalent filings) disclosed in such search (other than any such financing statements in respect of Permitted Liens);

      (iii)      opinions of counsel (which counsel shall be reasonably satisfactory to the Collateral Agent) with respect to the creation and perfection of the security interests in favor of the Collateral Agent in such Collateral as the Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to the Collateral Agent; and

      (iv)      evidence that each Loan Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument (including without limitation a Landlord Personal Property Collateral Access Agreement executed by the landlord of any Leasehold Property and by the applicable Loan Party) and made or caused to be made any other filing and recording (other than as set forth herein) reasonably required by the Collateral Agent.

      (f)      <u>Financial Statements; Projections</u>.  The Lenders shall have received from Holdings (i) the Historical Financial Statements, (ii) pro forma consolidated and consolidating balance sheets of Holdings and its Subsidiaries as at the Closing Date, and reflecting the consummation of the Transactions, the related financings and the other transactions contemplated by the Loan Documents to occur on or prior to the Closing Date, which pro forma financial statements shall be in form and substance satisfactory to Administrative Agent and Lenders, and (iii) the Projections.

      (g)      <u>Evidence of Insurance</u>.  The Administrative Agent shall have received a certificate from the Borrower's insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to <u>Section 5.05</u> is in full force and effect and that Administrative Agent, for the benefit of the Secured Parties, has been named as additional insured and loss payee thereunder to the extent required under <u>Section 5.05</u>.

U 00237

The Administrative Agent shall be satisfied with the amount, types, and terms and conditions of all insurance maintained by Holdings and its Subsidiaries.

(h)     Opinions of Counsel to Loan Parties.  Lenders and their respective counsel shall have received originally executed copies of the favorable written opinions of Faegre & Benson LLP counsel for the Loan Parties, and Cohne, Rappaport & Segal, PC, special Utah counsel for the Loan Parties in the form of Exhibit D and as to such other matters as Lead Arranger may reasonably request, dated as of the Closing Date and otherwise in form and substance reasonably satisfactory to Lead Arranger (and each Loan Party hereby instructs such counsel to deliver such opinions to Agents and Lenders).

(i)     Fees and Expenses.  The Borrower shall have paid to Administrative Agent, the Lead Arranger and the Lenders, the fees and expenses payable on the Closing Date referred to in Section 2.23.

(j)     Solvency Certificate.  On the Closing Date, Lead Arranger shall have received a Solvency Certificate from the Borrower dated the Closing Date and addressed to Administrative Agent and Lenders, and in form, scope and substance satisfactory to Lead Arranger, with appropriate attachments and demonstrating that after giving effect to the consummation of the Transactions, the Borrower and its Subsidiaries are and will be Solvent.

(k)     Closing Date Certificate.  Holdings and the Borrower shall have delivered to Administrative Agent an originally executed Closing Date Certificate, together with all attachments thereto.

(l)     Closing Date.  Lenders shall have made the Tranche B Term Loans to the Borrower on or before December 27, 2005.

(m)     Chief Financial Officer Certificate.  Holdings and the Borrower shall have delivered to Lead Arranger an originally executed chief financial officer certificate certifying that (A) the Consolidated Adjusted EBITDA of the Borrower and its Subsidiaries for the twelve-month period ending as of September 30, 2005 and as of the most recent date for which financial statements have been delivered pursuant to Section 3.01(f) was not less than $88.0 million, (with adjustments satisfactory to the Lead Arranger) and (B) the pro-forma Total Leverage Ratio of the Borrower and its Subsidiaries for the twelve-month period then ended as of September 30, 2005 and as of the most recent date for which financial statements have been delivered pursuant to Section 3.01(f) (which pro forma ratio shall be calculated reflecting the Transactions on a pro-forma basis and shall be acceptable to the Lead Arranger) was not greater than 4.10 to 1.00.

(n)     Completion of Proceedings.  All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby and all documents incidental thereto not previously found acceptable by Administrative Agent and its counsel shall be satisfactory in form and substance to Administrative Agent and such counsel, and Administrative Agent and such counsel shall have received all such

-66-

U 00238

counterpart originals or certified copies of such documents as Administrative Agent may reasonably request.

(o)    USA Patriot Act.  The Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act.

Each Lender, by delivering its signature page to this Agreement and funding a Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Closing Date.

### Section 3.02    Conditions to Each Credit Extension.

(a)    Conditions Precedent.  The obligation of each Lender to make any Loan, or Issuing Bank to issue any Letter of Credit, on any Credit Date, including the Closing Date, are subject to the satisfaction, or waiver in accordance with Section 10.04, of the following conditions precedent:

(i)    Administrative Agent shall have received a fully executed and delivered Funding Notice or Issuance Notice, as the case may be;

(ii)    after making the Credit Extensions requested on such Credit Date, the Total Utilization of Revolving Commitments shall not exceed the Revolving Commitments then in effect;

(iii)    as of such Credit Date, the representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of that Credit Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(iv)    as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension that would constitute an Event of Default or a Default; and

(v)    on or before the date of issuance of any Letter of Credit, Administrative Agent shall have received all other information required by the applicable Issuance Notice, and such other documents or information as Issuing Bank may reasonably require in connection with the issuance of such Letter of Credit.

(b)    Notices.  Any Notice shall be executed by an Authorized Officer in a writing delivered to Administrative Agent.  In lieu of delivering a Notice, the Borrower may give Administrative Agent telephonic notice by the required time of any proposed borrowing, conversion/continuation or issuance of a Letter of Credit, as the case may be; provided each such notice shall be promptly confirmed in writing by delivery of the applicable Notice to Administrative

U 00239

Agent on or before the applicable date of borrowing, continuation/conversion or issuance. Neither Administrative Agent nor any Lender shall incur any liability to the Borrower in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been given by a duly authorized officer or other person authorized on behalf of the Borrower or for otherwise acting in good faith.

<div align="center">

### ARTICLE FOUR

### REPRESENTATIONS AND WARRANTIES

</div>

In order to induce Agents, Lenders, Swingline Lender and Issuing Bank to enter into this Agreement and to make each Credit Extension to be made thereby, each Loan Party represents and warrants to each Agent, Lender, Swingline Lender and Issuing Bank, on the Closing Date and on each Credit Date, that the following statements are true and correct (it being understood and agreed that the representations and warranties made on the Closing Date are deemed to be made concurrently with the consummation of the Transactions):

**Section 4.01    Organization; Requisite Power and Authority; Qualification.**

Each of Holdings and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 4.01, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

**Section 4.02    Capital Stock and Ownership.**

The Capital Stock of each of Holdings and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable. As of the Closing Date, except as set forth in Schedule 4.02, there is no existing option, warrant, call, right, commitment or other agreement to which Holdings or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of Holdings or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Holdings or any of its Subsidiaries of any additional membership interests or other Capital Stock of Holdings or any of its Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Stock of Holdings or any of its Subsidiaries. Schedule 4.02 correctly sets forth the ownership interest of Holdings and each of its Subsidiaries in their respective Subsidiaries as of the Closing Date both before and after giving effect to the Transactions.

**Section 4.03    Due Authorization.**

The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action on the part of each Loan Party that is a party thereto.

<div align="center">-68-</div>

### Section 4.04    No Conflict.

The execution, delivery and performance by Loan Parties of the Loan Documents to which they are parties and the consummation of the transactions contemplated by the Loan Documents do not and will not (a) violate any provision of any law or any governmental rule or regulation applicable to Holdings or any of its Subsidiaries, any of the Organizational Documents of Holdings or any of its Subsidiaries, or any order, judgment or decree of any court or other agency of government binding on Holdings or any of its Subsidiaries except to the extent such violation could not be reasonably expected to have a Material Adverse Effect; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material Contractual Obligation of Holdings or any of its Subsidiaries; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Holdings or any of its Subsidiaries (other than any Liens created under any of the Loan Documents in favor of the Collateral Agent, on behalf of the relevant Secured Parties); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any material Contractual Obligation of Holdings or any of its Subsidiaries, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Lenders.

### Section 4.05    Governmental Consents.

The execution, delivery and performance by Loan Parties of the Loan Documents to which they are parties and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to the Collateral Agent for filing and/or recordation, as of the Closing Date.

### Section 4.06    Binding Obligation.

Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

### Section 4.07    Historical Financial Statements.

The Historical Financial Statements were prepared in conformity with GAAP and are accurate and complete and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments. As of the Closing Date, neither Holdings nor any of its Subsidiaries has any contingent liability or liability for taxes, long-term lease or unusual forward or long-term commitment that is not reflected in the Historical Financial Statements or the notes thereto and there have been no changes to the Historical Financial Statements or notes thereto which, in each case, is material in relation to the

-69-

U 00241

business, operations, properties, assets or condition (financial or otherwise) of Holdings and any of its Subsidiaries taken as a whole.

Section 4.08    **Projections**.

On and as of the Closing Date, the projections of Holdings and its Subsidiaries for the first year following the Closing Date (on a quarterly basis) and annually for six years following the Closing Date (the "Projections") are based on good faith estimates and assumptions made by the management of Holdings; provided the Projections are not to be viewed as facts and that actual results during the period or periods covered by the Projections may differ from such Projections and that the differences may be material; provided, further, as of the Closing Date, management of Holdings believed that the Projections were reasonable and attainable.

Section 4.09    **No Material Adverse Change**.

Since December 31, 2004, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

Section 4.10    **No Restricted Junior Payments**.

As of the Closing Date, neither Holdings nor any of its Subsidiaries has directly or indirectly declared, ordered, paid or made, or set apart any sum or property for, any Restricted Junior Payment or agreed to do so except as permitted pursuant to Section 6.05. No Default or Event of Default (each as defined in the Existing Credit Agreement) under the Existing Credit Agreement has occurred.

Section 4.11    **Adverse Proceedings, etc**.

There are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries (a) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 4.12    **Payment of Taxes**.

Except as otherwise permitted under Section 5.03, all tax returns and reports of Holdings and its Subsidiaries required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon Holdings and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable, unless the failure to do so could reasonably be expected to result in a Material Adverse Effect. Holdings knows of no proposed tax assessment against Holdings or any of its Subsidiaries which is not being actively contested by Holdings or such Subsidiary in good faith and by appropriate proceedings; provided,

U 00242

such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

### Section 4.13   Properties.

(a)    Title.  Each of Holdings and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property, including, but not limited to, Intellectual Property and licenses) all of their respective properties and assets reflected in their respective Historical Financial Statements referred to in Section 4.07 and in the most recent financial statements delivered pursuant to Section 5.01, in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.09.  Except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

(b)    Real Estate.  As of the Closing Date, Schedule 4.13 contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Loan Party, regardless of whether such Loan Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment.  Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and Holdings does not have knowledge of any default that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Loan Party, enforceable against such Loan Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

### Section 4.14   Environmental Matters.

Neither Holdings nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Neither Holdings nor any of its Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law.  To each of Holdings' and its Subsidiaries' knowledge, there have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against Holdings or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Neither Holdings nor any of its Subsidiaries nor, to any Loan Party's knowledge, any predecessor of Holdings or any of its Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any Facility, and none of Holdings' or any of its Subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260-270 or any state equivalent, except as may be conducted in compliance in all material respects with applicable Environmental Laws.  Compli-

-71-

U 00243

ance with all current, or to each of Holdings' and its Subsidiaries' knowledge, reasonably fore-
seeable future, requirements pursuant to or under Environmental Laws could not be reasonably
expected to have, individually or in the aggregate, a Material Adverse Effect. No event or condi-
tion has occurred or is occurring with respect to Holdings or any of its Subsidiaries relating to
any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activ-
ity which individually or in the aggregate has had, or could reasonably be expected to have, a
Material Adverse Effect.

Section 4.15   **No Defaults**.

On and as of the Closing Date, neither Holdings nor any of its Subsidiaries is in
default in the performance, observance or fulfillment of any of the obligations, covenants or con-
ditions contained in any of its Contractual Obligations (other than this Agreement), which could
reasonably be expected to have a Material Adverse Effect, and no condition exists which could
constitute such a default, except where the consequences, direct or indirect, of such default or
defaults, if any, could not reasonably be expected to have a Material Adverse Effect.

Section 4.16   **Material Contracts**.

Schedule 4.16 contains a true, correct and complete list of all the Material Con-
tracts in effect on the Closing Date, and except as described thereon, all such Material Contracts
are in full force and effect and no defaults currently exist thereunder.

Section 4.17   **Governmental Regulation**.

Neither Holdings nor any of its Subsidiaries is subject to regulation under the
Public Utility Holding Company Act of 1935, the Federal Power Act or the Investment Company
Act of 1940 or under any other federal or state statute or regulation which may limit its ability to
incur Indebtedness or which may otherwise render all or any portion of the Obligations unen-
forceable. Neither Holdings nor any of its Subsidiaries is a "registered investment company" or
a company "controlled" by a "registered investment company" or a "principal underwriter" of a
"registered investment company" as such terms are defined in the Investment Company Act of
1940.

Section 4.18   **Margin Stock**.

Neither Holdings nor any of its Subsidiaries is engaged principally, or as one of
its important activities, in the business of extending credit for the purpose of purchasing or carry-
ing any Margin Stock. No part of the proceeds of the Loans made to such Loan Party will be
used to purchase or carry any such margin stock or to extend credit to others for the purpose of
purchasing or carrying any such margin stock or for any purpose that violates, or is inconsistent
with, the provisions of Regulation T, U or X of said Board of Governors.

Section 4.19   **Employee Matters**.

Neither Holdings nor any of its Subsidiaries is engaged in any unfair labor prac-
tice that could reasonably be expected to have a Material Adverse Effect. There is (a) no unfair
labor practice complaint pending against Holdings or any of its Subsidiaries, or to the best

U 00244

knowledge of Holdings and the Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against Holdings or any of its Subsidiaries or to the best knowledge of Holdings and the Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving Holdings or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, and (c) to the best knowledge of Holdings and the Borrower, no union representation question existing with respect to the employees of Holdings or any of its Subsidiaries and, to the best knowledge of Holdings and the Borrower, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

### Section 4.20    Employee Benefit Plans.

Holdings, each of its Subsidiaries and each of their respective ERISA Affiliates are in compliance in all material respects with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan in all material respects. Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified or satisfies the conditions for relying on a favorable opinion letter issued by the Internal Revenue Service to the Plan's prototype sponsor in accordance with IRS Announcement 2001-77, and, to the knowledge of Holdings, nothing has occurred subsequent to the issuance of such determination letter or opinion letter which would cause such Employee Benefit Plan to lose its qualified status. No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by Holdings, any of its Subsidiaries or any of their ERISA Affiliates. No ERISA Event with respect to which there is any unpaid material liability or which could reasonably be expected to create any material liability to Holdings, any of its Subsidiaries, any of their ERISA Affiliates or any Employee Benefit Plan has occurred or is reasonably expected to occur. Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates. The present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by Holdings, any of its Subsidiaries or any of their ERISA Affiliates, (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan. As of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of Holdings, its Subsidiaries and their respective ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, based on information available pursuant to Section 4221(e) of ERISA is zero. Holdings, each of its Subsidiaries and each of their ERISA Affiliates have complied with the requirements of Section 515 of

U 00245

ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

### Section 4.21    Certain Fees.

No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby.

### Section 4.22    Solvency.

Each Loan Party is and, upon the incurrence of any Obligation by such Loan Party on any date on which this representation and warranty is made, will be, Solvent.

### Section 4.23    Compliance with Statutes, etc.

Each of Holdings and its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of Holdings or any of its Subsidiaries), except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

### Section 4.24    Disclosure.

No representation or warranty of any Loan Party contained in any Loan Document or in any other documents, certificates or written statements furnished to Lenders by or on behalf of Holdings or any of its Subsidiaries for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact (known to the Borrower, in the case of any document not furnished by it or in the case of any document furnished to the Borrower by the Sponsor) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made. Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by Holdings or the Borrower to be reasonable at the time made, it being recognized by Lenders that such projections as to future events are subject to the uncertainties and approximations inherent in any projections and are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results. There are no facts known (or which should upon the reasonable exercise of diligence be known) to Holdings or the Borrower (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to Lenders for use in connection with the transactions contemplated hereby.

### Section 4.25    Intellectual Property.

U 00246

Each of the Borrower and its Subsidiaries owns or possesses, or could obtain ownership or possession of, on terms not materially adverse to it, all patents, trademarks, service marks, trade names, copyrights, licenses and rights with respect thereto necessary for the present conduct of its business, without any known conflict with the rights of others, and free from any burdensome restrictions, except where such conflicts and restrictions could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

### Section 4.26    Investigations, Audits, etc.

Neither Holdings nor any of its Subsidiaries is the subject of (x) any pending review or audit by the Internal Revenue Service or any investigation by a Governmental Authority concerning the violation or possible violation of any law or (y) any pending litigation, judgment, action, charge, claim, demand, suit, petition, or arbitration, in each case, which could reasonably be expected to result in a Material Adverse Effect.

### Section 4.27    Agreements with Managers.

As of the Closing Date, Holdings has not entered into an agreement, whether written or oral, with any officer, for the purchase by such officer of any equity securities of Holdings or warrants or options to purchase equity securities of Holdings, except as provided in Schedule 4.02.

### Section 4.28    Foreign Assets Control Regulations.

None of the Loan Parties nor, to the best knowledge of Holdings and the Company after due inquiry, any Affiliate of any Loan Party, is, or will be after consummation of the Transactions and application of the proceeds of the Loans, because of being a "national" of a "designated foreign country" or a "specially designated national" within the meaning of the Regulations of the Office of Foreign Assets Control, United States Treasury Department (31 C.F.R., Subtitle B, Chapter V), or for any other reason, in violation of, any United States Federal Statute or Presidential Executive Order concerning trade or other relations with any foreign country or any citizen or national thereof.

### Section 4.29    Patriot Act.

None of the Loan Parties is or will be a person described or designated in the Specially Designated Nationals and Blocked Person List of the Office of Foreign Assets Control of the U.S. Treasury Department or the Anti-Terrorism Order, and none of the Loan Parties engages in or will engage in any dealings or transactions, or is otherwise associated with, any such persons. "Anti-Terrorism Order" means Executive Order No. 13224 of September 23, 2001, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, 66 Fed. Reg. 49,079 (2001), as amended.

### Section 4.30    Second Lien Documents.

The Borrower has delivered to the Administrative Agent complete and correct copies of the Second Lien Documents as in effect on the Closing Date. Except to the extent otherwise expressly set forth herein or in the schedules thereto, and subject to the qualifications set

U 00247

forth therein, each of the representations and warranties given by any Loan Party in the Second Lien Credit Agreement and the Second Lien Documents is true and correct in all material respects as of the Closing Date (or as of any earlier date to which such representation and warranty specifically relates).

<div align="center">ARTICLE FIVE</div>

<div align="center">AFFIRMATIVE COVENANTS</div>

Each Loan Party covenants and agrees that so long as any Commitment is in effect and until payment in full of all Obligations and cancellation or expiration of all Letters of Credit, each Loan Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Article Five.

**Section 5.01    Financial Statements and Other Reports.** Holdings will deliver to Administrative Agent and Lenders:

(a)    Monthly Reports. As soon as available, and in any event within thirty (30) days after the end of each month ending after the Closing Date, the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such month and the related consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such month and for the period from the beginning of the then current Fiscal Year to the end of such month, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, to the extent prepared on a monthly basis, all in reasonable detail, together with a Financial Officer Certification;

(b)    Quarterly Financial Statements. As soon as available, and in any event within forty-five (45) days after the end of each Fiscal Quarter of each Fiscal Year, the consolidated and consolidating balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(c)    Annual Financial Statements. As soon as available, and in any event within ninety (90) days after the end of each Fiscal Year, (i) the consolidated and consolidating balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Year and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year and the corresponding figures from the Fi-

<div align="center">-76-</div>

nancial Plan for the Fiscal Year covered by such financial statements, in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto; and (ii) with respect such consolidated financial statements a report thereon of an Accounting Firm (which report shall be unqualified as to going concern and scope of audit, and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards) together with a written statement by such independent certified public accountants stating (1) that their audit examination has included a review of the terms of the Loan Documents, (2) whether, in connection therewith, any condition or event that constitutes a Default or an Event of Default has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof, and (3) that nothing has come to their attention that causes them to believe that (x) the information contained in any Compliance Certificate is not correct or that the matters set forth in such Compliance Certificate are not stated in accordance with the terms hereof or (y) an Event of Default in respect of Section 6.08 has otherwise occurred and is continuing as of the end of such Fiscal Year;

(d)    Compliance Certificate.  Together with each delivery of financial statements of Holdings and its Subsidiaries pursuant to Sections 5.01(b) and 5.01(c), a duly executed and completed Compliance Certificate;

(e)    Statements of Reconciliation After Change in Accounting Principles.  If, as a result of any change in accounting principles and policies from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of Holdings and its Subsidiaries delivered pursuant to Section 5.01(b) or 5.01(c) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more a statements of reconciliation for all such prior financial statements in form and substance satisfactory to Administrative Agent;

(f)    Notice of Default.  Promptly upon any officer of Holdings or the Borrower obtaining knowledge (i) of, any condition or event that constitutes a Default or an Event of Default or that notice has been given to Holdings or the Borrower with respect thereto; (ii) that any Person has given any notice to Holdings or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 8.01(b); or (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Borrower has taken, is taking and proposes to take with respect thereto;

U 00249

(g)     Notice of Litigation.  Promptly upon any officer of Holdings or the Borrower obtaining knowledge of (i) the institution of any Adverse Proceeding not previously disclosed in writing by the Borrower to Lenders, or (ii) any material development in any Adverse Proceeding that, in the case of either (i) or (ii) if adversely determined, could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to Holdings or the Borrower to enable Lenders and their counsel to evaluate such matters;

(h)     ERISA.  (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, copies of (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (2) all notices received by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request;

(i)     Financial Plan.  As soon as practicable and in any event no later than thirty (30) days after the beginning of each Fiscal Year, a consolidated plan and financial forecast for such Fiscal Year and each Fiscal Year (or portion thereof) through the final maturity date of the Loans (a "Financial Plan"), including (i) a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of Holdings and its Subsidiaries for each such Fiscal Year, together with pro forma Compliance Certificates for each such Fiscal Year and an explanation of the assumptions on which such forecasts are based, (ii) forecasted consolidated statements of income and cash flows of Holdings and its Subsidiaries for each month of each such Fiscal Year, (iii) forecasts demonstrating projected compliance with the requirements of Section 6.08 through the final maturity date of the Loans and (iv) forecasts demonstrating adequate liquidity through the final maturity date of the Loans without giving effect to any additional debt or equity offerings not reflected in the Projections, together, in each case, with an explanation of the assumptions on which such forecasts are based all in form and substance reasonably satisfactory to Agents;

(j)     Insurance Report.  As soon as practicable and in any event by the last day of each Fiscal Year, a report in form and substance satisfactory to Administrative Agent outlining all material insurance coverage maintained as of the date of such report by Holdings and its Subsidiaries and all material insurance coverage planned to be maintained by Holdings and its Subsidiaries in the immediately succeeding Fiscal Year;

-78-

U 00250

(k)    Notice of Change in Board of Directors.  With reasonable promptness, written notice of any change in the board of directors (or similar governing body) of Holdings or the Borrower;

(l)    Notice Regarding Material Contracts.  Promptly, and in any event within ten (10) Business Days any new Material Contract is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to Administrative Agent (to the extent such delivery is permitted by the terms of any such Material Contract; provided, no such prohibition on delivery shall be effective if it were bargained for by Holdings or its applicable Subsidiary with the intent of avoiding compliance with this Section 5.01(l)), and an explanation of any actions being taken with respect thereto;

(m)    Environmental Reports and Audits.  As soon as practicable following receipt thereof, copies of all environmental audits and reports with respect to environmental matters at any Facility or which relate to any environmental liabilities of Holdings or its Subsidiaries which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(n)    Information Regarding Collateral.  The Borrower will furnish to the Collateral Agent prompt written notice of any change (i) in any Loan Party's corporate name, (ii) in any Loan Party's identity or corporate structure or (iii) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number.  The Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral and for the Collateral at all times following such change to have a valid, legal and perfected security interest as contemplated in the Collateral Documents.  The Borrower also agrees promptly to notify the Collateral Agent if any material portion of the Collateral is damaged or destroyed;

(o)    Annual Collateral Verification.  Each year, at the time of delivery of annual financial statements with respect to the preceding Fiscal Year pursuant to Section 5.01(c), the Borrower shall deliver to the Collateral Agent an Officer's Certificate (i) either confirming that there has been no change in such information since the date of the Collateral Questionnaire delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section and/or identifying such changes and (ii) certifying that all Uniform Commercial Code financing statements (including fixtures filings, as applicable) or other appropriate filings, recordings or registrations, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction identified pursuant to clause (i) above to the extent necessary to protect and perfect the security interests under the Collateral Documents for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period);

-79-

U 00251

(p)    Tax Notices. Promptly upon any officer of the Borrower obtaining knowledge of a tax event or liability not previously disclosed in writing by the Borrower to Administrative Agent which could reasonably be expected to result in a Material Adverse Effect, written notice thereof together with such other information as may be reasonably available to the Borrower to enable Lenders and their counsel to evaluate such matters;

(q)    Other Information. (A) Promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by Holdings to its security holders and creditors acting in such capacity or by any Subsidiary of Holdings to its security holders and creditors other than Holdings or another Subsidiary of Holdings, (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by Holdings or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority and (iii) all press releases and other statements made available generally by Holdings or any of its Subsidiaries to the public concerning material developments in the business of Holdings or any of its Subsidiaries, and (B) such other information and data with respect to Holdings or any of its Subsidiaries as from time to time may be reasonably requested by Administrative Agent or any Lender; and

(r)    Electronic Communications. Notices and other communications to the Lenders and the Issuing Bank hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender or the Issuing Bank pursuant to Article Two if such Lender or the Issuing Bank, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

**Section 5.02   Existence.**

Except as otherwise permitted under Section 6.09, each Loan Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its exis-

-80-

U 00252

tence and all rights (charter and statutory) and franchises, licenses, approvals and permits mate-
rial to its business; provided, no Loan Party or any of its Subsidiaries shall be required to pre-
serve any such existence, right or franchise, licenses and permits if such Person's board of direc-
tors (or similar governing body) shall determine that the preservation thereof is no longer desir-
able in the conduct of the business of such Person, and that the loss thereof is not disadvanta-
geous in any material respect to such Person or to Lenders.

### Section 5.03    Payment of Taxes and Claims.

Each Loan Party will, and will cause each of its Subsidiaries to, pay all Taxes im-
posed upon it or any of its properties or assets or in respect of any of its income, businesses or
franchises before any penalty or fine accrues thereon, and all claims (including claims for labor,
services, materials and supplies) for sums that have become due and payable and that by law
have or may become a Lien upon any of its properties or assets, prior to the time when any pen-
alty or fine shall be incurred with respect thereto; provided no such Tax or claim need be paid if
it is being contested in good faith by appropriate proceedings promptly instituted and diligently
conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in
conformity with GAAP shall have been made therefor, and (b) in the case of a charge or claim
which has or may become a Lien against any of the Collateral, such contest proceedings conclu-
sively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim.  No
Loan Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any
consolidated income Tax return with any Person (other than Holdings or any of its Subsidiaries).

### Section 5.04    Maintenance of Properties.

Each Loan Party will, and will cause each of its Subsidiaries to, maintain or cause
to be maintained in good repair, working order and condition, ordinary wear and tear excepted,
all material properties used or useful in the business of Holdings and its Subsidiaries and from
time to time will make or cause to be made all appropriate repairs, renewals and replacements
thereof.

### Section 5.05    Insurance.

Holdings will maintain or cause to be maintained, with financially sound and
reputable insurers (i) business interruption insurance reasonably satisfactory to Administrative
Agent and (ii) casualty insurance, public liability insurance, third party property damage insur-
ance with respect to liabilities, losses or damage in respect of the assets, properties and busi-
nesses of Holdings and its Subsidiaries as, in the case of the insurance described in clause (ii),
may customarily be carried or maintained under similar circumstances by Persons of established
reputation engaged in similar businesses, in such amounts (giving effect to self-insurance), with
such deductibles, covering such risks and otherwise on such terms and conditions as shall be cus-
tomary for such Persons.  Without limiting the generality of the foregoing, Holdings will main-
tain or cause to be maintained (a) flood insurance with respect to each Flood Hazard Property
that is located in a community that participates in the National Flood Insurance Program, in each
case in compliance with any applicable regulations of the Board of Governors of the Federal Re-
serve System, and (b) replacement value casualty insurance on the Collateral under such policies
of insurance, with such insurance companies, in such amounts, with such deductibles, and cover-

U 00253

ing such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses. Each such policy of insurance shall (i) name Administrative Agent, on behalf of Lenders, as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to Administrative Agent, that names Administrative Agent, on behalf of Lenders as the loss payee thereunder and provides for at least thirty (30) days' prior written notice to Administrative Agent of any modification or cancellation of such policy.

### Section 5.06    Inspections.

Each Loan Party will, and will cause each of its Subsidiaries to, permit any authorized representatives designated by any Lender to visit and inspect any of the properties of any Loan Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable written notice and at such reasonable times during normal business hours and as often as may reasonably be requested; provided, however, that each Lender shall at all times coordinate with the Administrative Agent regarding the frequency and timing of such visits and inspections so as to reasonably minimize the burden imposed on the Loan Parties; and provided, further, that notwithstanding anything set forth herein to the contrary, only one (1) visit of the Administrative Agent or Collateral Agent per Fiscal Year shall be at the expense of the Borrower unless an Event of Default has occurred and is continuing in which case, the Borrower shall also bear the expense of any such accompanying representatives so designated by Lenders.

### Section 5.07    Lenders Meetings.

Holdings and the Borrower will, upon the request of Administrative Agent or Requisite Lenders, participate in a meeting of Administrative Agent and Lenders once during each Fiscal Year to be held at the Borrower's corporate offices (or at such other location as may be agreed to by the Borrower and Administrative Agent) at such time as may be agreed to by the Borrower and Administrative Agent.

### Section 5.08    Compliance with Laws.

Each Loan Party will comply, and shall cause each of its Subsidiaries and all other Persons, if any, on or occupying any Facilities to comply, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including ERISA and all Environmental Laws), noncompliance with which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### Section 5.09    Environmental Disclosure.

Holdings will deliver to Administrative Agent and Lenders:

(a)    as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Holdings or any of its Subsidiaries or by independent consultants,

U 00254

governmental authorities or any other Persons, with respect to significant environmental matters at any Facility or with respect to any Environmental Claims;

(b)    promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws that, individually or in the aggregate, could reasonably be expected to have a material Adverse Effect, (2) any remedial action taken by Holdings or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (B) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Material Adverse Effect, and (3) Holdings or the Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that could cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(c)    as soon as practicable following the sending or receipt thereof by Holdings or any of its Subsidiaries, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (2) any Release required to be reported to any federal, state or local governmental or regulatory agency that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and (3) any request for information from any governmental agency that suggests such agency is investigating whether Holdings or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(d)    prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Holdings or any of its Subsidiaries that could reasonably be expected to (A) expose Holdings or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (B) affect the ability of Holdings or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (2) any proposed action to be taken by Holdings or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject Holdings or any of its Subsidiaries to any additional material obligations or requirements under any Environmental Laws; and

(e)    with reasonable promptness, such other documents and information as from time to time may be reasonably requested by Administrative Agent in relation to any matters disclosed pursuant to this Section 5.09(e).

**Section 5.10    Hazardous Materials Activities, etc.**

U 00255

Each Loan Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Loan Party or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Loan Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### Section 5.11    Subsidiaries.

In the event that any Person becomes a Domestic Subsidiary of Holdings, the Borrower shall (a) promptly cause such Domestic Subsidiary to become a Guarantor hereunder and a Grantor under the Pledge and Security Agreement by executing and delivering to Administrative Agent and Collateral Agent a Counterpart Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 3.01(b), 3.01(d), and 3.01(e). With respect to each such Subsidiary, the Borrower shall promptly send to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of Holdings, and (ii) all of the data required to be set forth in Schedules 4.01 and 4.02 with respect to all Subsidiaries of Holdings; provided, such written notice shall be deemed to supplement Schedules 4.01 and 4.02 for all purposes hereof.

### Section 5.12    Additional Material Real Estate Assets.

In the event that any Loan Party acquires a Material Real Estate Asset or a Real Estate Asset owned on the Closing Date becomes a Material Real Estate Asset and such interest has not otherwise been made subject to the Liens of the Collateral Documents in favor of each of the Collateral Agent, for the benefit of Secured Parties, then such Loan Party, contemporaneously with acquiring such Material Real Estate Asset, shall take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, documents, instruments, agreements, opinions and certificates similar to those described in Sections 3.01(d) and 3.01(e) with respect to each such Material Real Estate Asset that the Collateral Agent shall reasonably request to create in favor of the Collateral Agent for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority Security interest in such Material Real Estate Assets. In addition to the foregoing, the Borrower shall, at the request of Requisite Lenders, deliver, from time to time, to Administrative Agent such appraisals as are required by law or regulation of Real Estate Assets with respect to which the Collateral Agent has been granted a Lien.

### Section 5.13    Interest Rate Protection.

No later than ninety (90) days following the Closing Date and at all times thereafter, the Borrower shall obtain one or more Interest Rate Agreements for a term of not less than three (3) years and otherwise in form and substance reasonably satisfactory to the Administrative Agent, which Interest Rate Agreements shall effectively limit the Unadjusted Eurodollar Rate Component of the interest costs to the Borrower with respect to an aggregate notional principal amount of not less than 50% of the aggregate principal amount of the Tranche B Term Loans

U 00256

outstanding from time to time (based on the assumption that such notional principal amount was a Eurodollar Rate Loan with an Interest Period of three months) to a rate reasonably acceptable to the Administrative Agent.

**Section 5.14    Further Assurances.**

At any time or from time to time upon the request of Administrative Agent, each Loan Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent or either Collateral Agent may reasonably request in order to effect fully the purposes of the Loan Documents including providing Lenders with any information reasonably requested pursuant to Section 10.15. In furtherance and not in limitation of the foregoing, each Loan Party shall take such actions as Administrative Agent or either Collateral Agent may reasonably request from time to time to ensure that the Obligations are guarantied by the Guarantors and are secured by validly perfected, First Priority liens on all of the assets of Holdings, and its Subsidiaries and all of the outstanding Capital Stock of the Borrower and its Subsidiaries excluding the Cash and Cash Equivalents paid into the CSCI Earnout Escrow Fund and the CSCI Catchup Escrow Fund in accordance with the terms hereof.

**Section 5.15    Cash Management Systems.**

Subject to Section 5.17(a), Holdings and its Subsidiaries shall at all times ensure that all Cash and Cash Equivalents held by it are subject to a valid and perfected First Priority security interest in favor of the Collateral Agent, for the benefit of the Secured Parties, pursuant to a Control Agreement; provided, that Cash and Cash Equivalents of up to $1,000,000 in the aggregate at any one time for all such entities and all Cash and Cash Equivalents paid into the CSCI Earnout Escrow Fund and the CSCI Catchup Escrow Fund in accordance with the terms hereof shall, in each case, shall not be required to be subject to such perfected security interests.

As of the Closing Date, Schedule 5.15 contains a true, accurate and complete list of all accounts subject to a valid and perfected First Priority security interest pursuant to this Section 5.15.

**Section 5.16    Books and Records.**

The Loan Parties will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries in accordance with GAAP are made of all dealings and transactions in relation to its business and activities.

**Section 5.17    Certain Post Closing Obligations.**

Within ninety (90) days after the Closing Date (or such longer period deemed reasonably necessary by the Administrative Agent), each Loan Party shall use its commercially reasonable best efforts to (a) obtain duly executed Control Agreements, in form reasonably satisfactory to the Collateral Agent, in respect of those accounts necessary for the Loan Parties to comply with Section 5.15 and the Borrower shall provide a revised Schedule 5.15 reflecting the cash management systems of Holdings and its Subsidiaries implemented after the Closing Date, as reasonably acceptable to the Administrative Agent and (b) obtain duly executed Landlord Per-

U 00257

sonal Property Collateral Access Agreements, in form reasonably satisfactory to the Collateral Agent, in respect of the real properties set forth on Schedule 5.17.

## ARTICLE SIX

## NEGATIVE COVENANTS

Each Loan Party covenants and agrees that, so long as any Commitment is in effect and until payment in full of all Obligations and cancellation or expiration of all Letters of Credit, such Loan Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Article Six.

**Section 6.01   Indebtedness.**

No Loan Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)     the Obligations;

(b)     Indebtedness of any Guarantor Subsidiary to the Borrower or to any  other Guarantor Subsidiary, or of the Borrower to any Guarantor Subsidiary; provided, (i) all such Indebtedness shall be evidenced by promissory notes and all such notes shall be subject to a First Priority Lien pursuant to the Pledge and Security Agreement and a Second Priority Lien (as defined under the Second Lien Documents) pursuant to the Pledge and Security Agreement, (ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, is reasonably satisfactory to Administrative Agent, and (iii) any payment by any such Guarantor Subsidiary under any guaranty of the Obligations shall result in a pro tanto reduction of the amount of any Indebtedness owed by such Subsidiary to the Borrower or to any of its Subsidiaries for whose benefit such payment is made;

(c)     Indebtedness outstanding under the Second Lien Credit Agreement not to exceed $65,000,000 in the aggregate principal amount at any time;

(d)     Indebtedness incurred by Holdings or any of its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of the Borrower or any such Subsidiary pursuant to such agreements, in connection with Permitted Acquisitions or permitted dispositions of any business, assets or Subsidiary of Holdings or any of its Subsidiaries;

(e)     Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

-86-

U 00258

(f)    Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(g)    guaranties in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of Holdings and its Guarantor Subsidiaries;

(h)    guaranties by the Borrower of Indebtedness of a Guarantor Subsidiary or guaranties by a Subsidiary of Holdings of Indebtedness of the Borrower or a Guarantor Subsidiary with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.01;

(i)    Indebtedness described in Schedule 6.01, but not any extensions, renewals or replacements of such Indebtedness except (i) renewals and extensions expressly provided for in the agreements evidencing any such Indebtedness as the same are in effect on the date of this Agreement and (ii) refinancings and extensions of any such Indebtedness if the terms and conditions thereof are not less favorable to the obligor thereon or to the Lenders than the Indebtedness being refinanced or extended, and the average life to maturity thereof is greater than or equal to that of the Indebtedness being refinanced or extended; provided, such Indebtedness permitted under the immediately preceding clause (i) or (ii) above shall not (A) include Indebtedness of an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced, (B) exceed in a principal amount the Indebtedness being renewed, extended or refinanced or (C) incurred, created or assumed if any Default or Event of Default has occurred and is continuing or would result therefrom;

(j)    Indebtedness with respect to Capital Leases and purchase money Indebtedness in an aggregate amount not to exceed at any time $4,000,000; provided, any such Indebtedness (i) shall be secured only by the asset acquired in connection with the incurrence of such Indebtedness, and (ii) shall constitute not less than 85% of the aggregate consideration paid with respect to such asset;

(k)    Permitted Seller Consideration in connection with Permitted Acquisitions in an aggregate amount not to exceed at any time $5,000,000;

(l)    Indebtedness of the Borrower under any Interest Rate Agreements; and

(m)    other unsecured Indebtedness of Holdings and its Subsidiaries, which is unsecured and subordinated to the Obligations in a manner satisfactory to Administrative Agent in an aggregate amount not to exceed at any time $1,000,000.

**Section 6.02    Liens.**

No Loan Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of Holdings or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset,

U 00259

income or profits under the UCC of any State or under any similar recording or notice statute, except (each of the following, collectively, the "Permitted Liens"):

    (a)    Liens in favor of Collateral Agent, for the benefit of the Secured Parties granted pursuant to any Loan Document;

    (b)    Liens for Taxes if obligations with respect to such Taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

    (c)    statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case incurred in the ordinary course of business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

    (d)    Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

    (e)    easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of Holdings or any of its Subsidiaries;

    (f)    any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

    (g)    Liens in favor of any escrow agent solely on and in respect of any cash earnest money deposits made by Holdings or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

    (h)    purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

    (i)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

U 00260

(j)     any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(k)     licenses of patents, trademarks and other Intellectual Property rights granted by Holdings or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of the business of the Borrower or such Subsidiary;

(l)     Liens described in Schedule 6.02;

(m)     Liens securing Indebtedness permitted pursuant to Section 6.01(k); provided, any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness;

(n)     other Liens on assets other than the Collateral securing Indebtedness in an aggregate amount not to exceed $1,000,000 at any time outstanding;

(o)     Liens consisting of judgment or judicial attachment liens with respect to judgments that do not constitute an Event of Default under Section 8.01; and

(p)     Liens on the Collateral securing Indebtedness permitted pursuant to Section 6.01(c); provided that such Liens are subordinated to the Liens securing the Obligations in accordance with the terms of the Intercreditor Agreement.

Section 6.03   **Equitable Lien**.

If any Loan Party or any of its Subsidiaries shall create or assume any Lien upon any of its properties or assets, whether now owned or hereafter acquired, other than Permitted Liens, it shall make or cause to be made effective provisions whereby the Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness secured thereby as long as any such Indebtedness shall be so secured; provided, notwithstanding the foregoing, this covenant shall not be construed as a consent by Requisite Lenders to the creation or assumption of any such Lien not otherwise permitted hereby.

Section 6.04   **No Further Negative Pledges**.

Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale and (b) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be), no Loan Party nor any of its Subsidiaries shall enter into any agreement (other than this Agreement, the other Loan Documents and the Second Lien Documents) prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

Section 6.05   **Restricted Junior Payments**.

U 00261

No Loan Party shall, nor shall it permit any of its Subsidiaries or Affiliates through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment except that:

(a)    on or prior to the 120th day following the Closing Date, the Borrower may make a Restricted Junior Payment to Intermediate Holdings and Intermediate Holdings may make a Restricted Junior Payment to or through Holdings in an amount necessary to permit Holdings to pay the Dividend in an aggregate amount not to exceed $20.0 million and Holdings may pay such Dividend;

(b)    on or prior to December 31, 2005, the Borrower may make a Restricted Junior Payment to Intermediate Holdings and Intermediate Holdings may make a Restricted Junior Payment to or through Holdings in an amount necessary to permit Holdings to consummate the Redemption in an aggregate amount not to exceed $70.0 million and Holdings may consummate the Redemption;

(c)    so long as no Default or Event of Default shall have occurred and be continuing or shall be caused thereby, the Borrower may pay the Management Fees on a quarterly basis in arrears; provided that the date of any such payment is at least five (5) Business Days after the delivery of the Compliance Certificate required by Section 5.01(d) in respect of such Fiscal Quarter for which such Management Fees are due; provided, further, however, that if the Borrower is unable to pay the Management Fees (the "Unpaid Management Fees") because of the existence of a Default or Event of Default, the Borrower may pay the Unpaid Management Fees in cash in full at such time as no Default or Event of Default has occurred and is continuing;

(d)    Holdings may redeem Capital Stock of Holdings exclusively from terminated employees or employees no longer employed because of death or disability; provided, that the aggregate purchase price paid to repurchase such shares of stock shall not exceed $3,000,000 in the aggregate plus, in the case of the death of any employee for whom Holdings or any Subsidiary has acquired key man life insurance, the proceeds of such key man life insurance and the Borrower may make Restricted Junior Payments to Intermediate Holdings and Intermediate Holdings may make a Restricted Junior Payment to or through Holdings in amounts sufficient to permit Holdings to effect such redemptions; and

(e)    the Borrower may make Restricted Junior Payments to Intermediate Holdings and Intermediate Holdings may make a Restricted Junior Payment to Holdings (i) so long as no Default or Event of Default shall have occurred and be continuing or shall be caused thereby, in an aggregate amount not to exceed $300,000 in any Fiscal Year, to the extent necessary to permit Holdings to pay general administrative costs and expenses and (ii) to the extent necessary to permit Holdings to discharge the consolidated tax liabilities of Holdings and its Subsidiaries, in each case so long as Holdings applies the amount of any such Restricted Junior Payment for such purpose.

**Section 6.06    <u>Restrictions on Subsidiary Distributions</u>.**

U 00262

Except as provided herein, the Second Lien Documents or in any other Loan Document, no Loan Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of Holdings to:

      (a)    pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by Holdings or any other Subsidiary of Holdings;

      (b)    repay or prepay any Indebtedness owed by such Subsidiary to the Borrower or any other Subsidiary of Holdings;

      (c)    make loans or advances to Holdings or any other Subsidiary of Holdings; or

      (d)    transfer any of its property or assets to Holdings or any other Subsidiary of Holdings other than restrictions (i) in agreements evidencing Indebtedness permitted by Section 6.01(k) that impose restrictions on the property so acquired, (ii) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the ordinary course of business, or (iii) that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Capital Stock not otherwise prohibited under this Agreement.

**Section 6.07    Investments.**

No Loan Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including without limitation any Joint Venture or general partnership, except (each of the following, collectively, the "Permitted Investments"):

      (a)    Cash Equivalents;

      (b)    (i) equity Investments owned as of the Closing Date in any Domestic Subsidiary, and (ii) Investments made after the Closing Date in wholly-owned Guarantor Subsidiaries of Holdings;

      (c)    Investments in (i) any Securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors and (ii) deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of Holdings and its Subsidiaries;

      (d)    intercompany loans to the extent permitted under Section 6.01(b) (other than any loans or advances to any director or executive officer (or equivalent thereof) that would be in violation of Section 402 of the Sarbanes-Oxley Act to the extent the Company and its Subsidiaries are subject thereto);

      (e)    Consolidated Capital Expenditures permitted by Section 6.08(d);

-91-

U 00263

(f)    loans and advances to employees of Holdings and its Subsidiaries made in the ordinary course of business in an aggregate principal amount not to exceed $1,000,000 in the aggregate;

(g)    Investments made in connection with Permitted Acquisitions permitted pursuant to Section 6.09;

(h)    Investments described in Schedule 6.07; and

(i)    other Investments in an aggregate amount not to exceed at any time $1,500,000.

Notwithstanding the foregoing, in no event shall any Loan Party make any Investment which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.05.

Section 6.08   **Financial Covenants**.

(a)    Interest Coverage Ratio.  Holdings shall not permit the Interest Coverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending March 31, 2006, to be less than the correlative ratio indicated:

| FISCAL QUARTER | INTEREST COVERAGE RATIO |
|---|---|
| March 31, 2006 | 2.50 to 1.00 |
| June 30, 2006 | 2.50 to 1.00 |
| September 30, 2006 | 2.50 to 1.00 |
| December 31, 2006 | 2.50 to 1.00 |
| March 31, 2007 | 2.75 to 1.00 |
| June 30, 2007 | 2.75 to 1.00 |
| September 30, 2007 | 2.75 to 1.00 |
| December 31, 2007 | 2.75 to 1.00 |
| March 31, 2008 | 3.00 to 1.00 |
| June 30, 2008 | 3.00 to 1.00 |
| September 30, 2008 | 3.00 to 1.00 |
| December 31, 2008 | 3.00 to 1.00 |
| March 31, 2009 | 3.25 to 1.00 |
| June 30, 2009 | 3.25 to 1.00 |
| September 30, 2009 | 3.25 to 1.00 |
| December 31, 2009 | 3.25 to 1.00 |
| Thereafter | 3.50 to 1.00 |

(b)    Fixed Charge Coverage Ratio.  Holdings shall not permit the Fixed Charge Coverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending March 31, 2006 to be less than 1.25 to 1.00.

U 00264

(c)    Total Leverage Ratio.  Holdings shall not permit the Total Leverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending March 31, 2006, to exceed the correlative ratio indicated:

| FISCAL QUARTER | TOTAL LEVERAGE RATIO |
|---|---|
| March 31, 2006 | 4.50 to 1.00 |
| June 30, 2006 | 4.50 to 1.00 |
| September 30, 2006 | 4.50 to 1.00 |
| December 31, 2006 | 4.50 to 1.00 |
| March 31, 2007 | 4.25 to 1.00 |
| June 30, 2007 | 4.25 to 1.00 |
| September 30, 2007 | 4.25 to 1.00 |
| December 31, 2007 | 4.25 to 1.00 |
| March 31, 2008 | 4.00 to 1.00 |
| June 30, 2008 | 4.00 to 1.00 |
| September 30, 2008 | 4.00 to 1.00 |
| December 31, 2008 | 4.00 to 1.00 |
| March 31, 2009 | 3.75 to 1.00 |
| June 30, 2009 | 3.75 to 1.00 |
| September 30, 2009 | 3.75 to 1.00 |
| December 31, 2009 | 3.75 to 1.00 |
| Thereafter | 3.50 to 1.00 |

(d)    Maximum Consolidated Capital Expenditures.  Holdings shall not, and shall not permit its Subsidiaries to, make or incur Consolidated Capital Expenditures, in any Fiscal Year indicated below, in an aggregate amount for Holdings and its Subsidiaries in excess of the corresponding amount set forth below opposite such Fiscal Year; provided that following the consummation of any Permitted Acquisition, the amount of Consolidated Capital Expenditures permitted to be made in respect of the Fiscal Year in which such Permitted Acquisition is consummated and each subsequent Fiscal Year shall be increased by an amount equal to 2% of the pro forma aggregate consolidated revenue of the business so acquired; provided, however, such amount for any Fiscal Year shall be increased by an amount equal to 50% of the excess, if any, of such amount for the previous two Fiscal Years (without giving effect to any adjustment in accordance with this proviso) over the actual amount of Consolidated Capital Expenditures for the previous two Fiscal Years:

U 00265

| FISCAL YEAR | CONSOLIDATED CAPITAL EXPENDITURES |
|---|---|
| 2005 | $10,000,000 |
| 2006 | $10,000,000 |
| 2007 | $10,000,000 |
| 2008 | $10,000,000 |
| 2009 | $11,000,000 |
| 2010 | $11,000,000 |
| 2011 | $12,000,000 |
| 2012 | $12,000,000 |

(e)    Certain Calculations.  With respect to any period during which a Permitted Acquisition has occurred (each, a "Subject Transaction"), for purposes of determining compliance with the financial covenants set forth in this Section 6.08, Consolidated Adjusted EBITDA shall be calculated with respect to such period on a pro forma basis (including pro forma adjustments arising out of events which are directly attributable to a specific transaction, are factually supportable and are expected to have a continuing impact, in each case (x) as reasonably consented to by the Administrative Agent that are specified in reasonable detail in a certificate furnished to the Administrative Agent or (y) as determined on a basis consistent with Article 11 of Regulation S-X promulgated under the Securities Act and as interpreted by the staff of the Securities and Exchange Commission, which would include cost savings resulting from head count reduction, closure of facilities and similar restructuring, which pro forma adjustments in each of cases (i) and (ii) shall be certified in reasonable detail by the chief financial officer of Holdings) using the historical audited financial statements of any business so acquired or to be acquired or sold or to be sold and the consolidated financial statements of Holdings and its Subsidiaries which shall be reformulated as if such Subject Transaction, and any Indebtedness incurred or repaid in connection therewith, had been consummated or incurred or repaid at the beginning of such period (and assuming that such Indebtedness bears interest during any portion of the applicable measurement period prior to the relevant acquisition at the weighted average of the interest rates applicable to outstanding Loans incurred during such period).

Section 6.09   Fundamental Changes; Disposition of Assets; Acquisitions.

No Loan Party shall, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub-lease (as lessor or sublessor), transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment in the ordinary course of business) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

-94-

U 00266

(a)    any Subsidiary of Holdings may be merged with or into the Borrower or any Guarantor Subsidiary, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to the Borrower or any Guarantor Subsidiary; provided, in the case of such a merger, the Borrower or such Guarantor Subsidiary, as applicable shall be the continuing or surviving Person;

(b)    sales or other dispositions of assets that do not constitute Asset Sales;

(c)    Asset Sales, the proceeds of which (valued at the principal amount thereof in the case of non-Cash proceeds consisting of notes or other debt Securities and valued at fair market value in the case of other non-Cash proceeds) (i) are less than $750,000 with respect to any single Asset Sale or series of related Asset Sales and (ii) when aggregated with the proceeds of all other Asset Sales made within the same Fiscal Year, are less than $1,500,000; provided (1) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of the Borrower (or similar governing body)), (2) no less than 75% thereof shall be paid in Cash, and (3) the Net Asset Sale Proceeds thereof shall be applied as required in Section 2.27(a);

(d)    disposals of obsolete, worn out or surplus property;

(e)    Permitted Acquisitions; and

(f)    Investments made in accordance with Section 6.07.

**Section 6.10    Disposal of Subsidiary Interests.**

Except for any sale of all of its interests in the Capital Stock of any of its Subsidiaries in compliance with the provisions of Section 6.09, no Loan Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except as required by the Loan Documents and to qualify directors if required by applicable law; or (b) permit any of its Subsidiaries directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except as required by the Loan Documents and to another Loan Party (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualify directors if required by applicable law.

**Section 6.11    Sales and Lease-Backs.**

No Loan Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Loan Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than Holdings or any of its Subsidiaries to the extent such sale or transfer is otherwise permitted hereunder), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Loan Party to any Person (other

-95-

U 00267

than Holdings or any of its Subsidiaries to the extent such sale or transfer is otherwise permitted hereunder) in connection with such lease.

### Section 6.12    Transactions with Shareholders and Affiliates.

No Loan Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of 5% or more of any class of Capital Stock of Holdings or any of its Subsidiaries or with any Affiliate of Holdings or of any such holder, unless such transaction (i) has been disclosed to Administrative Agent, and (ii) is on terms that are no less favorable to Holdings or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided the foregoing restriction shall not apply to (a) transactions among the Loan Parties; (b) the payment by Holdings, and its Subsidiaries of reasonable and customary fees to members of its and its Subsidiaries' boards of directors (or similar governing body) and the payment and provisions of reasonable compensation and benefits (including without limitation permitted incentive stock plans) to officers; (c) compensation arrangements for officers and other employees of Holdings and its Subsidiaries entered into in the ordinary course of business; (d) the payment of Management Fees to the extent otherwise permitted hereunder; (e) the payment of the Dividend; (f) the consummation of the Redemption and (g) transactions described in Schedule 6.12.

### Section 6.13    Conduct of Business.

From and after the Closing Date, no Loan Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than the Core Business or any residential or commercial installation services business ancillary to the Core Business.

### Section 6.14    Permitted Activities of Holdings and Intermediate Holdings.

Holdings and Intermediate Holdings shall not (a) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever; (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Collateral Documents to which it is a party; (c) engage in any business or activity or own any assets (including, without limitation, Cash and Cash Equivalents) other than (i) (A) in the case of Holdings, holding 100% of the Capital Stock of Intermediate Holdings and (B) in the case of Intermediate Holdings holding 100% of the Capital Stock of the Borrower, (ii) performing its obligations and activities incidental thereto under the Loan Documents; and (iii) making Restricted Junior Payments to the extent permitted by this Agreement; (d) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person; (e) sell or otherwise dispose of any Capital Stock of any of its Subsidiaries; (f) create or acquire any Subsidiary or make or own any Investment in any Person other than (x) with respect to Intermediate Holdings, the Borrower and (y) with respect to Holdings, Intermediate Holdings; or (g) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

U 00268

**Section 6.15    Amendments or Waivers of Certain Related Agreements.**

Except as set forth in Section 6.16, no Loan Party shall nor shall it permit any of its Subsidiaries to agree to any material amendment, restatement, supplement or other modification to, or waiver of, any of its material rights or obligations under any CSCI Related Agreement, Organizational Document or any agreement evidencing Indebtedness (other after the Closing Date in a manner adverse to the Lenders without in each case obtaining the prior written consent of Requisite Lenders to such amendment (including, but not limited to, any right or obligation to make any payment into or from the CSCI Earnout Escrow Fund or the CSCI Catchup Escrow Fund, any right or obligation to make any other payment to the CSCI Seller or any calculation with respect to any of the foregoing), restatement, supplement or other modification or waiver.

**Section 6.16    Amendments or Waivers of Certain Agreements with Respect to Second Lien Documents.**

No Loan Party shall nor shall it permit any of its Subsidiaries to:

(a)    make any voluntary or optional payment or prepayment on or redemption of the Second Lien Credit Agreement or any Subordinated Indebtedness other than (i) to the extent permitted by Section 2.30, (ii) refinancings of such Indebtedness to the extent permitted by Section 6.01 and (iii) cancellation or prepayment of intercompany debt owed by any Loan Party or any of its Subsidiaries; or

(b)    amend or modify, or permit the amendment or modification of, (1) any provision of any Second Lien Document other than such amendment or modification not in violation of the Intercreditor Agreement, (2) any provision of any document governing any Subordinated Indebtedness (other than intercompany Indebtedness) to the extent that such modification or amendment is adverse to the Lenders or (3) any of the subordination provisions of any intercompany Indebtedness.

**Section 6.17    [Reserved].**

**Section 6.18    Fiscal Year.**

No Loan Party shall, nor shall it permit any of its Subsidiaries to change its Fiscal Year-end from December 31.

**Section 6.19    No Foreign Subsidiaries.**

No Loan Party shall, nor shall it permit any of its Subsidiaries to, create, acquire or otherwise own directly or indirectly any Subsidiary other than a Domestic Subsidiary.

U 00269

## ARTICLE SEVEN

## GUARANTY

### Section 7.01    Guaranty of the Obligations.

Subject to the provisions of Section 7.02, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "Guaranteed Obligations").

### Section 7.02    Contribution by Guarantors.

All Guarantors desire to allocate among themselves (collectively, the "Contributing Guarantors"), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "Funding Guarantor") under this Guaranty that exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in the amount of such other Contributing Guarantor's Fair Share Shortfall as of such date, with the result that all such contributions will cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. "Fair Share" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed. "Fair Share Shortfall" means, with respect to a Contributing Guarantor as of any date of determination, the excess, if any, of the Fair Share of such Contributing Guarantor over the Aggregate Payments of such Contributing Guarantor. "Fair Share Contribution Amount" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this Section 7.02, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. "Aggregate Payments" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 7.02) minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.02. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or dis-

U 00270

tribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.02 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.02.

Section 7.03    Payment by Guarantors.

Subject to Section 7.02, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

Section 7.04    Liability of Guarantors Absolute.

Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)    Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c)    the obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions;

(d)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the

-99-

generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)      any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations in each case in accordance with the terms of this Agreement; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith or the applicable Hedge Agreement and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Borrower or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents or the Hedge Agreements; and

(f)      this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents or the Hedge Agreements, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms

-100-

U 00272

or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents, any of the Hedge Agreements or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document, such Hedge Agreement or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or any of the Hedge Agreements or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Holdings or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which the Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

Section 7.05  **Waivers by Guarantors**.

Each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of the Borrower or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or

-101-

U 00273

insure any security interest or lien or any property subject thereto; (f) notices, demands, present-ments, protests, notices of protest, notices of dishonor and notices of any action or inaction, in-cluding acceptance hereof, notices of default hereunder, the Hedge Agreements or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaran-teed Obligations or any agreement related thereto, notices of any extension of credit to the Bor-rower and notices of any of the matters referred to in <u>Section 7.04</u> and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

### Section 7.06    <u>Guarantors' Rights of Subrogation, Contribution, etc.</u>

Until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guar-antor (including any other Guarantor) of the Guaranteed Obligations, including, without limita-tion, any such right of contribution as contemplated by <u>Section 7.02</u>. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subro-gation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reim-bursement or indemnification such Guarantor may have against the Borrower or against any col-lateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against the Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnifica-tion or contribution rights at any time when all Guaranteed Obligations shall not have been fi-nally and indefeasibly paid in full, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the bene-fit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether ma-tured or unmatured, in accordance with the terms hereof.

### Section 7.07    <u>Subordination of Other Obligations</u>.

Any Indebtedness of the Borrower or any Guarantor now or hereafter held by any Guarantor (the "<u>Obligee Guarantor</u>") is hereby subordinated in right of payment to the Guaran-

U 00274

teed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

### Section 7.08    Continuing Guaranty.

This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full and the Revolving Commitments shall have terminated and all Letters of Credit shall have expired or been cancelled. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

### Section 7.09    Authority of Guarantors or the Borrower.

It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or the Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

### Section 7.10    Financial Condition of the Borrower.

Any Credit Extension may be made to the Borrower or continued from time to time, and any Hedge Agreements may be entered into from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrower at the time of any such grant or continuation or at the time such Hedge Agreement is entered into, as the case may be. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Borrower. Each Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform its obligations under the Loan Documents and the Hedge Agreements, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower now known or hereafter known by any Beneficiary.

### Section 7.11    Bankruptcy, etc.

(a)    So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of Requisite Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Borrower or any other Guarantor. The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Borrower or any other Guarantor or by any defense which the Borrower or any other Guaran-

-103-

U 00275

tor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower of any portion of such Guaranteed Obligations.  Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by the Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**Section 7.12    Discharge of Guaranty upon Sale of Guarantor.**

If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

### ARTICLE EIGHT

### EVENTS OF DEFAULT

**Section 8.01    Events of Default.**

If any one or more of the following conditions or events shall occur:

(a)    _Failure to Make Payments When Due._  Failure by the Borrower to pay (i) when due any installment of principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (ii) when due any amount payable to Issuing Bank in reimbursement of any drawing under a Letter of Credit; or (iii) any interest on any Loan or any fee or any other amount due hereunder within five (5) days after the date due; or

U 00276

(b)    <u>Default in Other Agreements</u>. (i) Failure of any Loan Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in <u>Section 8.01(a)</u>) in an individual or aggregate principal amount of $1,000,000, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by any Loan Party with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c)    <u>Breach of Certain Covenants</u>. Failure of any Loan Party to perform or comply with any term or condition contained in <u>Section 2.16</u>, <u>Section 5.02</u> (to the extent any breach is not capable of cure), <u>Section 5.05</u>, <u>Section 5.15</u>, or <u>Article Six</u>; or failure of any Loan Party to perform or comply with any term or condition contained in <u>Sections 5.01(a)</u> through <u>(d)</u> and such failure shall not have been remedied or waived within ten (10) Business Days after such failure; or failure of any Loan Party to perform or comply with any term or condition contained in <u>Section 5.02</u> which is capable of cure and such failure shall not have been remedied or waived within five (5) Business Days after such failure; or

(d)    <u>Breach of Representations, etc</u>. Any representation, warranty, certification or other statement made or deemed made by any Loan Party in any Loan Document or in any statement or certificate at any time given by any Loan Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)    <u>Other Defaults Under Loan Documents</u>. Any Loan Party shall default in the performance of or compliance with any term contained herein or any of the other Loan Documents, other than any such term referred to in any other Section of this <u>Section 8.01</u>, and such default shall not have been remedied or waived within thirty (30) days after the earlier of (i) an officer of such Loan Party becoming aware of such default or (ii) receipt by the Borrower of notice from Administrative Agent or any Lender of such default; or

(f)    <u>Involuntary Bankruptcy; Appointment of Receiver, etc</u>. (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of Holdings or any of its Subsidiaries in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (ii) an involuntary case shall be commenced against Holdings or any of its Subsidiaries under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, se-

-105-

U 00277

questrator, trustee, custodian or other officer having similar powers over Holdings or any of its Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of Holdings or any of its Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of Holdings or any of its Subsidiaries, and any such event described in this clause (ii) shall continue for sixty (60) days without having been dismissed, bonded or discharged; or

(g)     Voluntary Bankruptcy; Appointment of Receiver, etc. (i) Holdings or any of its Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or Holdings or any of its Subsidiaries shall make any assignment for the benefit of creditors; or (ii) Holdings or any of its Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of Holdings or any of its Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.01(f); or

(h)     Judgments and Attachments. Any money judgment, writ or warrant of attachment or similar process involving in an individual or aggregate amount in excess of $1,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) or any material non-monetary judgment shall be entered or filed against Holdings or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); or

(i)     Dissolution. Any order, judgment or decree shall be entered against any Loan Party decreeing the dissolution or split up of such Loan Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days; or

(j)     Employee Benefit Plans. (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $1,000,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 412(n) of the Internal Revenue Code or under ERISA; or

(k)     Change of Control. A Change of Control shall occur; or

(l)     Guaranties, Collateral Documents and Other Loan Documents. At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than

-106-

U 00278

the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Agent or any Secured Party to take any action within its control, or (iii) any Loan Party shall contest the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Loan Document to which it is a party; or

(m)    <u>Environmental Matters</u>.  The Borrower or any of its Subsidiaries fails to: obtain or maintain any operating licenses or permits required by any Environmental Law; begin, continue or complete any remediation activities as required by any applicable Environmental Laws; store or dispose of any Hazardous Materials in accordance with any applicable Environmental Laws; or comply with any other applicable Environmental Laws; in each case, if such failure could reasonably be expected to have a Material Adverse Effect and any such failure remains unremedied for more than sixty (60) consecutive days;

then, (1) upon the occurrence and during the continuance of any Event of Default described in <u>Section 8.01(f)</u> or <u>8.01(g)</u>, automatically, and (2) upon the occurrence and during the continuance of any other Event of Default, at the request of (or with the consent of) Requisite Lenders, upon notice to the Borrower by Administrative Agent, (A) the Revolving Commitments, if any, of each Lender having such Revolving Commitments and the obligation of Issuing Bank to issue any Letter of Credit shall immediately terminate; (B) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Loan Party: (I) the unpaid principal amount of and accrued interest on the Loans, (II) an amount equal to the maximum amount that may at any time be drawn under all Letters of Credit then outstanding (regardless of whether any beneficiary under any such Letter of Credit shall have presented, or shall be entitled at such time to present, the drafts or other documents or certificates required to draw under such Letters of Credit), and (III) all other Obligations; <u>provided</u>, the foregoing shall not affect in any way the obligations of Lenders under <u>Section 2.04(d)</u> and <u>Section 2.11</u>; (C) the Administrative Agent may cause the Collateral Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents, subject to the provisions of the Intercreditor Agreement; and (D) Administrative Agent shall direct the Borrower to pay (and the Borrower hereby agrees upon receipt of such notice, or upon the occurrence and during the continuance of any Event of Default specified in <u>Sections 8.01(f)</u> and <u>(g)</u> to pay) to Administrative Agent such additional amounts of cash, to be held as security for the Borrower's reimbursement Obligations in respect of Letters of Credit then outstanding, equal to the Letter of Credit Usage at such time.

U 00279

# ARTICLE NINE

## AGENTS

**Section 9.01    Appointment of Agents.**

CGMI is hereby appointed Lead Arranger hereunder and under the other Loan Documents and each Lender hereby authorizes Lead Arranger to act as its agent in accordance with the terms hereof and the other Loan Documents. CGMI is hereby appointed Syndication Agent hereunder, and each Lender hereby authorizes Syndication Agent to act as its agent in accordance with the terms hereof and the other Loan Documents. CNAI is hereby appointed Administrative Agent hereunder and under the other Loan Documents and each Lender hereby authorizes Administrative Agent to act as its agent in accordance with the terms hereof and the other Loan Documents. Each of the Lenders, the Swing Line Lender and the Issuing Bank hereby irrevocably appoints CNAI as its agent hereunder and under the other  Loan Documents and authorizes Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article Nine are solely for the benefit of the Agents, the Lenders and the Issuing Bank, and the Borrower shall not have rights as a third party beneficiary of any of such provisions.  As of the Closing Date, CGMI, in its capacity as Lead Arranger or Syndication Agent, shall not have any obligations but shall be entitled to all benefits of this Section 9.

**Section 9.02    Rights as a Lender.**

Any Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Agents hereunder in their individual capacity.  The Agents and their Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

**Section 9.03    Exculpatory Provisions.**

The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agents:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing,

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agents are required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the relevant Lenders as shall be expressly provided for herein or in the other Loan Docu-

-108-

ments), provided, that neither the Administrative Agent nor the Collateral Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent or Collateral Agent, as the case may be, to liability or that is contrary to any Loan Document or applicable law, and

(c)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Agents or any of their Affiliates in any capacity.

The Agents shall not be liable for any action taken or not taken by it with the consent or at the request of the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary, or as Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.05) or in the absence of its own gross negligence or willful misconduct. The Agents shall be deemed not to have knowledge of any Default unless and until notice thereof is given to the Agents by the Borrower, a Lender or the Issuing Bank.

The Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article Three or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agents.

**Section 9.04    Reliance by Agents.**

The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agents also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the Issuing Bank, the Agents may presume that such condition is satisfactory to such Lender or the Issuing Bank unless the Agents shall have received notice to the contrary from such Lender or the Issuing Bank prior to the making of such Loan or the issuance of such Letter of Credit. The Agents may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**Section 9.05    Delegation of Duties.**

-109-

U 00281

The Agents may perform any and all of their duties and exercise their rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agents. The Agents and any sub-agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Loan Document by or through any one or more sub-agents appointed by such sub-agent with the approval of Administrative Agent (such appointing sub-agent is referred to in this Section 9.05 as an "Appointing Sub-Agent"). Administrative Agent and each such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory, indemnification and other provisions of this Article Nine and of Section 10.02 shall apply to any of the Related Parties of Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Article Nine and of Section 10.02 shall apply to each such sub-agent and to the Related Parties of each sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Article Nine were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by the Administrative Agent and/or an Appointing Sub-Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of the Loan Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to Administrative Agent and, if applicable, an Appointing Sub-Agent and not to any Loan Party Lender or any other Person and no Loan Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

**Section 9.06   Resignation of Administrative Agent.**

Administrative Agent may at any time give notice of its resignation to the Lenders, the Issuing Bank and the Borrower. Upon receipt of any such notice of resignation, the Requisite Lenders shall have the right, with the consent of the Borrower (not to be unreasonably withheld), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent and Collateral Agent gives notice of its resignation, then the retiring Administrative Agent and Collateral Agent may, with (except after the occurrence and during the continuation of a Default or Event of Default) the consent of the Borrower (not to be unreasonably withheld) and on behalf of the Lenders and the Issuing Bank, appoint a successor Administrative Agent meeting the qualifications set forth above, provided that if Administrative Agent shall notify the Borrower and the Lenders that no qualifying person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent and Collateral Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by Administrative Agent on behalf of the

U 00282

Lenders or the Issuing Bank under any of the Loan Documents, the retiring Administrative Agent and Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through Administrative Agent or Collateral Agent shall instead be made by or to each Lender and the Issuing Bank directly, until such time as the Requisite Lenders with (except after the occurrence and during the continuation of a Default or Event of Default) the consent of the Borrower (not to be unreasonably withheld) appoint a successor Administrative Agent as provided for above in this paragraph. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent and Collateral Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph). The fees payable by the Borrower to a successor Administrative Agent or Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article Nine and Section 10.02 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent. Any resignation or removal of Administrative Agent pursuant to this Section shall also constitute the resignation or removal of CNAI or its successor as Swing Line Lender, and any successor Administrative Agent appointed pursuant to this Section shall, upon its acceptance of such appointment, become the successor Swing Line Lender for all purposes hereunder. In such event (a) the Borrower shall prepay any outstanding Swing Line Loans made by the retiring or removed Administrative Agent in its capacity as Swing Line Lender, (b) upon such prepayment, the retiring or removed Administrative Agent and Swing Line Lender shall surrender any Swing Line Note held by it to the Borrower for cancellation, and (c) the Borrower shall issue, if so requested by successor Administrative Agent and Swing Line Loan Lender, a new Swing Line Note to the successor Administrative Agent and Swing Line Lender, in the principal amount of the Swing Line Loan Sublimit then in effect and with other appropriate insertions.

## Section 9.07   Non-Reliance on Agents and Other Lenders.

Each Lender, the Swing Line Lender and the Issuing Bank acknowledges that it has, independently and without reliance upon the Agents or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender, the Swing Line Lender and the Issuing Bank also acknowledges that it will, independently and without reliance upon the Agents or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

U 00283

Section 9.08   No Other Duties, etc.

Anything herein to the contrary notwithstanding, none of the Bookrunner, Lead Arranger or Syndication Agent listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as Administrative Agent, the Collateral Agent, a Lender or the Issuing Bank hereunder.

Section 9.09   Collateral Documents and Guaranty.

(a)   Agents Under Collateral Documents and Guaranty. Each Lender hereby further authorizes Collateral Agent, on behalf of and for the benefit of Lenders, to be the agent for and representative of Lenders with respect to the Guaranty, the Collateral and the Collateral Documents. Subject to Section 10.04, without further written consent or authorization from Lenders, Collateral Agent may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.04) have otherwise consented or (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.04) have otherwise consented.

(b)   Right to Realize on Collateral and Enforce Guaranty. Anything contained in any of the Loan Documents to the contrary notwithstanding, (other than Section 10.03), the Borrower, the Collateral Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of Lenders in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent, as applicable, and (ii) in the event of a foreclosure by Collateral Agent, on any of the Collateral pursuant to a public or private sale, Collateral Agent, or any Lender may be the purchaser of any or all of such Collateral at any such sale and Collateral Agent as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale.

Section 9.10   Intercreditor Agreement

Notwithstanding anything herein to the contrary, (i) each Lender hereby further authorizes the Collateral Agent, on behalf of and for the benefit of Lenders, to execute the Intercreditor Agreement and (ii) each Lender also acknowledges (a) that the Lien and security interest granted to the Administrative Agent and/or the Collateral Agent pursuant to the Collateral Documents and the exercise of any right or remedy by the Administrative Agent and/or Collateral Agent thereunder are subject to the provisions of the Intercreditor Agreement and (b) that the Collateral Agent hereunder, is also acting as Collateral Agent under the Second Lien Credit

-112-

U 00284

Agreement, and in such dual capacities has entered into the Intercreditor Agreement on behalf of both the Lenders hereunder as well as the lenders under the Second Lien Credit Agreement, each Lender hereby waiving any actual or potential conflict or breach of duty created or existing as the result of such dual capacities and acknowledging that it has read the terms and conditions of the Intercreditor Agreement and has accepted the same without reliance on any of the Agents.  In the event of any conflict between the terms of the Intercreditor Agreement and the Collateral Documents, the terms of the Intercreditor Agreement shall govern and control.

## ARTICLE TEN

## MISCELLANEOUS

**Section 10.01** <u>Notices; Effectiveness; Electronic Communication</u>.

(a)    <u>Notices Generally</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)    if to the Borrower, to it at c/o Wind Point Partners, 676 Michigan Avenue, Suite 3700, Chicago, Illinois 60611, Attention of Nathan Brown (Telecopier No. 312-255-4820; Telephone No. 312-255-4800); with a copy to Sponsor at 676 North Michigan Ave., Suite 3700, Chicago, Illinois 60611, Attention of Alex Washington (Telecopier No. 312-255-4820; Telephone No. 312-255-4800), with a copy to Faegre & Benson LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota, Attention of Daniel J. Amen (Telecopier No. 612-766-1600; Telephone No. 612-766-8615);

(ii)    if to Administrative Agent or the Swing Line Lender, to Citicorp North America, Inc., at 390 Greenwich Street, New York, New York 10013, Attention of Rob Zeimer (Telecopier No. 646-291-1655; Telephone No. 212-723-6734), with a copy to Cahill Gordon & Reindel LLP, 80 Pine Street, New York, New York 10005, Attention of Michael E. Michetti (Telecopier No. 212-269-5420; Telephone No. 212-701-3000);

(iii)    if to the Issuing Bank, to Citicorp North America, Inc., Attention of Rob Zeimer (Telecopier No. 212-723-6734; Telephone No. 646-291-1655), with a copy to Citibank North America, at 2 Penns Way, Suite 200, New Castle, Delaware 19720; Attention of Jessica Zimmers (Telecopier No. 212-994-0849; Telephone No. 302-894-6052); and

(iv)    if to a Lender, to it at its address (or telecopier number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business

-113-

U 00285

day for the recipient).  Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)    <u>Electronic Communications</u>.  Notices and other communications to the Lenders and the Issuing Bank hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by Administrative Agent; <u>provided</u> that the foregoing shall not apply to notices to any Lender or the Issuing Bank pursuant to Article Two if such Lender or the Issuing Bank, as applicable, has notified Administrative Agent that it is incapable of receiving notices under such Section by electronic communication.  Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    <u>Change of Address, Etc</u>.  Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

**Section 10.02 <u>Expenses; Indemnity; Damage Waiver</u>.**

(a)    <u>Costs and Expenses</u>.  Each Loan Party shall pay (i) all reasonable out-of-pocket expenses incurred by the Agents and their Affiliates, including the reasonable fees, charges and disbursements of counsel for the Agents, in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all out-of-pocket expenses incurred by the Agents, any Lender or the Issuing Bank, including the fees, charges and disbursements of any counsel for the Agents, any Lender or the Issuing Bank, in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

U 00286

(b)  Indemnification by Loan Parties.  Each Loan Party shall indemnify the Agents (and any sub-agent thereof), each Lender and the Issuing Bank, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Loan Parties or any of their Subsidiaries, or any Environmental Liability related in any way to the Loan Parties or any of their Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by a Loan Party or any other Loan Party,  and regardless of whether any Indemnitee is a party thereto, provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  The indemnification under this Section 10.02(b) shall survive and continue for all Indemnitees, notwithstanding any failure of the Loans to close.

(c)  Reimbursement by Lenders.  To the extent that the Loan Parties fail to pay any amount required under paragraph (a) or (b) of this Section to be paid by it to the Agents (or any sub-agent thereof), the Issuing Bank or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Agents (or any such sub-agent), the Issuing Bank or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agents (or any such sub-agent) or the Issuing Bank in its capacity as such, or against any Related Party of any of the foregoing acting for the Agents (or any such sub-agent) or Issuing Bank in connection with such capacity.  The obligations of the Lenders under this paragraph (c) are subject to the provisions of Section 10.10.

(d)  Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, the Loan Parties shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connec-

U 00287

tion with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

       (e)    <u>Payments</u>. All amounts due under this <u>Section 10.02</u> shall be payable not later than five (5) Business Days after demand therefor.

## Section 10.03  <u>Right of Set-Off</u>.

       Without limitation of any other rights of the Lenders or the Issuing Bank, if an Event of Default shall have occurred and be continuing, each Lender, the Issuing Bank, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the Issuing Bank or any such Affiliate to or for the credit or the account of the Loan Parties against and on account of any and all of the obligations of the Loan Parties now or hereafter existing under this Agreement or any other Loan Document to such Lender or the Issuing Bank, irrespective of whether or not such Lender or the Issuing Bank shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Loan Parties may be contingent or unmatured or are owed to a branch or office of such Lender or the Issuing Bank different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender, the Issuing Bank and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of set-off) which such Lender, the Issuing Bank or their respective Affiliates may have. Each Lender and the Issuing Bank agrees promptly to notify the Loan Parties and Administrative Agent after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application.

## Section 10.04  <u>Amendments and Waivers</u>.

       (a)    <u>Requisite Lenders' Consent</u>. Subject to <u>Section 10.04(b)</u> and <u>Section 10.04(c)</u>, no amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by any Loan Party therefrom, shall in any event be effective without the written concurrence of the Requisite Lenders.

       (b)    <u>Affected Lenders' Consent</u>. Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

       (i)    extend the scheduled final maturity of any Loan or Note;

       (ii)    waive, reduce or postpone any scheduled repayment (but not prepayment) or amend <u>Section 2.27</u> to change the nature of any mandatory prepayment or <u>Section 2.30(b)</u> regarding the application thereof;

       (iii)    extend the stated expiration date of any Letter of Credit beyond the Revolving Commitment Termination Date;

<div align="center">-116-</div>

U 00288

(iv)    reduce or forgive the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.21), any premium or any fee payable hereunder or change the cash pay nature of any such interest;

(v)    extend the time for payment of any such interest, premium or fees;

(vi)    reduce the principal amount of any Loan or any reimbursement obligation in respect of any Letter of Credit;

(vii)    amend, modify, terminate or waive any provision of Section 2.25 (c), this Section 10.04(b) or Section 10.04(c);

(viii)    amend, directly or indirectly, the definition of "Requisite Lenders" or "Pro Rata Share" (or any other defined terms used to define terms);

(ix)    release all or substantially all of the Collateral or all or substantially all of the Guarantors or all or substantially all of the value of the Guaranty from the Guaranty except as expressly provided in the Loan Documents;

(x)    consent to the assignment or transfer by any Loan Party of any of its rights and obligations under any Loan Document; or

(xi)    amend, modify or terminate any provision of Section 10.06 so as to restrict or limit the rights of any Lender to assign or transfer any of its rights or obligations hereunder.

(c)    Other Consents.  No amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by any Loan Party therefrom, shall:

(i)    increase any Revolving Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; provided, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Revolving Commitment of any Lender;

(ii)    amend, modify, terminate or waive any provision hereof relating to the Swing Line Sublimit or the Swing Line Loans without the consent of Swing Line Lender;

(iii)    amend the definition of "Requisite Class Lenders" without the consent of Requisite Class Lenders of each Class;

(iv)    alter the required application of any repayments or prepayments as between Classes pursuant to Section 2.30 without the consent of Requisite Class Lenders of each Class which is being allocated a lesser repayment or prepayment as a result thereof; provided, Requisite Lenders may waive, in whole or in part, any prepayment so long as the application, as between Classes, of any portion of such prepayment which is still required to be made is not altered;

U 00289

(v)　　amend, modify, terminate or waive any obligation of Lenders relating to the purchase of participations in Letters of Credit as provided in Section 2.11 without the written consent of Administrative Agent and of Issuing Bank;

(vi)　　amend, modify, terminate or waive any provision of Article Nine as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent;

(vii)　　amend, modify, terminate or waive any provision hereof that has the effect of disproportionately disadvantaging a Class of Lenders relative to any other Class shall be effective without the consent of Requisite Class Lenders.

**Section 10.05  Execution of Amendments, etc.**

Administrative Agent may, but shall have no obligation to, with the written concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.05 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Loan Party, on such Loan Party.

**Section 10.06  Successors and Assigns.**

(a)　　Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of paragraph (b) of this Section, (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)　　Assignments by Lenders. Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that

(i)　　except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans

-118-

U 00290

outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loan of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $1,000,000, in the case of any assignment in respect of Revolving Commitments and Revolving Loans, or $1,000,000, in the case of any assignment in respect of Tranche B Term Loans, unless each of Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consent (each such consent not to be unreasonably withheld or delayed);

     (ii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this clause (ii) shall not prohibit any lender from assigning all or a portion of its rights and obligations among separate Classes on a non-*pro rata* basis;

     (iii)    any assignment of a Revolving Commitment must be approved by Administrative Agent, the Issuing Bank and so long as no Event of Default has occurred and is continuing, the Borrower (such consent not to be unreasonably withheld or delayed) unless (x) the Person that is the proposed assignee is itself a Lender with a Revolving Commitment or its Affiliate (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee), (y) unless the assignee is taking delivery of an assignment in connection with settlement of a credit derivatives transaction and (z) the assignment is being made by CNAI on or prior to the date on which the primary syndication of the Senior Credit Facilities is completed; and

     (iv)    the parties to each assignment shall execute and deliver to Administrative Agent an Assignment and Assumption, which may be electronically executed and delivered to the Administrative Agent, together with a processing and recordation fee of $3,500 (or as otherwise agreed by the Administrative Agent) and the Eligible Assignee, if it shall not be a Lender, shall deliver to Administrative Agent an Administrative Questionnaire.

     Notwithstanding anything to the contrary herein or in any Assignment Agreement, in the case of an assignment to an Affiliate of an assigning Lender, such assignment shall be effective between such assigning Lender and its Affiliate immediately without compliance with the conditions for assignment under Sections 10.06(b) through (d), but shall not be effective with respect to any Loan Party, Administrative Agent, any other Agent, any Issuing Bank, any Swing Line Lender or any Lender, and each Loan Party, Administrative Agent, each other Agent, each Issuing Bank, each Swing Line Lender and each Lender shall be entitled to deal solely and directly with such assigning Lender under any such assignment, in each case, until the conditions for assignment under Sections 10.06(b) through (d) have been complied with.

     Subject to acceptance and recording thereof by Administrative Agent pursuant to paragraph (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the ex-

U 00291

tent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.36, 2.35 and 10.02 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c)    Register. Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrower, Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.

(d)    Participations. Any Lender may at any time, without the consent of, or notice to, the Borrower or Administrative Agent, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver to (i) extend the final scheduled maturity of any Loan, Note or Letter of Credit (unless such Letter of Credit is not extended beyond the Revolving Commitment Termination Date) in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Loan Party of any of its rights and obligations under this Agreement or (iii) release all or substantially all of the Collateral under the Collateral

-120-

U 00292

Documents (except as expressly provided in the Loan Documents) supporting the Loans hereunder in which such participant is participating. Subject to paragraph (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.33(c), 2.34, 2.35 and 2.36 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.04 as though it were a Lender, provided such Participant agrees to be subject to Section 2.36 as though it were a Lender.

(e)    Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Sections 2.33(c), 2.34, 2.35 and 2.36 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.36 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.36(e) as though it were a Lender.

(f)    Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    SPV Lender. Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (a "SPV"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it shall not institute against, or join any other person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 10.06(g), any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefore, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans

U 00293

and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV. This Section 10.06(g) may not be amended without the written consent of the SPV. Notwithstanding anything to the contrary in this Agreement, no SPV shall be entitled to any greater rights under Section 2.29 than its Granting Lender would have been entitled to absent the use of such SPV.

### Section 10.07 Independence of Covenants.

All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

### Section 10.08 Survival of Representations, Warranties and Agreements.

All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Loan Party set forth in Sections 2.33(c), 2.34, 2.35, 2.36, 10.02, and 10.03 and the agreements of Lenders set forth in Sections 2.32, 9.03(b) and 9.06 shall survive the payment of the Loans, the cancellation or expiration of the Letters of Credit and the reimbursement of any amounts drawn thereunder, and the termination hereof.

### Section 10.09 No Waiver; Remedies Cumulative.

No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Loan Documents or any of the Hedge Agreements. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

### Section 10.10 Marshalling; Payments Set Aside.

Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Loan Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or Administrative Agent or Lenders enforce any security interests or exercise their rights of set-off, and such payment or payments or the proceeds of such enforcement or set-off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a

U 00294

trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or set-off had not occurred.

Section 10.11  <u>Severability</u>.

In case any provision in or obligation hereunder or any Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

Section 10.12  <u>Obligations Several; Independent Nature of Lenders' Rights</u>.

The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder.  Nothing contained herein or in any other Loan Documents, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

Section 10.13  <u>Headings</u>.

Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

Section 10.14  <u>Governing Law; Jurisdiction; Etc.</u>

(a)    <u>Governing Law</u>.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND RULE 327(b) OF THE NEW YORK CIVIL PRACTICE LAW AND RULES.

(b)    <u>Submission to Jurisdiction</u>. Each Loan Party irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other

U 00295

manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that any Agent, any Lender or the Issuing Bank may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)    Waiver of Venue. Each Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Service of Process. Each Loan Party hereto irrevocably consents to service of process in the manner provided for notices in Section 10.01. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

### Section 10.15 USA PATRIOT Act.

Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA Patriot Act.

### Section 10.16 WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

### Section 10.17 Treatment of Certain Information; Confidentiality.

Each of the Agents, the Lenders and the Issuing Bank agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to it, its Affiliates and their respective partners, directors, officers, employees, agents, advisors, auditors and representatives (it being understood that the Persons to whom such disclosure

U 00296

is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to Agents, any Lender or the Issuing Bank on a nonconfidential basis from a source other than the Borrower.

For purposes of this Section, "Information" means all information received from the Borrower or any of its Subsidiaries relating to Holdings, Intermediate Holdings, the Borrower or any of their Subsidiaries or any of their respective businesses, other than any such information that is available to any Agent, any Lender or the Issuing Bank on a nonconfidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

### Section 10.18  Usury Savings Clause.

Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and the Borrower to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess

U 00297

shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrower.

### Section 10.19 Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents, and the Fee Letter constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Article Three, this Agreement shall become effective when it shall have been executed by Administrative Agent and when Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

### Section 10.20 Electronic Execution of Assignments.

The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

### Section 10.21 Entire Agreement.

This Agreement represents the entire agreement of the parties with regard to the subject matter hereof, and the terms of any letters and other documentation entered into between any of the parties hereto prior to the execution of this Agreement which relate to Loans to be made hereunder shall be replaced by the terms of this Agreement.

[Remainder of page intentionally left blank]

-126-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

UNITED SUBCONTRACTORS, INC.
USI SENIOR HOLDINGS, INC.
USI INTERMEDIATE HOLDINGS, INC.
SAN GABRIEL INSULATION, INC.
UNITED SHELVING ACQUISITION CORP.
CONSTRUCTION SERVICES & CONSULTANTS, INC.

By: _____
   Name: Timothy Gallagher
   Title:  Chief Financial Officer


USI INVESTMENT GROUP, LLC

By: _____
   Name: J. Kevin Gilligan
   Title:  Manager

[First Lien Credit Agreement]

TI 00299

CITICORP NORTH AMERICA, INC.,
as Administrative Agent, Collateral Agent, Swingline
Lender and a Lender

By: _____
Name:  Aaron Dannenberg
Title:   Director and Vice President

CITIGROUP GLOBAL MARKETS INC.,
as Lead Arranger, Bookrunner and Syndication Agent

By: _____

Name:  Aaron Dannenberg
Title:   Director and Vice President

[First Lien Credit Agreement]

II 00301

Schedule 1.01

<u>Certain Adjustments to Financial Covenant Definitions</u>

## 1. Consolidated Adjusted EBITDA

Consolidated Adjusted EBITDA for the purposes of calculating the covenants pursuant to <u>Section 6.08</u> as of:

(i)    March 31, 2006 shall be the sum of Q2 2005 EBITDA, Q3 2005 EBITDA, Q4 2005 EBITDA and actual Consolidated Adjusted EBITDA for the three months ended March 31, 2006 as reflected in the financial statements delivered in accordance with <u>Section 5.01(b)</u>;

(ii)    June 30, 2006 shall be the sum of Q3 2005 EBITDA, Q4 2005 EBITDA, and actual Consolidated Adjusted EBITDA for the six months ended June 30, 2006 as reflected in the financial statements delivered in accordance with <u>Section 5.01(b)</u> ;

(iii)    September 30, 2006 shall be the sum of Q4 2005 EBITDA and actual consolidated Adjusted EBITDA for the nine months ended September 30, 2006 as reflected in the financial statements delivered in accordance with <u>Section 5.01(b)</u> ; and

(iv)    Thereafter Consolidated Adjusted EBITDA will be Consolidated Adjusted EBITDA for the previous 4 Fiscal Quarters as reflected in the financial statements delivered in accordance with <u>Section 5.01(b)</u>.

*Q2 2005 EBITDA:* $22,396,000.

*Q3 2005 EBITDA:* $24,605,000.

*Q4 2005 EBITDA:* actual Consolidated Adjusted EBITDA for quarter ended December 31, 2005 as reflected in the financial statements delivered in accordance with <u>Section 5.01(b)</u>.

## 2. Total Leverage Ratio

Consolidated Adjusted EBITDA for the purposes of calculating the Total Leverage Ratio pursuant to <u>Section 6.08(c)</u> shall be calculated as above.

## 3. Interest Coverage Ratio.

First Test – March 31, 2006:  The numerator will be the Consolidated Adjusted EBITDA (as calculated above) and the denominator will be the Consolidated Cash Interest Expense for the period from January 1, 2006 to March 31, 2006 multiplied four (4) times.

Second Test – June 30, 2006:  The numerator will be the Consolidated Adjusted EBITDA (as calculated above) and the denominator will be the Consolidated Cash Interest Expense for the period from January 1, 2006 to June 30, 2006 multiplied two (2) times.

U 00302

Third Test – September 30, 2006:  The numerator will be the Consolidated Adjusted EBITDA (as calculated above) and the denominator will be the Consolidated Cash Interest Expense for the period from January 1, 2006 to September 30, 2006 multiplied one and one-third (1⅓) times.

Thereafter the numerator will be the Consolidated Adjusted EBITDA for the previous 4 Fiscal Quarters and the denominator will be the Consolidated Cash Interest Expense for the same period.

### 4.    Fixed Charge Coverage Ratio.

First Test – March 31, 2006:  The numerator will be the Consolidated Adjusted EBITDA (as calculated above) less the Consolidated Capital Expenditures (as calculated below) and the denominator will be the Consolidated Fixed Charges for the period from January 1, 2006 to March 31, 2006 multiplied four (4) times.

Second Test –June 30, 2006:  The numerator will be the Consolidated Adjusted EBITDA (as calculated above) less the Consolidated Capital Expenditures (as calculated below) and the denominator will be the annualized Consolidated Fixed Charges for the period from January 1, 2006 to June 30, 2006 multiplied two (2) times.

Third Test – September 30, 2006:  The numerator will be the Consolidated Adjusted EBITDA (as calculated above) less the Consolidated Capital Expenditures (as calculated below) and the denominator will be the annualized Consolidated Fixed Charges for the period from January 1, 2006 to September 30, 2006 multiplied one and one-third (1⅓) times.

Thereafter the numerator will be Consolidated Adjusted EBITDA less Consolidated Capital Expenditures for the previous 4 Fiscal Quarters and the denominator will be Consolidated Fixed Charges for the previous 4 Fiscal Quarters.

### 5.    Capital Expenditures.

Capital Expenditures for the purposes of calculating the Fixed Charge Coverage Ratio will be Consolidated Capital Expenditure for the previous 4 Fiscal Quarters for each test period.

U 00303

(Multicurrency—Cross Border)

Execution Copy
CB10-384A



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

Dated as of  December 29, 2005

CITIBANK, N.A.                 and                 UNITED SUBCONTRACTORS INC.

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

1.     **Interpretation**

(a)     *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)     *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.     **Obligations**

(a)     *General Conditions.*

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)   Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)   Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

U 00117

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

           (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

           (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

U 00118

(ii)   *Liability*. If: —

(1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)   X does not so deduct or withhold; and

(3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.   Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations.*

(i)   *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)   *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)   *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

**ISDA® 1992**

**U 00119**

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

U 00120

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

    (i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

    (ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

    (iii)    *Credit Support Default.*

        (1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

        (2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

        (3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

    (iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

    (v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

    (vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

ISDA® 1992

U 00121

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) ***Merger Without Assumption***. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b) *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

   (i)   *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

      (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

      (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

   (ii)   *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

   (iii)   *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

   (iv)   *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

   (v)   *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)   *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

U 00123

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If :—

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

U 00124

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   *Effect of Designation.*

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   *Calculations.*

(i)   *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1)   *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)   *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)   *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

ISDA® 1992

U 00125

pimary

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

U 00126

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

11

ISDA® 1992

U 00127

9.    Miscellaneous

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    Offices; Multibranch Parties

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

U 00128

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

12.    Notices

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

U 00129

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14

ISDA® 1992

U 00130

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

ISDA® 1992

U 00131

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

**"Non-default Rate"** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

**"Non-defaulting Party"** has the meaning specified in Section 6(a).

**"Office"** means a branch or office of a party, which may be such party's head or home office.

**"Potential Event of Default"** means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

**"Reference Market-makers"** means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

**"Relevant Jurisdiction"** means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

**"Scheduled Payment Date"** means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

**"Set-off"** means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

**"Settlement Amount"** means, with respect to a party and any Early Termination Date, the sum of: —

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

**"Specified Entity"** has the meanings specified in the Schedule.

ISDA® 1992

U 00132

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992

U 00133

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

................................................................       ................................................................
(Name of Party)                                                          (Name of Party)


By: ............................................................       By: ............................................................
Name:                                                                    Name:
Title:                                                                   Title:
Date:                                                                    Date:

ISDA® 1992

U 00134

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.


CITIBANK, N.A.                                    UNITED SUBCONTRACTORS INC.
                (Name of Party)                                   (Name of Party)

By:                                               By:
Name:                                             Name: Timothy J. Gallaher
Title:         Linda Cook                         Title: Chief Financial Officer
Date:         Vice President                      Date: 4/21/06
               Citibank, N.A.


18                                                ISDA® 1992

U 00135

U 00136

Execution Copy
Reference No. CB10-384A

SCHEDULE

to the

ISDA Master Agreement

dated as of December 29, 2005,

between

CITIBANK, N.A.,
a national banking association organized under the laws of the United States
("Party A")

and

UNITED SUBCONTRACTORS INC.,
a corporation organized under the laws of the State of Utah
("Party B")

Part 1

Termination Provisions

In this Agreement:

(a)    **"Specified Entity"** means for the purpose of Section 5(a)(v) of this Agreement, (i) in relation to Party A, Citigroup Global Markets Limited, Citigroup Global Markets Inc., Citigroup Forex Inc., Citigroup Global Markets Commercial Corp., Citicorp Securities Services, Inc., Citigroup Financial Products Inc., Citigroup Energy Inc., and Citigroup Global Markets Deutschland AG (individually a "Section 5(a)(v) Affiliate"), and (ii) in relation to Party B, USI Senior Holdings, Inc., USI Intermediate Holdings, Inc., and each Guarantor Subsidiary as defined in the Credit Agreement.

(b)    **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement. For purposes of clause (c) of such definition, Specified Transaction includes any forward securities contracts, and any other similar transactions, and any Interest Rate Agreement, as defined in the Credit Agreement, now existing or hereafter entered into between Party A (or any Section 5(a)(v) Affiliate) and Party B (or any Specified Entity of Party B).

U 00137

(c)    The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and will apply to Party B.

For purposes of Section 5(a)(vi), the following provisions apply:

**"Specified Indebtedness** shall have the meaning set forth in Section 14 of this Agreement, provided, however, that Specified Indebtedness shall not include deposits received in the course of a party's ordinary banking business.

**"Threshold Amount"** means,

(i) with respect to Party A, 2% of the stockholders' equity of Party A; and
(ii) with respect to Party B, USD 1,000,000.

including the U.S. Dollar equivalent on the date of any default, event of default or other similar condition or event of any obligation stated in any other currency.

For purposes of (i) above, stockholders' equity shall be determined by reference to the relevant party's most recent consolidated (quarterly, in the case of a U.S. incorporated party) balance sheet and shall include, in the case of a U.S. incorporated party, legal capital, paid-in capital, retained earnings and cumulative translation adjustments. Such balance sheet shall be prepared in accordance with accounting principles that are generally accepted in such party's country of organization.

(d)    The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) of this Agreement will apply to Party A and will apply to Party B.

(e)    The **"Automatic Early Termination"** provisions of Section 6(a) will not apply to Party A and will not apply to Party B; provided, however, that with respect to a party, where the Event of Default specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or to the extent analogous thereto, (8) is governed by a system of law which does not permit termination to take place after the occurrence of the relevant Event of Default, then the Automatic Early Termination provisions of Section 6(a) will apply to such party.

(f)    For the purpose of the **"Payments on Early Termination"** provisions of Section 6(e):

(i)  The Second Method will apply; and

(ii)  Market Quotation will apply.

(g)    **"Termination Currency"** means United States Dollars.

(h)    **"Additional Termination Event"** will apply.    It shall constitute an Additional Termination Event, Party B shall be the sole Affected Party and Party A shall be the

U 00138

party entitled to determine the Settlement Amount, if at any time (i) the Credit Agreement shall for any reason, cease to be in full force and effect; (ii) Party A or an Affiliate of Party A shall for any reason cease to be a party to the Credit Agreement; (iii) all or any portion of the Collateral shall be released from the Lien(s) of the Credit Agreement; (iv) the obligations of Party B with respect to Transactions hereunder are no longer guaranteed pursuant to the Guaranty (as such term is defined in the Credit Agreement; or (v) Party A, other than by its own election, shall for any reason not be secured equally and ratably and on a pari passu basis with the Lenders under any agreements or instruments, which may be in effect at any time, securing the obligations of Party B under the Credit Agreement.

(i)     **Failure to Pay or Deliver; Section 5(a)(i).**  The provisions of Section 5(a)(i) of the Agreement are hereby amended to delete on line 3 the word "third" and to insert in lieu thereof the word "first".

Part 2

Tax Representations

(a)     **Payer Representations.**  For the purpose of Section 3(e) of this Agreement, Party A will make the following representation and Party B will make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or documents under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)     **Payee Representations.**  For the purpose of Section 3(f) of the Agreement, Party A and Party B make the representations specified below, if any:

The following representation will apply to Party A:

It is a national banking association organized under the laws of the United States and its U.S. taxpayer identification number is 13-5266470.  It is "exempt" within the meaning of Treasury Regulation sections 1.6041-3(p) and 1.6049-4(c) from information reporting on Form 1099 and backup withholding.

U 00139

The following representation will apply to Party B:

It is a corporation created or organized in the United States or under the laws of the United States and its U.S. taxpayer identification number is 87-0572162. It is "exempt" within the meaning of Treasury Regulation sections 1.6041-3(p) and 1.6049-4(c) from information reporting on Form 1099 and backup withholding.

Part 3

Agreement to Deliver Documents

For the purpose of Section 4(a) of this Agreement:

I. Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| (i) Party B | As required under Section 4(a)(iii) of the Agreement, IRS Form W-9, IRS Form W-8BEN, IRS Form W-8ECI, IRS Form W-8EXP and/or IRS Form W-8IMY, whichever is relevant. | Promptly upon execution of this Agreement; and promptly upon learning that any form previously provided by Party B has become obsolete or incorrect. |

II. Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| (a)  Party B | An opinion of counsel to Party B in form as is reasonably satisfactory to Party A. | As soon as practicable after execution of this Agreement. | No |

U 00140

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| (b) Party A and Party B | Evidence reasonably satisfactory to the other party of the (i) authority of such party and any Credit Support Provider to enter into the Agreement, any Credit Support Document and any Transactions and (ii) the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | As soon as practicable after execution of this Agreement and, if requested by the other party, as soon as practicable after execution of any Confirmation of any other Transaction. | Yes |
| (c) Party B | The party's Annual Report containing audited consolidated financial statements certified by independent certified public accountants for each fiscal year. | As soon as available and in any event within 90 days (or as soon as practicable after becoming publicly available) after the end of each of its first three fiscal quarters. | Yes |
| (d) Party B | The party's unaudited consolidated financial statements, the consolidated balance sheet and related statements of income for each fiscal quarter. | As soon as available and in any event within 45 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal quarters. | Yes |
| (e) Party B | A duly executed copy of the Credit Support Document specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |

U 00141

Part 4

Miscellaneous

(a)  **Addresses for Notices.**  For the purpose of Section 12(a) of this Agreement:

**Address for notices or communications to Party A:**

Address:        250 West Street
                10th Floor
                New York, New York  10013

Attention:      Director Derivatives Operations

Facsimile No.: 212 723 2956

(For all purposes)

In addition, in the case of notices or communications relating to Section 5, 6, 11 or 13 of this Agreement, a second copy of any such notice or communication shall be addressed to the attention of Party A's legal department as follows:

Address:        Legal Department
                77 Water Street
                9th Floor
                New York, New York 10004

Attention:      Department Head

Facsimile No.: 212 657 1452

Address for notices or communications to Party B:

Address:        5201 Eden Ave., Suite 220
                Edina, MN 55436

Attention:      Chief Financial Officer

Facsimile No: 952-697-4061

(b)  **Effectiveness of Notice.**  Section 12(a) is hereby amended by deleting the words "facsimile transmission or" in line 3 thereof.

(c)  **Process Agent.**  For the purpose of Section 13(c) of this Agreement:

N:\Citibank\Citi103\CB10-384A.doc                24

**U 00142**

Party B appoints as its Process Agent: not applicable.

(d)  **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(e)  **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:

Party A is a Multibranch Party and may act through any of the following offices: New York, London and Tokyo.

Party B is not a Multibranch Party.

(f)  **Calculation Agent.** The Calculation Agent will be Party A. The failure of Party A to perform its obligations as Calculation Agent hereunder shall not be construed as an Event of Default or Termination Event.

(g)  **Credit Support Documents.** With respect to this Agreement, "Credit Support Document" means (i) the Collateral Documents and (ii) the Guaranty, each as defined in the Credit Agreement.

(h)  **Credit Support Provider.** Credit Support Provider means in relation to Party A, none, and in relation to Party B, individually and collectively each Guarantor, as defined in the Credit Agreement.

(i)  **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York.

(j)  **Jurisdiction.** Section 13(b)(i) of the Agreement is hereby amended by (i) deleting in line 2 the word "non-" and (ii) deleting the final paragraph thereof. The following shall be added at the end of Section 13(b): "Nothing in this provision shall prohibit a party from bringing an action to enforce a money judgment in any other jurisdiction."

(k)  **"Affiliate"** will have the meaning specified in Section 14 of this Agreement.

(l)  **"Netting of Payments"** Either party may notify the other in writing, not less than one Local Business Day in advance of a Scheduled Payment Date, that with regard to payments due on that date, subparagraph (ii) of Section 2(c) of this Agreement will not apply. Except to the extent that such advance written notice shall have been given, subparagraph (ii) of Section 2(c) will apply.

U 00143

Part 5

Other Provisions

(a) **ISDA Definitions Incorporated by Reference.** The definitions and provisions contained in the 2000 ISDA Definitions (as published by the International Swap and Derivatives Association, Inc.) (the "2000 Definitions") are incorporated by reference herein. Any terms used and not otherwise defined herein which are contained in the 2000 Definitions shall have the meaning set forth therein. In the event of any conflict between the 2000 Definitions and any other ISDA-published definitions referenced in a Confirmation, such Confirmation and the ISDA-published definitions referred to therein shall control for the purposes of the particular Transaction.

(b) **Additional Definitions.** The following definitions are added to Section 14 of the Agreement:

"Credit Agreement" shall mean the First Lien Credit and Guaranty Agreement dated as of December 27, 2005, entered into by and among Party B, USI Senior Holdings, Inc., USI Intermediate Holdings, Inc., certain Subsidiaries of Party B, the Lenders party thereto from time to time, Citigroup Global Markets Inc. as Sole Lead Arranger, Bookrunner and Syndication Agent, and Citicorp North America, Inc. as Administrative Agent and Collateral Agent (as amended, restated, extended, supplemented or otherwise modified in writing from time to time).

(c) **Additional Representations.** For purposes of Section 3 of this Agreement, the following shall be added, immediately following paragraph (f) thereof:

"(g) **No Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(h) **Evaluation and Understanding.** It is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the financial and other risks of that Transaction.

(i) **Status of Parties.** The other party is not acting as a fiduciary or an advisor for it in respect of that Transaction.

U 00144

(j)    **No Agency.** It is entering into this Agreement and each Transaction as principal and not as agent.

(k) **Eligible Contract Participant.** (a) It is an "eligible contract participant" within the meaning of Section 1(a)(12) of the Commodity Exchange Act, as amended (the "CEA"), (b) this Agreement and each Transaction are subject to individual negotiation by each party, and (c) neither this Agreement nor any Transaction will be executed or traded on a "trading facility" within the meaning of Section 1a(33) of the CEA.

(l) **Hedging.** In the case of Party B, it has entered into this Agreement (and it will enter into each transaction hereunder) to hedge its exposure to movements in interest rates and not for the purposes of speculation.

(m) **Compliance with Internal Investment Policies.** In the case of Party B, each Transaction entered into under this Agreement will be entered into in accordance with, and will at all times comply with, applicable internal investment policies and guidelines from time to time adopted by Party B.

(n) **Obligations of Party B.** The obligations of Party B to Party A under this Agreement shall be equally and ratably secured and guaranteed with Party B's obligations under the Credit Agreement.

(o) **Additional Representations and Agreements of Party B.** Party B hereby acknowledges and agrees that each of the statements contained in Article 4 of the Credit Agreement are true and correct as at the date hereof and will be true and correct as of the date on which they are deemed to be restated pursuant to the terms of the Credit Agreement. "

(d) **Additional Events of Default with respect to Party B.** The occurrence of any of the following events shall constitute an Event of Default with respect to Party B as though specified as such in section 5(a) of this Agreement: any "Event of Default" as defined in the Credit Agreement.

(e) **Accuracy of Specified Information.** Section 3(d) of this Agreement is hereby amended by the addition of the following in the third line thereof after the word "respect" and before the period: *"or, in the case of audited or unaudited financial statements, is a fair presentation of the financial condition of the relevant party in accordance with generally accepted accounting principles as of the date of such statements".*

(f)    **Set-off.** Section 6 of the Agreement is amended by adding the following new subsection 6(f):

"(f) *Set-off.* Without affecting the provisions of this Agreement requiring the calculation

U 00145

of certain net payment amounts, all payments under this Agreement will be made without set off or counterclaim, except as provided as follows in this Section 6(f): Any amount (the 'Early Termination Amount') payable to one party (the Payee) by the other party (the Payer) under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(iv)[46] has occurred, will, at the option of the party ('X') other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party),[47] be reduced by its set-off against any amount(s) (the 'Other Agreement Amount') payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this Section 6(f).

"For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

"If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

"Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

    (g)    **Waiver of Right to Trial by Jury.** Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement.

    (h)    **Severability.** In the event that any one or more of the provisions contained in this Agreement should be held invalid, illegal, or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The parties shall endeavor, in good faith negotiations, to replace the invalid, illegal or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

    (i)    **Netting.** In the event that any Terminated Transaction cannot be aggregated and netted against all other Terminated Transactions under Section 6(e) of the

U 00146

Agreement, such excluded Terminated Transactions shall be aggregated and netted amongst themselves to the fullest extent permitted by law.

(j)    **Confirmation Procedures.** For each Transaction that Party A and Party B enter hereunder, Party A shall promptly send to Party B a Confirmation setting forth the terms of such Transaction. Party B shall execute and return the Confirmation to Party A or request correction of any error within five Business Days of receipt. Failure of Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation and acceptance of such terms.

(k)    **Escrow Payments.** If by reason of the time difference between the cities in which payments are to be made, it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that date are to be made in escrow. In this case the deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the party giving the notice, accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by the irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 am. local time on that day) if that payment is not released by 5:00 p.m. on the date it is deposited for any reason other than the intended recipients' failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(l)    **Recording of Conversations.** Each party hereto consents to the monitoring or recording at any time and from time to time, by the other party of the telephone conversations of trading and marketing personnel of the parties and their authorized representatives in connection with this Agreement or any Transaction or potential Transaction; and the parties waive any further notice of such monitoring or recording and agree to give proper notice and obtain any necessary consent of such personnel for any such monitoring or recording.

(m) **Limitation of Liability.** No party shall be required to pay or be liable to the other party for any consequential, indirect or punitive damages, opportunity costs or lost profits.

(n) **Confidential Information.** Each party may share any information concerning the other party with any of its Affiliates.

(o) **Swap Transaction/Transaction.** With effect from and including the date of this Agreement:

U 00147

(i)    the term "Transaction" as used in this Agreement shall be limited to a rate swap transaction, forward rate transaction, interest rate option, cap transaction, floor transaction or collar transaction, in each case denominated in U.S. dollars;

(ii)   reference to a "Swap Transaction" in the 2000 Definitions is deemed to be a reference to a "Transaction" for the purpose of interpreting this Agreement or any Confirmation; and

(iii)  reference to a "Transaction" in this Agreement or any Confirmation is deemed to be a reference to a "Swap Transaction" for the purpose of interpreting the 2000 Definitions.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

CITIBANK, N.A.                                    UNITED SUBCONTRACTORS INC.

By: _____                      By: _____
Name: _____                      Name: Timothy J. Gallagher
Title: _____                      Title: Chief Financial Officer
        Linda Cook
        Vice President
        Citibank, N.A.

U 00148

## COMPLIANCE CERTIFICATE

**THE UNDERSIGNED HEREBY CERTIFIES AS FOLLOWS:**

1.  I am the Chief Financial Officer of UNITED SUBCONTRACTORS, INC. ("Borrower").

I have reviewed the terms of that certain First Lien Credit and Guaranty Agreement, dated as of December 27, 2005, (as it may be amended, supplemented, restated or otherwise modified, the "Credit Agreement"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among Borrower, UNITED SUBCONTRACTORS, INC., a Utah corporation ("Borrower"), USI SENIOR HOLDINGS, INC., a Delaware corporation ("Holdings"), USI INTERMEDIATE HOLDINGS, INC., a Delaware corporation, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, CITIGROUP GLOBAL MARKETS, INC., as Sole Lead Arranger, Sole Bookrunner and Syndication Agent, and CITICORP NORTH AMERICA, INC., as Administrative Agent and Collateral Agent, and I have made, or have caused to be made under my supervision, a review in reasonable detail of the transactions and condition of Borrower and its Subsidiaries during the accounting period covered by the attached financial statements.

2.  The examination described in paragraph 1 above did not disclose, and I have no knowledge of, the existence of any condition or event which constitutes an Event of Default or Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate, except as set forth in a separate attachment, if any, to this Certificate, describing in detail, the nature of the condition or event, the period during which it has existed and the action which Borrower has taken, is taking, or proposes to take with respect to each such condition or event.

The foregoing certifications, together with the computations set forth in the Annex A hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered November 12, 2007 pursuant to Section 5.01(d) of the Credit Agreement.

UNITED SUBCONTRACTORS, INC.

By: _____
Name: Timothy J. Gallagher
Title: Chief Financial Officer

U 00001

## ATTACHMENT TO FIRST LIEN COMPLIANCE CERTIFICATE

## NOTICE OF DEFAULT

The Borrower has exceeded the following Financial Covenants as set forth in Section 6.08 of the Credit Agreement:

**Section 6.08(a) – Interest Coverage Ratio:**

At September 30, 2007:

|  |  |
|---|---|
| Actual: | 2.50 to 1.00 |
| Covenant: | 2.75 to 1.00 |

**Section 6.08(a) – Leverage Ratio:**

At September 30, 2007:

|  |  |
|---|---|
| Actual: | 4.56 to 1.00 |
| Covenant: | 4.25 to 1.00 |

The Borrower is currently in the process of obtaining an amendment to the Credit Agreement to address the current non-compliance with the two Financial Covenants set forth above. Discussions with Lenders have and continue to take place and a Management Presentation to all Lenders is being given on November 13, 2007. The target is to finalize and execute an amendment by the end of November 2007.

UNITED SUBCONTRACTORS, INC.

By: _____
Name: Timothy J. Gallagher
Title:   Chief Financial Officer

U 00002

DRAFT

# NOTE TO FIRST LIEN TERM LOAN LENDERS

Following is the draft Term Sheet for the Amendment to the First Lien Credit Agreement.  The Term Sheet has been drafted by Lender counsel, Cahill Gordon & Reindel, and has been agreed with the First Lien Lender Steering Committee, which represents a majority of the First Lien Term Loan Lenders.

At present, the Company is working with the Second Lien Lenders to arrive at an amendment to the Second Lien Credit Agreement.  That amendment will mirror the First Lien amendment for those items that are applicable to both agreements.

Cahill Gordon is now working on drafting the amendment agreement document.  The amendment will be posted in final form on Intralinks in the near future.  Instructions on where to send the amendment agreement after you have signed it will accompany that posting.

If you have any questions regarding the amendment, please contact Tim Gallagher, USI CFO, at 952-697-4063.

DRAFT

Confidential                                    United Subcontractors, Inc.

<div style="text-align:center">

**TERM SHEET**

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS**

**AMENDMENT AND WAIVER TO FIRST LIEN CREDIT AGREEMENT**

</div>

Capitalized terms not defined herein have the meanings given such terms by the First Lien Credit and Guaranty Agreement, dated as of December 27, 2005, as amended, supplemented, restated or otherwise modified from time to time, by and among the United Subcontractors, Inc. (the "*Borrower*"), the other Loan Parties signatory thereto, Citigroup Global Markets Inc., as Sole Lead Arranger, Sole Bookrunner and Syndication Agent and Citicorp North America, Inc., as Administrative Agent and Collateral Agent (the "*First Lien Credit Agreement*").

**Amendments to the First Lien Credit Agreement:**

1. <u>Financial Covenants</u>.  The Interest Coverage Ratio and Total Leverage Ratio financial covenant tests for the Fiscal Quarters ending December 31, 2007, March 31, 2008, June 30, 2008, September 30, 2008 and December 31, 2008 set forth in Section 6.08 shall be replaced with covenant limits set at a 20% cushion based on the current financial forecast presented by the Borrower and the final agreed pricing below.  For the avoidance of doubt, it is understood and agreed that the 20% cushion shall apply only to the financial forecasts and not to historical financial data.  No change will be made to the Fixed Charge Coverage Ratio financial covenant levels.

2. <u>Applicable Margin</u>.  The rates in the definition of "Applicable Margin" shall be replaced with the grid below:

| Leverage | Eurodollar Rate Loans | Base Rate Loans |
| --- | --- | --- |
| ≥ 5.5:1.0 | 6.00% | 5.00% |
| ≥ 5.25:1.0 but < 5.5:1.0 | 5.25% | 4.25% |
| ≥ 5.0:1.0 but < 5.25:1.0 | 5.00% | 4.00% |
| ≥ 4.5:1.0 but < 5.0:1.0 | 4.75% | 3.75% |
| ≥ 4.0:1.0 but < 4.5:1.0 | 4.50% | 3.50% |
| < 4.0:1.0 | 4.25% | 3.25% |

<div style="text-align:center">Page 2</div>

U 00008

3. <u>Consolidated Excess Cash Flow</u>. Section 2.27(e) shall be amended so that the Borrower shall be required to prepay the Loans and/or permanently reduce the Revolving Commitments in accordance with Section 2.30(b) in an aggregate amount equal to 75% of Consolidated Excess Cash Flow on a quarterly basis; <u>provided</u> that if the Total Leverage Ratio as of the end of any Fiscal Quarter is less than 4.0:1.0, the Borrower shall not be required to make such prepayment on a quarterly basis with respect to such Fiscal Quarter and shall make such prepayment on an annual basis for so long as the Total Leverage Ratio as of the end of each Fiscal Quarter is less than 4.0:1.0.

4. <u>Revolving Loans</u>. Total outstanding Revolving Loans and/or Swing Line Loans shall be limited to $5.0 million at any one time whenever the Total Leverage Ratio exceeds 4.5:1.0 at the time of the borrowing or issuance and after giving pro forma effect thereto.

5. <u>Letters of Credit</u>. There shall be no change to the Letter of Credit Sublimit.

6. <u>Permitted Acquisitions</u>. Clause (b) of the definition of "Permitted Acquisition" shall be amended to delete the provisions set forth therein and permit acquisitions for aggregate consideration (including any Earnout Obligations) for all such acquisitions after the effective date of the amendment through the Tranche B Term Loan Maturity Date in an amount of up to $30.0 million and only when at least 50% of the total consideration (including any Earnout Obligations) in respect thereof is paid using the cash proceeds of newly contributed common equity or qualified capital stock (to be defined in a customary manner) to the Borrower with the remaining portion to be paid using not more than $2.0 million plus the Borrower's cumulative retained portion of Consolidated Excess Cash Flow; <u>provided</u>, that the [CA/TX Acquisitions] shall be deemed to be Permitted Acquisitions only so long as the purchase price does not exceed $10.0 million in the aggregate and 100% of the total consideration in respect thereof is paid using the cash proceeds of newly contributed common equity or qualified capital stock to the Borrower.   In addition, no proceeds of Revolving Loans shall be used to finance acquisitions.

7. <u>Management Fee</u>. The Borrower will defer payment of Management Fees ("***Unpaid Management Fees***") whenever the Total Leverage Ratio exceeds 4.25:1.0.  The Borrower may pay all Unpaid Management Fees as well as pay the ongoing quarterly

DRAFT

Confidential                                          United Subcontractors, Inc.

Management Fees as provided for in the Credit Agreement provided that after giving pro forma effect thereto (i) the Total Leverage Ratio is equal to or lower than 4.25:1.0, (ii) the Borrower shall be in pro forma compliance with Article Six of the Credit Agreement, (iii) the Borrower shall not pay more than $2.0 million in Management Fees (including Unpaid Management Fees) in any 12 month period and (iv) no proceeds of Revolving Loans shall be used to pay Management Fees (including Unpaid Management Fees).

8. <u>Material Adverse Effect</u>.  Clause (i) of the definition of "Material Adverse Effect" shall be amended to add "prospects" thereto.

9. <u>Certain Calculations</u>.  Section 6.08(e) shall be amended to require pro forma calculations for dispositions as well as acquisitions.

10. <u>Mandatory Prepayments</u>.  Section 2.27 shall be amended to require the Borrower to prepay $7.0 million of Term Loans by December 31, 2007.

**Waiver to First Lien Credit Agreement:**

Waive the default caused by the Borrower's failure to comply with the financial covenants set forth in Section 6.08 of the First Lien Credit Agreement for the Fiscal Quarter ending September 30, 2007.

**Amendment Fee:**

0.50% on the Loans and Commitments outstanding of consenting Lenders under the First Lien Credit Agreement.

**Representations and Warranties:**

Customary for an amendment of this type.

**Conditions Precedent to Amendment Effectiveness:**

1. Consent of the Required Lenders, accuracy of representations and warranties and payment of fees and expenses.

2. Amendment of the Second Lien Credit Agreement and Intercreditor Agreement in form and substance reasonably satisfactory to the Required Lenders, including without limitation, amendments to the financial covenants set forth in Section 6.08 of the Second Lien Credit Agreement to preserve the cushion set forth in Section 5.3(b) of the Intercreditor Agreement and acknowledgment that the cushion set forth in Section 5.3(a)(i) of the Intercreditor Agreement shall apply after giving effect to the amendment of the First Lien Credit Agreement.

DRAFT

Confidential                                                                                    United Subcontractors, Inc.

| | |
|---|---|
| **Governing Law:** | New York |
| **Expenses:** | The Borrower will pay all costs and expenses associated with the amendment, including, without limitation, the reasonable legal fees of counsel to the Lenders, Cahill Gordon & Reindel LLP, whether or not the amendment is deemed effective. |
| **Counsel to the Lenders:** | Cahill Gordon & Reindel LLP |

29
30

388 Greenwich Street, 17th fl.
New York, NY 10013



December 12, 2007

**BY HAND DELIVERY,**
**FACSIMILE AND OVERNIGHT**
**COURIER**

Chief Financial Officer
Tim Gallagher
United Subcontractors Inc.
5201 Eden Ave., Suite 220
Edina, MN 55436
Facsimile No. 952 697 4061

Dear Sir or Madam:

Reference is made to the ISDA Master Agreement (the "Agreement") dated as of December 29, 2005 between Citibank, N.A. and United Subcontractors Inc. ("Counterparty"), and the First Lien Credit and Guaranty Agreement dated as of December 27, 2005, entered into by and among Party B, USI Senior Holdings, Inc., USI Intermediate Holdings, Inc., certain Subsidiaries of Party B, the Lenders party thereto from time to time, Citigroup Global Markets Inc. as Sole Lead Arranger, Bookrunner and Syndication Agent, and Citicorp North America, Inc. as Administrative Agent and Collateral Agent (the "Credit Agreement").

Reference is also made to the Attachment to First Lien Compliance Certificate Notice of Default, provided by Counterparty on November 12, 2007 and attached hereto as Exhibit A, pursuant to which, an Event of Default has occurred and is continuing under the Credit Agreement. In accordance with the provisions of Section 5(a)(vi)(1) and Part 5(d) of the Agreement, an Event of Default with respect to Counterparty has occurred and is continuing. This notice constitutes notice under the Agreement.

Designation of an Early Termination Date and computation of amounts due to or by the undersigned on the Early Termination Date will be sent under separate cover.

If you have any questions please contact the undersigned at (212) 816 5252.

Sincerely,

CITIBANK, N.A.

By: _____
    Name: Scott L. Flood
    Title: Authorized Signatory

**U 00031**

# Tim Gallagher

| | |
|---|---|
| **From:** | Tim Gallagher |
| **Sent:** | Wednesday, December 12, 2007 5:32 PM |
| **To:** | skatzenstein@gsc.com; anthony.heyman@blackrock.com; Frank, Richard J. |
| **Cc:** | Robert Cummings; Thomas N. Wuellner |
| **Subject:** | United Subcontractors - Issue with Citi and Swap Agreement |

Citi advised us today that since we are in default of the 1st Lien Term Loan and because there is a cross-default provision in our interest rate swap agreement, we are in default of our swap agreement. As such, they want the swap agreement terminated now. Based on the value of the swap at the close of business on Tuesday, we would owe Citi an amount of $2.8M to wrap up the swap. In addition, we would be required to go find another swap arrangement which will likely be very costly.

Because of the significant cash outflow that the swap termination would require, we ask that you consider providing us with a "default waiver" instead of a forebearance agreement for the same period of time as the forebearance agreement (i.e. 6-7 weeks). We would envision any "default waiver" to include the same limitations we have today (i.e. limitations of borrowings from the revolver, etc.) and that are contemplated in the proposed forebearance agreement. The default waiver would terminate before we went into default on the second lien term loan.

Would you be available to talk with us about this tomorrow (Thursday)?

Regards,
Tim

**Timothy J. Gallagher**
*Chief Financial Officer*
*United Subcontractors, Inc.*
(office) 952-697-4063
(fax)    952-697-4061
(cell)   952-210-7654

U 00606

**Robert Bernstein**

| | |
|---|---|
| **From:** | Ahrens, Stephen [Stephen.Ahrens@blackrock.com] |
| **Sent:** | Monday, June 23, 2008 4:24 PM |
| **To:** | Robert Bernstein |
| **Subject:** | FW: USI - Waiver |
| **Attachments:** | USI Waiver Agreement_vDOC.DOC; rypy04_.DOC |

-----Original Message-----
**From:** Heyman, Anthony
**Sent:** Monday, June 23, 2008 4:06 PM
**To:** Ahrens, Stephen
**Subject:** FW: USI - Waiver

Here is one…

---

**From:** Hamilton, Shana G. [mailto:SHamilton@cahill.com]
**Sent:** Friday, December 14, 2007 2:54 PM
**To:** skatzenstein@gsc.com; Heyman, Anthony; aschilling@cyptree.com; michael.sohr@alliancebernstein.com;
terry.mccarthy@alliancebernstein.com; McKinney, Casey; epurcell@capitalsource.com; kathleen.brooks@ge.com;
Martone, Salvatore Jr (GE, Corporate); Goldsmith, Scott; bhalendu.deshpande@himco.com; Frank, Richard J.
**Cc:** Ohler, Michael J.; Bradburd, Nathaniel
**Subject:** RE: USI - Waiver

Attached is a revised waiver, clean and marked.  The only two changes in the attached are (1) addition of requirement that Borrower provide prior notice to the Lenders before making any payment to any third party in excess of $1.0 million and (2) a revision to the fee language to incorporate a "consent by" date.

We plan on sending the waiver to the Company and its counsel this afternoon, please let us know prior to 4p (NY time) if you have any additional comments.

Upon sign off on the agreement by the Company, the waiver will be sent to the Agent for posting to the syndicate for review and signature.

Regards,
Shana

<<USI Waiver Agreement_vDOC.DOC>> <<rypy04_.DOC>>

Shana G. Hamilton
212.701.3086
shamilton@cahill.com

---

**From:** Hamilton, Shana G.
**Sent:** Friday, December 14, 2007 12:18 PM
**To:** Hamilton, Shana G.; 'skatzenstein@gsc.com'; 'anthony.heyman@blackrock.com'; 'aschilling@cyptree.com';

**U00619**

'michael.sohr@alliancebernstein.com'; 'terry.mccarthy@alliancebernstein.com'; 'McKinney, Casey'; 'epurcell@capitalsource.com';
'kathleen.brooks@ge.com'; 'Martone, Salvatore Jr (GE, Corporate)'; 'Goldsmith, Scott'; 'bhalendu.deshpande@himco.com'; 'Frank, Richard J.'

**Cc:**  Ohler, Michael J.
**Subject:**  RE: USI - Waiver

Please let me know if there are multiple funds within your institutions from whom I should be expecting signature pages (and their names) so that I can confirm we have all necessary signatures.  Also, some people have had difficulty opening the attachment so I have re-attached it here.

Regards,
Shana

<< File: USI Waiver Agreement_v3 (3).DOC >>

Shana G. Hamilton
212.701.3086
shamilton@cahill.com

**From:**  Hamilton, Shana G.
**Sent:**  Thursday, December 13, 2007 5:57 PM
**To:**  'skatzenstein@gsc.com'; 'anthony.heyman@blackrock.com'; 'aschilling@cyptree.com'; 'michael.sohr@alliancebernstein.com';
'terry.mccarthy@alliancebernstein.com'; 'McKinney, Casey'; 'epurcell@capitalsource.com'; 'kathleen.brooks@ge.com'; 'Martone, Salvatore Jr
(GE, Corporate)'; 'Goldsmith, Scott'; 'bhalendu.deshpande@himco.com'; 'Frank, Richard J.'

**Cc:**  Ohler, Michael J.
**Subject:**  USI - Waiver

Attached for your review is a draft of the USI Waiver and Amendment Agreement.  The attached temporarily waives the 9/30 covenant default until 1/18.  We would like to get this out to the Company tomorrow afternoon, please let us know if you have any comments as soon as possible.  Also attached hereto is a signature page to the waiver, please arrange to have the attached executed and returned to me via pdf (shamilton@cahill.com) or fax (212 378 2515) by tomorrow afternoon, with two originals to follow at the address below.  I will hold all signatures in escrow.   Feel free to contact me with any other questions or concerns.

Regards,
Shana

<< File: USI Waiver Agreement_v3.DOC >>  << File: Signature to USI Waiver.pdf >>

Shana Galeon Hamilton
Cahill Gordon & Reindel LLP
80 Pine Street  New York, NY 10005
Tel 212 701 3086 Fax 212 378 2515
shamilton@cahill.com

The information contained in this e-mail message may be privileged and confidential information and is intended only for the use of the individual and/or entity identified in the alias address of this message. If the reader of this message is not the intended recipient, or an employee or agent responsible to deliver it to the intended recipient, you are hereby requested not to distribute or copy this communication. If you have received this communication in error, please notify us immediately by telephone or return e-mail and delete the original message from your system.  Thank you.

U00620

* * * * * * * * * * * * * * * * * * * *

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

* * * * * * * * * * * * * * * * * * * *

THE INFORMATION CONTAINED IN THIS MESSAGE AND ANY ATTACHMENT MAY BE PRIVILEGED, CONFIDENTIAL, PROPRIETARY OR OTHERWISE PROTECTED FROM DISCLOSURE. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and permanently delete it from your computer and destroy any printout thereof.

U00621



**"Hamilton, Shana G."**
**<SHamilton@cahill.com>**

12/14/2007 03:51 PM

<u>Document is Retained</u>

To  <tgallagher@unitedsub.com>; <kgilligan@unitedsub.com>;
    <tg@wppartners.com>; <tnw@wppartners.com>;
    <ssolow@kayescholer.com>; <rlc@windpointpartners.com>
cc  <skatzenstein@gsc.com>; <rfrank@gsc.com>;
    <cmckinney@babsoncapital.com>; <aschilling@cyptree.com>;
    <scott_goldsmith@invesco.com>;
bcc

Subject  United Subcontractors, Inc. - Draft Amendment

History:    🔁 This message has been forwarded.

Attached for your review is an initial draft of the USI Waiver & Amendment. Please note that the attached is subject to further review and comment by our clients. Feel free to contact me with any questions or comments.

Regards,

Shana



Shana G. Hamilton
212.701.3086
shamilton@cahill.com



The information contained in this e-mail message may be privileged and confidential information and is intended only for the use of the individual and/or entity identified in the alias address of this message. If the reader of this message is not the intended recipient, or an employee or agent responsible to deliver it to the intended recipient, you are hereby requested not to distribute or copy this communication. If you have received this communication in error, please notify us immediately by telephone or return e-mail and delete the original message from your system. Thank you.

* * * * * * * * * * * * * * * * * * * *

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

U 00594

* * * * * * * * * * * * * * * * * * * * *



USI Waiver Agreement_v3 (3).DOC

U 00595

DRAFT

# WAIVER AND AMENDMENT AGREEMENT

WAIVER AND AMENDMENT AGREEMENT (the "Agreement"), dated December [  ], 2007, by and among UNITED SUBCONTRACTORS, INC., a Utah corporation (the "Borrower"), USI SENIOR HOLDINGS, INC., a Delaware corporation ("Holdings"), USI INTERMEDIATE HOLDINGS, INC., a Delaware corporation ("Intermediate Holdings"), certain Subsidiaries of Borrower, as Guarantors, and the Lenders party hereto.

## R E C I T A L S :

WHEREAS, the Borrower, Holdings, Intermediate Holdings, the Guarantors, Citigroup Global Markets Inc., as Sole Lead Arranger, Sole Bookrunner and Syndication Agent and Citicorp North America, Inc., as Administrative Agent and Collateral Agent are party to that certain First Lien Credit and Guaranty Agreement, dated as of December 27, 2005 (as amended to the date hereof and as the same may be further amended, supplemented or otherwise modified from time to time, the "Credit Agreement").

WHEREAS, as of the date hereof, the Borrower is in default of various provisions of the Credit Agreement as more particularly described below;

WHEREAS, the circumstances described herein constitute multiple Events of Default under the Credit Agreement;

WHEREAS, the Borrower has requested that the Requisite Lenders waive such Events of Default, solely for the period and on the terms and conditions specified herein; and

WHEREAS, the Requisite Lenders are willing to agree to waive such Events of Default, solely for the period and on the terms and conditions specified herein;

NOW, THEREFORE, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS

**Section 1.1    Interpretation.**  All capitalized terms used herein (including the introductory paragraph and recitals hereto) shall have the respective meanings ascribed thereto in the Credit Agreement unless otherwise defined herein.

## SECTION 2. ACKNOWLEDGMENTS

**Section 2.1    Acknowledgment of Obligations.**  The Borrower hereby acknowledges, confirms and agrees that the aggregate principal amount of the Loans outstanding as of the close of business on December [  ], 2007, equals $[              ].  The foregoing amount does not include all of the interest, fees, expenses and other amounts which are chargeable or otherwise reimbursable under the Credit Agreement and the other Loan Documents.  All such Obligations, together with interest accrued and accruing thereon, and all fees, costs, expenses and other charges now or hereafter payable by the Loan Parties to the Lenders, are and will be unconditionally owing by the Borrower to the Lenders, without offset, defense or counterclaim of any kind, nature or description whatsoever.

**Section 2.2    Acknowledgement of Guarantee.**  Holdings, Intermediate Holdings and each Subsidiary hereby acknowledges, confirms and agrees that it has executed and delivered to the Lenders the Credit Agreement, pursuant to which Holdings, Intermediate Holdings and each Subsidiary has

U 00596

9   unconditionally, and jointly and severally, guarantied repayment in full of the Obligations (as amended or
40  otherwise modified from time to time in accordance with the terms there, the "Guarantee"). Holdings,
41  Intermediate Holdings and each Subsidiary hereby (i) consents to the Borrower's execution and delivery
42  of this Agreement; (ii) agrees to be bound by this Agreement; (iii) affirms that nothing contained in this
43  Agreement shall modify in any respect whatsoever the Guarantee or any other Loan Document to which it
44  is a party; and (iv) reaffirms that the Guarantee and such Loan Documents shall continue to remain in full
45  force and effect. Although Holdings, Intermediate Holdings and each Subsidiary have been informed of
46  the matters set forth herein and have acknowledged and agreed to same, Holdings, Intermediate Holdings
47  and each Subsidiary understands that the Requisite Lenders have no obligation to inform such Person of
48  such matters in the future or to seek acknowledgment of such Person or agreement to future amendments,
49  waivers or consents, and nothing herein shall create such a duty.

50     **Section 2.3    Binding Effect of Documents.** Each Loan Party party hereto hereby
51  acknowledges, confirms and agrees that: (a) each of the Loan Documents to which such Loan Party is a
52  party has been duly executed and delivered to the Lenders by such Loan Party, and each is and shall
53  remain in full force and effect as of the date hereof, (b) the agreements and obligations of each Loan Party
54  contained in such documents and in this Agreement constitute the legal, valid and binding Obligations of
55  each such Loan Party, enforceable against it in accordance with their respective terms, and no Loan Party
56  has any valid defense to the enforcement of such Obligations and (c) the Lenders are and shall be entitled
57  to the rights, remedies and benefits provided for under the Loan Documents and applicable law.

58  **SECTION 3.  WAIVER IN RESPECT OF EXISTING DEFAULTS**

59     **Section 3.1    Acknowledgment of Default.** The Borrower hereby acknowledges and agrees
60  that the Events of Default more particularly identified on Exhibit A hereto (the "Existing Defaults") have
61  occurred and are continuing, each of which constitutes an Event of Default and entitles the Lenders to
62  exercise their rights and remedies under the Loan Documents, applicable law or otherwise. The Borrower
63  represents and warrants that as of the date hereof, no other Events of Default exist other than the Existing
64  Defaults. The Borrower hereby acknowledges and agrees that the Lenders have the exercisable right to
65  declare the Obligations to be immediately due and payable under the terms of the Loan Documents.

66     **Section 3.2    Waiver.**

67          (a)    In reliance upon the representations, warranties and covenants of each Loan Party
68  contained in this Agreement, and subject to the terms and conditions of this Agreement, the Requisite
69  Lenders agree to temporarily waive the Existing Defaults solely for the period (the "Waiver Period")
70  commencing on the date hereof and ending on the date which is the earliest of: (i) January 18, 2008,
71  (ii) the occurrence or existence of any Event of Default other than the Existing Defaults, (iii) the occur-
72  rence or existence of any Default or Event of Default under and as defined in the Second Lien Credit
73  Agreement and (iv) the occurrence or existence of any Waiver Default (as defined below).

74          (b)    Upon the termination of the Waiver Period, the agreement of the Requisite Lend-
75  ers to waive the Existing Defaults shall automatically and without further action terminate and be of no
76  force and effect, it being expressly agreed that the effect of such termination will be that the Existing De-
77  faults will then immediately be Events of Default, permitting the Requisite Lenders to exercise immedi-
78  ately all rights and remedies under the Loan Documents and applicable law, including, but not limited to,
79  accelerating all of the Obligations; in each case without any further notice to the Borrower or passage of
80  time.

81          (c)    Notwithstanding the waiver provided for herein, the Existing Defaults shall con-
82  tinue to be agreed to be deemed and treated as continuing Events of Default for the purpose of triggering

-2-

U 00597

all limitations, restrictions or prohibitions on certain actions that may be taken or omitted or otherwise acquiesced to by or on behalf of any Loan Party pursuant to the Credit Agreement or any other Loan Document, including, without limitation, the borrowing of any Revolving Loans or Swingline Loans, issuing Letters of Credit, any limitations, restrictions or prohibitions with respect to any distribution, advance or other payment from any Loan Party to any other Loan Party, any direct or indirect owner of an equity interest in any Loan Party or any Affiliate of any of the foregoing; and any actions or inactions taken or omitted or otherwise acquiesced to by or on behalf of any Loan Party in violation of such provisions while any Default or Event of Default (including any Existing Default) exists will constitute additional Events of Default under the Credit Agreement or any other Loan Document, as well as a Waiver Default (as defined below) under this Agreement.

(d)    The waiver set forth in this Section 3.2 shall not extend to any Lender's rights and remedies under the Intercreditor Agreement or any other subordination or other provisions in favor of the Lenders which have arisen or may in the future arise as a result of the occurrence of any Default or Event of Default (including any Existing Defaults) or otherwise (collectively, the "Intercreditor Rights"), it being understood that the Existing Defaults shall at all times be agreed to be deemed and treated as continuing Events of Default for purposes of the exercise of any and all Intercreditor Rights by the Lenders, and the Lenders shall at all times be permitted to amend or otherwise modify any provision of the Intercreditor Agreement in accordance with the respective terms thereof.

As used herein, the term "Waiver Default" shall mean: (A) the occurrence of any Default or Event of Default other than the Existing Defaults; (B) the failure of any Loan Party to timely and strictly comply with any term, condition, or covenant set forth in this Agreement; (C) the failure of any representation or warranty made by any Loan Party under or in connection with this Agreement to be true and complete in all material respects as of the date when made or any other breach of any such representation or warranty in any material respect; (D) any breach by any Loan Party of any term, condition, covenant, representation, warranty or other provision (subject to any applicable cure period provided in the respective documents as in effect on the date hereof) set forth in any Loan Documents; (E) the taking of any action by any Loan Party to in any way repudiate or assert a defense to any Obligation under the Credit Agreement, this Agreement or any of the other Loan Document or the assertion of any claim or cause of action against any Lender relating in any way thereto; or (F) any lender under the Second Lien Credit Agreement or any agent thereof exercises any rights or remedies under the Second Lien Credit Agreement or institutes any action or proceeding with respect to such rights or remedies (including any action of foreclosure), including, without limitation, the acceleration of any Second Lien Loans. Any Waiver Default shall constitute an immediate Event of Default under the Credit Agreement.

**Section 3.3    No Other Waivers; Reservation of Rights.**

(a)    Other than to the extent of the waiver set forth in this Section 3.2 with respect to the Existing Defaults, no Lender has waived, is by this Agreement waiving, nor has any present intention of waiving, any Events of Default which may be continuing on the date hereof or any Events of Default which may occur after the date hereof (whether the same or similar to the Existing Defaults or otherwise), and the Requisite Lenders have not agreed to waive any other Events of Default (other than, during the Waiver Period, the Existing Defaults to the extent expressly set forth herein), occurring at any time.

(b)    Subject to Section 3.2 hereof (solely with respect to the Existing Defaults), the Requisite Lenders reserve the right, in their discretion, to exercise any or all of their rights and remedies under the Credit Agreement and the other Loan Documents as a result of any other Events of Default occurring at any time. No Lender has waived any of such rights or remedies, and nothing in this Agreement, and no delay on its part in exercising any such rights or remedies, should be construed as a waiver of any such rights or remedies.

CG&R DRAFT: 12/13/07 4:21 PM#Error! Unknown document property name. vError! Unknown document property name.

U 00598

**Section 3.4    Additional Events of Default.**  The parties hereto acknowledge, confirm and agree that any misrepresentation by any Loan Party, or any failure of any Loan Party to comply with the covenants, conditions and agreements contained in this Agreement, or, to the extent such failure would constitute an Event of Default under the Credit Agreement, any other Loan Documents, shall constitute an Event of Default under this Agreement, the Credit Agreement and the other Loan Documents.  In the event any Person, other than the Lenders party hereto, shall at any time exercise for any reason (including, without limitation, by reason of any Existing Defaults, any other present or future Event of Default, or otherwise) any of their rights or remedies against any Loan Party, or against any Loan Party's properties or assets, including, without limitation, the lenders under the Second Lien Credit Agreement, such event shall constitute an immediate Event of Default hereunder and an immediate Event of Default under the Credit Agreement.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

To induce the Requisite Lenders to execute and deliver this Agreement, the Loan Parties hereby represent and warrant as follows:

**Section 4.1    Representations in Loan Documents.**  Both before and immediately after giving effect to this Agreement: (a) no Default or Event of Default has occurred and is continuing except for the Existing Defaults, and (b) all of the representations and warranties in the Credit Agreement and in the other Loan Documents are true and correct in all material respects on and as of the date hereof as if made on the date hereof (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date).

**Section 4.2    Binding Effect of Documents.**  This Agreement has been duly authorized, executed and delivered to the Requisite Lenders by the Loan Parties, is enforceable in accordance with its terms and is in full force and effect, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

**Section 4.3    No Conflict.**  The execution, delivery and performance of this Agreement by the Loan Parties will not violate any requirement of law or contractual obligation of any of the Loan Parties and will not result in, or require, the creation or imposition of any Lien on any of properties or revenues of any of the Loan Parties.

## SECTION 5. CONDITIONS TO EFFECTIVENESS OF CERTAIN PROVISIONS OF THIS AGREEMENT

The effectiveness of the terms and provisions of Section 3.2 hereof shall be subject to the receipt by the Requisite Lenders of each of the following, each in form and substance satisfactory to the Requisite Lenders:

(a)    a signature page to this Agreement, duly authorized, executed and delivered by the Loan Parties and the Requisite Lenders;

(b)    receipt by the Requisite Lenders (i) of a waiver fee in amount equal to 0.25% of such consenting Lender's outstanding Commitments and Loans under the Credit Agreement, and (ii) all reasonable fees and reasonable out of pocket disbursements of Cahill Gordon & Reindel LLP in connection with the preparation, negotiation, execution, or delivery of this Agreement and the transactions related hereto.

-4-

U 00599

170   **SECTION 6. MISCELLANEOUS**

171       **Section 6.1    Effect of Agreement.** Except as modified pursuant hereto, no other changes or
172   modifications to the Loan Documents are intended or implied and in all other respects the Loan
173   Documents hereby are ratified, restated and confirmed by all parties hereto as of the effective date hereof.
174   To the extent of conflict between the terms of this Agreement and the other Loan Documents, the terms of
175   this Agreement shall govern and control.  The Credit Agreement and this Agreement shall be read and
176   construed as one agreement.

177       **Section 6.2    Further Assurances.** At the Borrower's expense, the parties hereto shall
178   execute and deliver such additional documents and take such further action as may be necessary or
179   desirable to effectuate the provisions and purposes of this Agreement.

180       **Section 6.3    Successors and Assigns.** This Agreement shall be binding upon and inure to the
181   benefit of each of the parties hereto and their respective successors and assigns.

182       **Section 6.4    Survival of Representations and Warranties.** All representations and
183   warranties made in this Agreement or any other document furnished in connection with this Agreement
184   shall survive the execution and delivery of this Agreement and the other documents, and no investigation
185   by any Lender or any closing shall affect the representations and warranties or the right of any Lender to
186   rely upon them.

187       **Section 6.5    Release.**

188       (a)    In consideration of the agreements of the Requisite Lenders contained herein and
189   for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,
190   each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby
191   absolutely, unconditionally and irrevocably releases, remises and forever discharges the Requisite Lend-
192   ers, and their successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divi-
193   sions, predecessors, directors, officers, attorneys, employees, agents and other representatives (the Requi-
194   site Lenders and all such other Persons being hereinafter referred to collectively as the "Releasees" and
195   individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, con-
196   tracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any
197   and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (indi-
198   vidually, a "Claim" and collectively, "Claims") of every kind and nature, known or unknown, suspected
199   or unsuspected, at law or in equity, which any Loan Party or any of its successors, assigns, or other legal
200   representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of
201   them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any
202   time on or prior to the date of this Agreement, including, without limitation, for or on account of, or in
203   relation to, or in any way in connection with this Agreement, the Credit Agreement, or any of the other
204   Loan Documents or transactions hereunder or thereunder.

205       (b)    Each Loan Party understands, acknowledges and agrees that the release set forth
206   above may be pleaded as a full and complete defense and may be used as a basis for an injunction against
207   any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the
208   provisions of such release.

209       (c)    Each Loan Party agrees that no fact, event, circumstance, evidence or transaction
210   which could now be asserted or which may hereafter be discovered shall affect in any manner the final,
211   absolute and unconditional nature of the release set forth above.

-5-

U 00600

`12        **Section 6.6    Covenant Not to Sue.** Each Loan Party, on behalf of itself and its successors,
∠13   assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants
214   and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory
215   proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by
216   such Loan Party pursuant to <u>Section 6.5</u> hereof.  If any Loan Party or any of its successors, assigns or
217   other legal representations violates the foregoing covenant, such Loan Party, for itself and its successors,
218   assigns and legal representatives, agrees to pay, in addition to such other damages as any Releasee may
219   sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of
220   such violation.

221        **Section 6.7    Severability.** Any provision of this Agreement held by a court of competent
222   jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Agreement.

223        **Section 6.8    Reviewed by Attorneys.** Each Loan Party represents and warrants to the
224   Requisite Lenders that it (a) understands fully the terms of this Agreement and the consequences of the
225   execution and delivery of this Agreement, (b) has been afforded an opportunity to discuss this Agreement
226   with, and have this Agreement reviewed by, such attorneys and other persons as such Loan Party may
227   wish, and (c) has entered into this Agreement and executed and delivered all documents in connection
228   herewith of its own free will and accord and without threat, duress or other coercion of any kind by any
229   Person.  The parties hereto acknowledge and agree that neither this Agreement nor the other documents
230   executed pursuant hereto shall be construed more favorably in favor of one than the other based upon
231   which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the
232   negotiation and preparation of this Agreement and the other documents executed pursuant hereto or in
233   connection herewith.

234        **Section 6.9    Governing Law: Consent to Jurisdiction and Venue.** THIS AGREEMENT
235   AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE
236   GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH,
237   THE LAWS OF THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS
238   5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND RULE 327(b) OF
239   THE NEW YORK CIVIL PRACTICE LAW AND RULES.  Each Loan Party irrevocably and
240   unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the courts of the
241   State of New York sitting in New York County and of the United States District Court of the Southern
242   District of New York, and any appellate court from any thereof, in any action or proceeding arising out of
243   or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any
244   judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect
245   of any such action or proceeding may be heard and determined in such New York State court or, to the
246   fullest extent permitted by applicable law, in such Federal court.  Each of the parties hereto agrees that a
247   final judgment in any such action or proceeding shall be conclusive and may be enforced in other
248   jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement
249   or in any other Loan Document shall affect any right that any Lender may otherwise have to bring any
250   action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its
251   properties in the courts of any jurisdiction.  Each Loan Party irrevocably and unconditionally waives, to
252   the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the
253   laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan
254   Document in any court referred to above.  Each of the parties hereto hereby irrevocably waives, to the
255   fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of
256   such action or proceeding in any such court.

257        **Section 6.10    Mutual Waiver of Jury Trial.** EACH PARTY HERETO HEREBY
258   IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW,

<center>-6-</center>

U 00601

;9      ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY
260     OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER
261     LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY
262     (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY
263     HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY
264     OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER
265     PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING
266     WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE
267     BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER  LOAN DOCUMENTS
268     BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS
269     SECTION.

270          **Section 6.11    Counterparts.**  This Agreement may be executed in any number of counterparts,
271     but all of such counterparts shall together constitute but one and the same agreement.

U 00602

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

UNITED SUBCONTRACTORS, INC.
USI SENIOR HOLDINGS, INC.
USI INTERMEDIATE HOLDINGS, INC.
SAN GABRIEL INSULATION, INC.
UNITED SHELVING ACQUISITION CORP.
CONSTRUCTION SERVICES & CONSULTANTS, INC.
USI ACQUISITION CORP.
TABOR INSULATION, INC.


By: _____
      Name:  Timothy J. Gallagher
      Title:   Chief Financial Officer



USI INVESTMENT GROUP, LLC



By: _____
      Name:  J. Kevin Gilligan
      Title:   Manager

[USI Waiver & Amendment Agreement]

U 00603

_____,
as a Lender

By: _____
    Name:
    Title:

[USI Waiver & Amendment Agreement]

U 00604

1
2
3

**EXHIBIT A**
**to**
**WAIVER AND AMENDMENT AGREEMENT**

4
5

      1.    The Borrower is in breach of Sections 6.08(a), (b) and (c) of the Credit Agreement for the Fiscal Quarter ending September 30, 2007.

6

CG&R DRAFT: 12/13/07 4:21 PM#Error! Unknown document property name. vError! Unknown document property name.

U 00605

December 18, 2007

**BY HAND DELIVERY,
FACSIMILE AND OVERNIGHT
COURIER**

Chief Financial Officer
Tim Gallagher
United Subcontractors Inc.
5201 Eden Ave., Suite 220
Edina, MN 55436
Facsimile No. 952 697 4061

Dear Sir or Madam:

Reference is made to the ISDA Master Agreement (the "Agreement") dated as of December 29, 2005 between Citibank, N.A. ("Citibank") and United Subcontractors Inc. ("Counterparty") and to the Notice of Event of Default dated December 12, 2007 advising that an Event of Default had occurred under the Agreement.

Please be advised that today, December 18, 2007, is hereby designated as the Early Termination Date under the Agreement. A computation of amounts due to or by the undersigned on the Early Termination Date will be sent to you under separate cover.

The undersigned reserves all rights available to it at law and under the Agreement.

If you have any questions please contact the undersigned at (212) 816 5252.

Sincerely,

CITIBANK, N.A.

By: _____
Name: Scott L. Flood
Title: Authorized Signatory

U00623

DEC-18-2007 TUE 02:50 PM UNITED SUBCONTRACTORS    FAX NO. 952 697 4079    P. 01/01



www.unitedsub.com

**VIA FACSIMILE**

December 18, 2007

Mr. Scott Flood
Authorized Signatory
Citigroup
390 Greenwich St.
New York, NY 10013

RE:    Your Letters Dated December 12, 2007 and December 18, 2007

Dear Mr. Flood:

This letter is to advise you that Requisite Lenders to the First Lien Credit and Guaranty
Agreement, dated December 27, 2005, between United Subcontractors, Inc. and Citicorp N.A.,
among others, have agreed to and are in the process of executing a Waiver and Amendment
Agreement which removes any default under that Agreement. As such, there is no default at the
present time. A copy of the executed agreement will be forwarded to the Citicorp N.A., the
administrative agent, once it is finalized and executed.

Please contact either myself at 952-697-4063 or Company's Counsel, Sheldon Solow of Kaye
Scholer LLP, at 312-583-2320 if you require further information.

Sincerely,

Timothy J. Gallagher
Chief Financial Officer

cc:    Sheldon Solow, Kaye Scholer

U00622

**Scot. L. Flood**
Managing Director
Deputy General Counsel
Office of the General Counsel

388 Greenwich Street
17th Floor
New York, NY 10013

Tel 212-816-5252
Fax 646-291-1414
scott.l.flood@citi.com

December 18, 2007



**BY HAND DELIVERY,
FACSIMILE AND OVERNIGHT
COURIER**

Chief Financial Officer
Tim Gallagher
United Subcontractors Inc.
5201 Eden Ave., Suite 220
Edina, MN  55436
Facsimile No.  952 697 4061

Dear Sir or Madam:

Reference is made to the ISDA Master Agreement (the "Agreement") dated as of December 29, 2005 between Citibank, N.A. ("Citibank") and United Subcontractors Inc. ("Counterparty"), to the Notice of Event of Default dated December 12, 2007 advising that an Event of Default had occurred under the Agreement (the "Default Notice" and to our letter of December 18, 2007 designating today as the Early Termination Date under the Agreement.

Please note that we have received your facsimile of today, December 18 advising that a waiver was in process but has not as yet been finalized.  Please be advised that the Transactions were terminated as of 11:00 am today prior to receipt of your letter and the finalization of any waiver.

As a result of the designation of an Early Termination Date under the Agreement the amount owed by Counterparty to the undersigned pursuant to Section 6(e)(i) of the Agreement is USD$ $2,751,333 (the "Defaulted Amount").  This notice constitutes the statement required to be finished by the undersigned under Section 6(d)(i) of the Agreement.

Please wire transfer USD$ $2,751,333 due to the undersigned plus interest at the Default Rate in immediately available funds in accordance with the following instructions:

Correspondent Bank:  Citibank N.A. New York
Account Number:  00167679
Swift:  CITIUS33 OR ABA a/c 021000089
Account Name:  Financial Futures

A schedule of the Settlement Amount, Market Quotation and Unpaid Amounts is attached.  The Market Quotations for the Transactions were determined in accordance with Section 6(e) of the Agreement and the definition of "Market Quotation" (disregarding the quotations having the highest and lowest values, arithmetic mean of the remaining quotations).

Dec-18-2007  05:38pm    From-CITIGROUP                    212 723 8864           T-812   P.002/002   F-812

In addition to rights under the Agreement the undersigned shall also have any rights otherwise available to it under any other agreement or applicable law.

If you have any questions please contact the undersigned at the telephone number above.

Sincerely,

CITIBANK, N.A.

By: _____
Name:
Title:

U 00566

Execution Version

## WAIVER AND AMENDMENT AGREEMENT

WAIVER AND AMENDMENT AGREEMENT (the "Agreement"), dated December 27, 2007, by and among UNITED SUBCONTRACTORS, INC., a Utah corporation (the "Borrower"), USI SENIOR HOLDINGS, INC., a Delaware corporation ("Holdings"), USI INTERMEDIATE HOLDINGS, INC., a Delaware corporation ("Intermediate Holdings"), certain Subsidiaries of Borrower, as Guarantors, and the Lenders party hereto.

### R E C I T A L S :

WHEREAS, the Borrower, Holdings, Intermediate Holdings, the Guarantors, Citigroup Global Markets Inc., as Sole Lead Arranger, Sole Bookrunner and Syndication Agent and Citicorp North America, Inc., as Administrative Agent and Collateral Agent are party to that certain First Lien Credit and Guaranty Agreement, dated as of December 27, 2005 (as amended to the date hereof and as the same may be further amended, supplemented or otherwise modified from time to time, the "Credit Agreement").

WHEREAS, as of the date hereof, the Borrower is in default of various provisions of the Credit Agreement as more particularly described below;

WHEREAS, the circumstances described herein constitute multiple Events of Default under the Credit Agreement;

WHEREAS, the Borrower has requested that the Requisite Lenders waive such Events of Default, solely for the period and on the terms and conditions specified herein; and

WHEREAS, the Requisite Lenders are willing to agree to waive such Events of Default, solely for the period and on the terms and conditions specified herein;

NOW, THEREFORE, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS

**Section 1.1    Interpretation.** All capitalized terms used herein (including the introductory paragraph and recitals hereto) shall have the respective meanings ascribed thereto in the Credit Agreement unless otherwise defined herein.

## SECTION 2. ACKNOWLEDGMENTS

**Section 2.1    Acknowledgment of Obligations.** The Borrower hereby acknowledges, confirms and agrees that the aggregate principal amount of the Loans outstanding as of the close of business on December 18, 2007, equals $286,277,639.90. The foregoing amount does not include all of the interest, fees, expenses and other amounts which are chargeable or otherwise reimbursable under the Credit Agreement and the other Loan Documents. All such Obligations, together with interest accrued and accruing thereon, and all fees, costs, expenses and other charges now or hereafter payable by the Loan Parties to the Lenders, are and will be unconditionally owing by the Borrower to the Lenders, without offset, defense or counterclaim of any kind, nature or description whatsoever. The Borrower acknowledges and agrees that that it is in "workout" and that the Loan Parties will pay the expenses of the Agents, Lenders and Issuing Bank provided for in Section 10.02(a) of the Credit Agreement during a workout.

**Section 2.2    Acknowledgement of Guarantee.** Holdings, Intermediate Holdings and each Subsidiary hereby acknowledges, confirms and agrees that it has executed and delivered to the Lenders the Credit Agreement, pursuant to which Holdings, Intermediate Holdings and each Subsidiary has unconditionally, and jointly and severally, guarantied repayment in full of the Obligations (as amended or otherwise modified from time to time in accordance with the terms there, the "Guarantee"). Holdings, Intermediate Holdings and each Subsidiary hereby (i) consents to the Borrower's execution and delivery of this Agreement; (ii) agrees to be bound by this Agreement; (iii) affirms that nothing contained in this Agreement shall modify in any respect whatsoever the Guarantee or any other Loan Document to which it is a party; and (iv) reaffirms that the Guarantee and such Loan Documents shall continue to remain in full force and effect. Although Holdings, Intermediate Holdings and each Subsidiary have been informed of the matters set forth herein and have acknowledged and agreed to same, Holdings, Intermediate Holdings and each Subsidiary understands that the Requisite Lenders have no obligation to inform such Person of such matters in the future or to seek acknowledgment of such Person or agreement to future amendments, waivers or consents, and nothing herein shall create such a duty.

**Section 2.3    Binding Effect of Documents.** Each Loan Party party hereto hereby acknowledges, confirms and agrees that: (a) each of the Loan Documents to which such Loan Party is a party has been duly executed and delivered to the Lenders by such Loan Party, and each is and shall remain in full force and effect as of the date hereof, (b) the agreements and obligations of each Loan Party contained in such documents and in this Agreement constitute the legal, valid and binding Obligations of each such Loan Party, enforceable against it in accordance with their respective terms, and no Loan Party has any valid defense to the enforcement of such Obligations and (c) the Lenders are and shall be entitled to the rights, remedies and benefits provided for under the Loan Documents and applicable law.

## SECTION 3.   WAIVER IN RESPECT OF EXISTING DEFAULTS

**Section 3.1    Acknowledgment of Default.** The Borrower hereby acknowledges and agrees that the Events of Default more particularly identified on Exhibit A hereto (the "Existing Defaults") have occurred and are continuing, each of which constitutes an Event of Default and entitles the Lenders to exercise their rights and remedies under the Loan Documents, applicable law or otherwise. The Borrower represents and warrants that as of the date hereof, no other Events of Default exist other than the Existing Defaults. The Borrower hereby acknowledges and agrees that the Lenders have the exercisable right to declare the Obligations to be immediately due and payable under the terms of the Loan Documents.

**Section 3.2    Waiver.**

(a)    In reliance upon the representations, warranties and covenants of each Loan Party contained in this Agreement, and subject to the terms and conditions of this Agreement, the Requisite Lenders agree to temporarily waive the Existing Defaults solely for the period (the "Waiver Period") commencing on the date hereof and ending on the date which is the earliest of: (i) January 31, 2008, (ii) the occurrence or existence of any Event of Default other than the Existing Defaults, (iii) the occurrence or existence of any Default or Event of Default under and as defined in the Second Lien Credit Agreement and (iv) the occurrence or existence of any Waiver Default (as defined below).

(b)    Upon the termination of the Waiver Period, the agreement of the Requisite Lenders to waive the Existing Defaults shall automatically and without further action terminate and be of no force and effect, it being expressly agreed that the effect of such termination will be that the Existing Defaults will then immediately be Events of Default, permitting the Requisite Lenders to exercise immediately all rights and remedies under the Loan Documents and applicable law, including, but not limited to, accelerating all of the Obligations; in each case without any further notice to the Borrower or passage of time.

U 00054

(c)    Notwithstanding the waiver provided for herein, the Existing Defaults shall continue to be agreed to be deemed and treated as continuing Events of Default for the purpose of triggering all limitations, restrictions or prohibitions on certain actions that may be taken or omitted or otherwise acquiesced to by or on behalf of any Loan Party pursuant to the Credit Agreement or any other Loan Document (other than (x) any contract to convert a Loan to a Eurodollar Rate Loan or to continue any Eurodollar Rate Loan pursuant to Section 2.21(a) of the Credit Agreement and (y) existing Letters of Credit may be extended or renewed; and for the avoidance of doubt, the actions described in the previous clauses (x) and (y) may be taken despite any default or cross default under any Interest Rate Agreement, or any failure to maintain Interest Rate Agreements pursuant to Section 5.13 of the Credit Agreement), including, without limitation, the borrowing of any Revolving Loans or Swingline Loans, issuing Letters of Credit, any limitations, restrictions or prohibitions with respect to any distribution, advance or other payment from any Loan Party to any other Loan Party, any direct or indirect owner of an equity interest in any Loan Party or any Affiliate of any of the foregoing; and any actions or inactions taken or omitted or otherwise acquiesced to by or on behalf of any Loan Party in violation of such provisions while any Default or Event of Default (including any Existing Default) exists will constitute additional Events of Default under the Credit Agreement or any other Loan Document, as well as a Waiver Default (as defined below) under this Agreement.

(d)    The waiver set forth in this Section 3.2 shall not extend to any Lender's rights and remedies under the Intercreditor Agreement or any other subordination or other provisions in favor of the Lenders which have arisen or may in the future arise as a direct or indirect occurrence of any Default or Event of Default (including any Existing Defaults) or otherwise (collectively, the "Intercreditor Rights"), it being understood that the Existing Defaults shall at all times be agreed to be deemed and treated as continuing Events of Default for purposes of the exercise of any and all Intercreditor Rights by the Lenders, and the Lenders shall at all times be permitted to amend or otherwise modify any provision of the Intercreditor Agreement in accordance with the respective terms thereof.

As used herein, the term "Waiver Default" shall mean: (A) the occurrence of any Default or Event of Default other than the Existing Defaults; (B) the failure of any Loan Party to timely and strictly comply with any term, condition, or covenant set forth in this Agreement; (C) the failure of any representation or warranty made by any Loan Party under or in connection with this Agreement to be true and complete in all material respects as of the date when made or any other breach of any such representation or warranty in any material respect; (D) any breach by any Loan Party of any term, condition, covenant, representation, warranty or other provision (subject to any applicable cure period provided in the respective documents as in effect on the date hereof) set forth in any Loan Documents; (E) the taking of any action by any Loan Party to in any way repudiate or assert a defense to any Obligation under the Credit Agreement, this Agreement or any of the other Loan Document or the assertion of any claim or cause of action against any Lender relating in any way thereto; or (F) any lender under the Second Lien Credit Agreement or any agent thereof exercises any rights or remedies under the Second Lien Credit Agreement or institutes any action or proceeding with respect to such rights or remedies (including any action of foreclosure), including, without limitation, the acceleration of any Second Lien Loans.  Any Waiver Default shall constitute an immediate Event of Default under the Credit Agreement.

### Section 3.3    No Other Waivers; Reservation of Rights.

(a)    Other than to the extent of the waiver set forth in this Section 3.2 with respect to the Existing Defaults, no Lender has waived, is by this Agreement waiving, nor has any present intention of waiving, any Events of Default which may be continuing on the date hereof or any Events of Default which may occur after the date hereof (whether the same or similar to the Existing Defaults or otherwise), and the Requisite Lenders have not agreed to waive any other Events of Default (other than, during the Waiver Period, the Existing Defaults to the extent expressly set forth herein), occurring at any time.

U 00055

(b)    Subject to <u>Section 3.2</u> hereof (solely with respect to the Existing Defaults), the Requisite Lenders reserve the right, in their discretion, to exercise any or all of their rights and remedies under the Credit Agreement and the other Loan Documents as a result of any other Events of Default occurring at any time. No Lender has waived any of such rights or remedies, and nothing in this Agreement, and no delay on its part in exercising any such rights or remedies, should be construed as a waiver of any such rights or remedies.

Section 3.4    **Additional Events of Default.**  The parties hereto acknowledge, confirm and agree that any misrepresentation by any Loan Party, or any failure of any Loan Party to comply with the covenants, conditions and agreements contained in this Agreement, or, to the extent such failure would constitute an Event of Default under the Credit Agreement, any other Loan Documents, shall constitute an Event of Default under this Agreement, the Credit Agreement and the other Loan Documents. In the event any Person, other than the Lenders party hereto, shall at any time exercise for any reason (including, without limitation, by reason of any Existing Defaults, any other present or future Event of Default, or otherwise) any of their rights or remedies against any Loan Party, or against any Loan Party's properties or assets, including, without limitation, the lenders under the Second Lien Credit Agreement, such event shall constitute an immediate Event of Default hereunder and an immediate Event of Default under the Credit Agreement.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

To induce the Requisite Lenders to execute and deliver this Agreement, the Loan Parties hereby represent and warrant as follows:

Section 4.1    **Representations in Loan Documents.**  Both before and immediately after giving effect to this Agreement: (a) no Default or Event of Default has occurred and is continuing except for the Existing Defaults, and (b) all of the representations and warranties in the Credit Agreement and in the other Loan Documents are true and correct in all material respects on and as of the date hereof as if made on the date hereof (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date).

Section 4.2    **Binding Effect of Documents.**  This Agreement has been duly authorized, executed and delivered to the Requisite Lenders by the Loan Parties, is enforceable in accordance with its terms and is in full force and effect, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

Section 4.3    **No Conflict.**  The execution, delivery and performance of this Agreement by the Loan Parties will not violate any requirement of law or contractual obligation of any of the Loan Parties and will not result in, or require, the creation or imposition of any Lien on any of properties or revenues of any of the Loan Parties.

## SECTION 5. CONDITIONS TO EFFECTIVENESS OF CERTAIN PROVISIONS OF THIS AGREEMENT

The effectiveness of the terms and provisions of <u>Section 3.2</u> hereof shall be subject to the receipt by the Requisite Lenders of each of the following, each in form and substance satisfactory to the Requisite Lenders:

(a)    a signature page to this Agreement, duly authorized, executed and delivered by the Loan Parties and the Requisite Lenders;

U 00056

(b)    the Borrower shall have paid a fee to each Lender who consents to this Agreement by 5:00 p.m. (New York City time) on December 21, 2007, in an amount equal to 0.25% of such consenting Lender's outstanding Commitments and Loans under the Credit Agreement

(c)    receipt by the Requisite Lenders of all reasonable fees and reasonable out of pocket disbursements of Cahill Gordon & Reindel LLP in connection with the preparation, negotiation, execution, or delivery of this Agreement and the transactions related hereto.

## SECTION 6. MISCELLANEOUS

**Section 6.1    Effect of Agreement.**  Except as modified pursuant hereto, no other changes or modifications to the Loan Documents are intended or implied and in all other respects the Loan Documents hereby are ratified, restated and confirmed by all parties hereto as of the effective date hereof. To the extent of conflict between the terms of this Agreement and the other Loan Documents, the terms of this Agreement shall govern and control.  The Credit Agreement and this Agreement shall be read and construed as one agreement.

**Section 6.2    Further Assurances.**  At the Borrower's expense, the parties hereto shall execute and deliver such additional documents and take such further action as may be necessary or desirable to effectuate the provisions and purposes of this Agreement.

**Section 6.3    Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.

**Section 6.4    Survival of Representations and Warranties.**  All representations and warranties made in this Agreement or any other document furnished in connection with this Agreement shall survive the execution and delivery of this Agreement and the other documents, and no investigation by any Lender or any closing shall affect the representations and warranties or the right of any Lender to rely upon them.

**Section 6.5    Release.**

(a)    In consideration of the agreements of the Requisite Lenders contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges the Requisite Lenders, and their successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (the Requisite Lenders and all such other Persons being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every kind and nature, known or unknown, suspected or unsuspected, at law or in equity, which any Loan Party or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with this Agreement, the Credit Agreement, or any of the other Loan Documents or transactions hereunder or thereunder.

U 00057

(b)     Each Loan Party understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)     Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

Section 6.6     **Covenant Not to Sue.**  Each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by such Loan Party pursuant to Section 6.5 hereof.  If any Loan Party or any of its successors, assigns or other legal representations violates the foregoing covenant, such Loan Party, for itself and its successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

Section 6.7     **Severability.**  Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Agreement.

Section 6.8     **Reviewed by Attorneys.**  Each Loan Party represents and warrants to the Requisite Lenders that it (a) understands fully the terms of this Agreement and the consequences of the execution and delivery of this Agreement, (b) has been afforded an opportunity to discuss this Agreement with, and have this Agreement reviewed by, such attorneys and other persons as such Loan Party may wish, and (c) has entered into this Agreement and executed and delivered all documents in connection herewith of its own free will and accord and without threat, duress or other coercion of any kind by any Person.  The parties hereto acknowledge and agree that neither this Agreement nor the other documents executed pursuant hereto shall be construed more favorably in favor of one than the other based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation and preparation of this Agreement and the other documents executed pursuant hereto or in connection herewith.

Section 6.9     **Governing Law:  Consent to Jurisdiction and Venue.**  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND RULE 327(b) OF THE NEW YORK CIVIL PRACTICE LAW AND RULES.  Each Loan Party irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its

U 00058

properties in the courts of any jurisdiction.  Each Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to above.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Section 6.10    **Mutual Waiver of Jury Trial.**  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER  LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 6.11    **Counterparts.**  This Agreement may be executed in any number of counterparts, but all of such counterparts shall together constitute but one and the same agreement.

Section 6.12    **Notice of Payment.**  The Borrower will provide prior notice to the Lenders before making any payment to any third party in excess of $1.0 million.

U 00059

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

UNITED SUBCONTRACTORS, INC.
USI SENIOR HOLDINGS, INC.
USI INTERMEDIATE HOLDINGS, INC.
SAN GABRIEL INSULATION, INC.
UNITED SHELVING ACQUISITION CORP.
CONSTRUCTION SERVICES & CONSULTANTS, INC.
USI ACQUISITION CORP.
TABOR INSULATION, INC.

By: _____
Name: Timothy J. Gallagher
Title:   Chief Financial Officer


USI INVESTMENT GROUP, LLC


By: _____
Name: J. Kevin Gilligan
Title:   Manager

[USI Waiver & Amendment Agreement]

U 00060

**EXHIBIT A**
**to**
**WAIVER AND AMENDMENT AGREEMENT**

1.    The Borrower is in breach of Sections 6.08(a), (b) and (c) of the Credit Agreement for the Fiscal Quarter ending September 30, 2007.

U 00061

Citibank, N.A.
as a Lender

By: _____

Name:

Title:    THOMAS A NEVILLE
          Attorney-In-Fact

U 00062

Denali Capital LLC, managing member of
DC Funding Partners LLC, portfolio manager for
DENALI CAPITAL CLO IV, LTD., or an affiliate

as a Lender

By: _____

Name:    Kelli C. Marti

Title:    Senior Vice President

[USI Waiver & Amendment Agreement]

U 00063

Denali Capital LLC, managing member of
DC Funding Partners LLC, portfolio manager for
DENALI CAPITAL CLO V, LTD., or an affiliate

as a Lender

By: _____

Name:    Kelli C. Marti
Title:    Senior Vice President

U 00064

Denali Capital LLC, managing member of
DC Funding Partners LLC, portfolio manager for
DENALI CAPITAL CLO VI, LTD., or an affiliate
as a Lender

By: _____
Name:  ~~Kelli C. Marti~~
Title:  Senior Vice President

U 00065

Denali Capital LLC, managing member of
DC Funding Partners LLC, portfolio manager for
DENALI CAPITAL CLO VII, LTD. or an affiliate

as a Lender

By: _____

Name:    Kelli C. Marti
Title:    Senior Vice President

U 00066

Denali Capital LLC, managing member of
DC Funding Partners LLC, portfolio manager for
DENALI CAPITAL CLO VIII, LTD. or an affiliate

as a Lender

By: _____

Name:     Kelli C. Marti

Title:     Senior Vice President

U 00067

Denali Capital LLC, managing member of
DC Funding Partners LLC, portfolio manager for DENALI
CAPITAL CREDIT OPPORTUNITY FUND FINANCING,
LTD., or an affiliate

as a Lender

By: _____

Name: Kelli C. Marti
Title: Senior Vice President

U 00068

IKB Capital Corporation
as a Lender

By: _____
Name: David Snyder
Title: President

[USI Waiver & Amendment Agreement]

2007 Dec 21 1:09PM    IKB CAPITAL              +212-583-8808              P.3

Bacchus (U.S.) 2006-1, Ltd.
as a Lender

By: _____
    Name: David Snyder
    Title: President

[USI Waiver & Amendment Agreement]

U 00073

Latitude CLO I Ltd.

as a Lender

By:

Name: Chauncey Lufkin
Title:    Chief Investment Officer

U 00074

Mountain Capital CLO III Ltd

as a Lender

By: _____

Name: Jonathan Dietz

Title: Director

U 00075

**Mountain Capital CLO IV Ltd.**

as a Lender

By: _____
    Name:    Jonathan Dietz
    Title:    Director

[USI Waiver & Amendment Agreement]

**Mountain Capital CLO V Ltd.**

as a Lender

By: _____
Name:    Jonathan Dietz
Title:    Director

U 00077

Nationwide Life Insurance Company,
as a Lender

By: _____
Name:
Title:    THOMAS M. POWERS
          VICE PRESIDENT

U 00078

Nationwide Life and Annuity Insurance Company,
as a Lender

By: _____

Name:

Title:    THOMAS M. POWERS
          VICE PRESIDENT

[USI Waiver & Amendment Agreement]

DEC 21 2007 10:04 AM FR OPPENHEIMER FUNDS03 768 2808 TO 912123782415    P.02

Oppenheimer Senior Floating Rate Fund,
as a Lender

By: _____
Name:
Title:        Jason Reuter
              Manager

[USI Waiver & Amendment Agreement]

**U 00080**

DEC 21 2007 10:05 AM FR OPPENHEIMER FUNDS03 768 2808 TO 912123782415    P.03

HarbourView CLO 2006-1,
as a Lender

By: _____

Name:
Title:    Jason Reuter
          Manager

[USI Waiver & Amendment Agreement]

Prospro Co 1, B.Y
_____
as a Lender

By: _____
Name:
Title:

John Randolph Watkins
Executive Director

_____
as a Lender

By: _____
Name:
Title:        John Randolph Watkins
              Executive Director

U 00083

Prospur Ho In BV
_____
as a Lender

By _____
  Name:
  Title:
       John Randolph Watkins
       Executive Director

[USI Waiver & Amendment Agreement]

THE ROYAL BANK OF SCOTLAND PLC
as a Lender

By: _____

Name: Todd Johnson
Title: Vice President

[US] Waiver & Amendment Agreement]

SPCP Group, L.L.C
as a Lender

By: _____
Name:
Title:

U 00086

Stanfield AZURE CLO, Ltd.
By: Stanfield Capital Partners, LLC
as its Collateral Manager

As a Lender

By: _____
Name:
Title:    David Frey
Managing Director

[US] Waiver & Amendment Agreement]

U 00087

Stanfield Bristol CLO, Ltd.
By: Stanfield Capital Partners LLC
as it Collateral Manager

As a Lender

By:

Name:

Title:

David Frey
Managing Director

U 00088

12/21/2007    12:19    STANFIELD CAPITAL → 912123782415                          NO.733    D004

Stanfield Daytona CLO, Ltd
By: Stanfield Capital Partners, LLC
as its Collateral Manager

As a Lender

By:
Name:
Title:    David Frey
          Managing Director

[USI Waiver & Amendment Agreement]

**U 00089**

Stanfield Modena CLO, Ltd
By: Stanfield Capital Partners, LLC
as its Asset Manager

As a Lender

By: _____

Name:

Title:   David Frey
         Managing Director

U 00090

Stanfield Vantage CLO, Ltd
By: Stanfield Capital Partners, LLC
as its Asset Manager

As a Lender

By:
Name:
Title:  David Frey
        Managing Director

U 00091

Van Kampen Dynamic Credit
Opportunities Fund
By: Van Kampen Asset Management

_____

as a Lender

By: _____
Name:
Title:

Christina Jamieson
Managing Director

[USI Waiver & Amendment Agreement]

U 00092

WATERFRONT CLO 2007-1, LTD.
as a Lender

By: _____
Name: Kevin S. Buckle
Title: Senior Vice President
Grandview Capital Management, LLC
As Investment Manager

U 00093

GULF STREAM-COMPASS CLO 2004-1 LTD
By: Gulf Stream Asset Management LLC
As Collateral Manager

as a Lender

By: _____
Name: Mark D. Aronson
Title: Trader / principle

[USI Waiver & Amendment Agreement]

U 00069

GULF STREAM-COMPASS CLO 2002-1 LTD
By: Gulf Stream Asset Management LLC
As Collateral Manager

as a Lender

By: _____

Name: _____
Title: _____

[US] Waiver & Amendment Agreement]

**U 00070**

GULF STREAM-COMPASS CLO 2005-II LTD
By: Gulf Stream Asset Management, LLC
As Collateral Manager

as a Lender

By: _____
Name: _____
Title: _____

[USI Waiver & Amendment Agreement]

BABSON CLO LTD. 2003-I
BABSON CLO LTD. 2004-I
BABSON CLO LTD. 2004-II
BABSON CLO LTD. 2005-I
BABSON CLO LTD. 2005-II
BABSON CLO LTD. 2005-III
BABSON CLO LTD. 2006-I
BABSON CLO LTD. 2006-II
BABSON CLO LTD. 2007-I
BABSON CREDIT STRATEGIES CLO, LTD.
SAPPHIRE VALLEY CDO I, LTD.
SUFFIELD CLO, LIMITED,
as Lenders

By: Babson Capital Management LLC as Collateral Manager

By: _____
    Name: Casey McKinney
    Title: Director

MASSACHUSETTS MUTUAL LIFE INSURANCE
COMPANY,
as a Lender

By: Babson Capital Management LLC as Investment Adviser

By: _____
    Name: Casey McKinney
    Title: Director

C.M. LIFE INSURANCE COMPANY,
as a Lender

By: Babson Capital Management LLC as Investment Sub-Adviser

By: _____
    Name: Casey McKinney
    Title: Director

MASSMUTUAL ASIA LIMITED,
as a Lender

By: Babson Capital Management LLC as Investment Adviser

By: _____
    Name: Casey McKinney
    Title: Director

[USI Waiver & Amendment Agreement]

U 00094

CAPITALSOURCE FINANCE LLC,
as a Lender

By:

Name:
Title:          Joanne Fungaroli
                Authorized Signatory

U 00095

**NAVIGATOR CDO 2003, LTD.**, as a Lender

By:    Antares Asset Management Inc., as Collateral
       Manager

       By: _____
       Name: Kathleen Brooks
       Title: Authorized Signatory


**NAVIGATOR CDO 2004, LTD.**, as a Lender

By:    Antares Asset Management Inc., as Collateral
       Manager

       By: _____
       Name: Kathleen Brooks
       Title: Authorized Signatory


**NAVIGATOR CDO 2005, LTD.**, as a Lender

By:    Antares Asset Management Inc., as Collateral
       Manager

       By: _____
       Name: Kathleen Brooks
       Title: Authorized Signatory


**NAVIGATOR CDO 2006, LTD.**, as a Lender

By:    GE Asset Management Inc., as Collateral Manager

       By: _____
       Name: Kathleen Brooks
       Title: Authorized Signatory


[USI Waiver & Amendment Agreement]

U 00096

Atlas Loan Funding (Navigator), LLC
By: Atlas Capital Funding, Ltd.
By: Structured Asset Investors, LLC
Its Investment Manager
as a Lender

By: _Diana M Himes_ _____

Name:  Diana M. Himes
Title:  Vice President

[USI Waiver & Amendment Agreement]

GSC CREDIT STRATEGIES FUND
as a Lender

By: _____

Name:
Title:

GSCP (NJ), L.P., on behalf of each of the following
funds, in its capacity as Collateral Manager:

GSC PARTNERS CDO FUND IV, LIMITED
GSC PARTNERS CDO FUND V, LIMITED
GSC PARTNERS CDO FUND VI, LIMITED
GSC PARTNERS CDO FUND VII, LIMITED
GSC CAPITAL CORP. LOAN FUNDING 2005-1

By: _____
　　Seth Katzenstein
Name: _____
　　Authorized Signatory
Title: _____
　　GSC Group

GSC PARTNERS GEMINI FUND LIMITED
By: GSCP (NJ), L.P., as Collateral Monitor
By: GSCP (NJ), INC., its General Partners

By: _____
Name: _____
Title: _____
　　Seth Katzenstein
　　Authorized Signatory
　　GSC Group

[USI Waiver & Amendment Agreement]

Hartford Institutional Trust, on behalf of its
Floating Rate Bank Loan Series
    By: Hartford Investment Management
        Company, its Investment Manager
as a Lender

By: _____
Name: Michael J. Bacevich
Title: Managing Director

[USI Waiver & Amendment Agreement]

U 00100

12/21/2007  16:15    8602978875                HIMCU                                    PAGE  02/02

The Hartford Mutual Funds, Inc., on behalf of the
Hartford Floating Rate Fund by Hartford
Investment Management Company, its sub-advisor,
us a lender.

By:  _____

Name:  Michael J. Bacevich

Title:  Managing Director

[US] Waiver & Amendment Agreement]

U 00101

Atlas Loan Funding (Hartford), LLC
By: Atlas Capital Funding, Ltd.
By: Structured Asset Investors, LLC
Its Investment Manager

as a Lender

By: *Diana M Himes*

Name:
Title:    Diana M. Himes
          Vice President

U 00102

DEC. 21. 2007  8:59AM    LA SALLE BANK                    NO. 3754   P. 2

Beecher CBNA Loan Funding LLC

as a Lender

By: _____

    Name:

    Title:    **Pam Gwin**

             **Attorney-in-fact**

[US] Waiver & Amendment Agreement]

U 00103

DEC. 21. 2007  8:59AM    LA SALLE BANK                    NO. 3754   P. 3

Bushnell CBNA Loan Funding LLC, for itself or as agent
for Bushnell CFPI Loan Funding LLC

as a Lender

By: _____

Name:
Title:        **Pam Gwin**
              **Attorney-in-fact**

[USI Waiver & Amendment Agreement]

**U 00104**

DEC. 21. 2007  8:59AM    LA SALLE BANK                      NO. 3754   P. 4

Stedman CBNA Loan Funding LLC, for itself or as
agent for Stedman CFPI Loan Funding LLC.

as a Lender

By: _____

Name:    **Pam Gwin**
Title:   **Attorney-in-fact**

[USI Waiver & Amendment Agreement]

**U 00105**

LANDMARK IV CDO LIMITED
By Aladdin Capital Management LLC as Manager,
as a Lender

By: _____
Name:  William W. Lowry
Title:    Authorized Signatory

[USI Waiver & Amendment Agreement]

U 00106

LANDMARK V CDO LIMITED
By Aladdin Capital Management LLC as Manager,
as a Lender

By: _____
   Name:  William W. Lowry
   Title:   Authorized Signatory

[USI Waiver & Amendment Agreement]

LANDMARK VI CDO LIMITED
By Aladdin Capital Management LLC as Manager,
as a Lender

By: _____
Name:  William W. Lowry
Title:   Authorized Signatory

[USI Waiver & Amendment Agreement]

**U 00108**

LANDMARK VII CDO LIMITED
By Aladdin Capital Management LLC as Manager,
as a Lender

By: _____
　　Name:  William W. Lowry
　　Title:    Authorized Signatory

U 00109

LANDMARK VIII CLO LIMITED
By Aladdin Capital Management LLC as Manager,
as a Lender

By: _____
    Name:  William W. Lowry
    Title:   Authorized Signatory

GREYROCK CDO LTD.,
By Aladdin Capital Management LLC as Manager,
as a Lender

By: _____
Name:  William W. Lowry
Title:    Authorized Signatory

[USI Waiver & Amendment Agreement]

U 00111

Atlas Loan Funding 1, LLC
By: Atlas Capital Funding, Ltd.
By: Structured Asset Investors, LLC
Its Investment Manager

as a Lender

By: _Diana M. Himes_

Name:
Title:    Diana M. Himes
          Vice President

[USI Waiver & Amendment Agreement]

U 00112

12/19/2007  18:36     12128783594          AVENUE CAPITAL GROUP          PAGE  02/02

Avenue CLO Fund, Limited
Avenue CLO II, Limited
Avenue CLO III, Limited
Avenue CLO IV, Limited

as a Lender

By:
    Name:  Richard D'Addario
    Title:  Senior Portfolio Manager

[US] Waiver & Amendment Agreement]

**U 00113**

Barclays Bank, PLC
as a Lender

By: _____
    Name:  Jason Moynihan
    Title:  Head of U.S. Loan Trading

[USI Waiver & Amendment Agreement]

U 00114

Canadian Imperial Bank of Commerce,
as a Lender

By: _____
    Name:    John O'Dowd
    Title:   Authorized Signatory

U 00115

CIFC Funding 2006-I, Ltd.
CIFC Funding 2007-I, Ltd.

as a Lender

By: _____
Name:        Sean O. Dougherty
Title:        General Counsel

[USI Waiver & Amendment Agreement]