UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
CITIBANK, N.A.,

                Plaintiff,       <u>OPINION</u>

      -against-            08 Civ. 00569 (MGC)

UNITED SUBCONTRACTORS, INC.

                Defendant.

-----------------------------------X

APPEARANCES:

        KRAMER LEVIN NAFTALIS & FRANKEL LLP
        Attorneys for Plaintiff
        1177 Avenue of the Americas
        New York, New York 10036

        By:  Marshall H. Fishman, Esq.
            Erin E. Oshiro, Esq.

        VANDENBERG & FELIU LLP
        Attorneys for Defendant
        110 East 42nd Street
        New York, New York 10017

        By:  Robert B. Bernstein, Esq.
            Jeffrey E. Gross, Esq.

**Cedarbaum, J.**

    This diversity action arises out of a swap agreement entered into by the parties to hedge interest payments on a $335 million credit agreement. Citibank, N.A., terminated its swap agreement with United Subcontractors, Inc., and filed a complaint seeking

1

$2,751,333,[1] plus interest, allegedly owed by United
Subcontractors under the agreement.  United Subcontractors
counterclaimed for breach of contract.  Citibank now moves for
summary judgment under Fed. R. Civ. P. 56.

**BACKGROUND**

The parties have agreed to the following facts.  On December
27, 2005, United Subcontractors, various lenders, and other
parties entered into the First Lien Credit and Guaranty Agreement
(the "Credit Agreement").  Under the Credit Agreement, several
lenders agreed to provide United Subcontractors with up to $295
million in credit and a $40 million revolving commitment.
Citigroup Global Markets, Inc., was the lead arranger and
syndication agent for the loan.  It structured the Credit
Agreement and syndicated the loan to other lenders.  Citicorp,
N.A., was the administrative agent.  Citibank, N.A. ("Citibank"),
the plaintiff in this action, was a counterparty with United
Subcontractors to the December 29, 2005 International Swap
Dealers Association, Inc., Master Agreement (the "Swap
Agreement").

---

[1] The Complaint seeks $2,751,333 at paragraph 13, but only
$2,731,333 at paragraphs 17 and 19.  In its statement
pursuant to Local Rule 56.1, Citibank has clarified that the
correct amount is $2,751,333, and indeed, that was the
amount sought in Citibank's December 18, 2007 termination
letter.

2

Pursuant to the Swap Agreement, United Subcontractors hedged its interest rate risk under the Credit Agreement, such that, once each quarter, Citibank would make a payment to United Subcontractors if the LIBOR was above a certain rate and United Subcontractors would make a payment to Citibank if the LIBOR was below a certain rate.

Under the Credit Agreement, United Subcontractors agreed that it would maintain certain financial ratios as of certain dates. The Credit Agreement required United Subcontractors to have, on September 30, 2007, an interest coverage ratio of 2.75 to 1.00 and a leverage ratio of 4.25 to 1.00. (Credit Agreement § 6.08.)

According to his affidavit, Timothy Gallagher, the CFO of United Subcontractors, realized in July of 2007 that by the end of September his company would fail to meet the interest coverage ratio and the leverage ratio. Gallagher informed "Citibank, as administrative agent,"[2] of the problem and asked that it take the

---

[2] All documents submitted indicate that Citicorp, not Citibank, was the administrative agent. (See, e.g., the cover page of the Credit Agreement.) The Gallagher Affidavit itself, at paragraph three, also identifies Citicorp as the administrative agent. It is therefore unclear why Gallagher contacted the plaintiff, Citibank, regarding the modification fee. According to its statement pursuant to Local Rule 56.1, United Subcontractors "contacted Citibank when it anticipated that its future quarterly earnings would cause a default of certain financial covenant[s].... Citibank stated that its non-negotiable fee for taking the lead in negotiations to amend the Credit Agreement would be $1.5 million." (United

3

lead in negotiating a modification of the agreement to avoid the possibility that the ratios would not be met. (Gallagher Affidavit ¶ 11.) He was advised that the fee for arranging such a modification would be $1.5 million, which he believed to be above market. United Subcontractors therefore decided to negotiate the modification itself.

The Credit Agreement requires that "no amendment, modification, termination or waiver of any provision of the [Credit Agreement] ... shall in any event be effective without the written concurrence of the Requisite Lenders." (Credit Agreement § 10.04.) The "Requisite Lenders" are defined as any grouping of "one or more" lenders holding "more than 50%" of the outstanding indebtedness. (Id. § 1.01.)

Gallagher identified nine lenders holding more than 50% of the outstanding indebtedness, formed a steering committee, and began negotiations to amend the financial covenant ratios. On September 30, 2007, United Subcontractors failed to meet the interest coverage ratio and the leverage ratio. On November 12, 2007, Gallagher provided a Notice of Default, stating that the "Borrower has exceeded the following Financial Covenants as set

---

Subcontractors' Additional 56.1 Statements ¶ 1.) Citibank neither admitted nor denied these facts, and they will be taken as true for the purposes of this motion. (Citibank's Response to United Subcontractors' Counterstatements ¶ 1 (United Subcontractors' statement "does not contain material facts and does not provide a defense to Citibank's claim for breach of contract").)

forth in Section 6.08 of the Credit Agreement," and also stating that the "Borrower is currently in the process of obtaining an amendment to the Credit Agreement to address the current non-compliance with the two Financial Covenants set forth above. Discussions with Lenders have and continue to take place and a Management Presentation to all Lenders is being given on November 13, 2007. The target is to finalize and execute an amendment by the end of November 2007."

On November 20, counsel for the Requisite Lenders circulated, by email, an unsigned draft term sheet (the "Draft Term Sheet") containing proposed amendments to the financial covenants of the Credit Agreement. The Draft Term Sheet stated that it would "[w]aive the default caused by the Borrower's failure to comply with the financial covenants set forth in Section 6.08 of the [Credit Agreement] for the Fiscal Quarter ending September 30, 2007."

The Swap Agreement, in a section titled "Cross Default," provided that a failure by United Subcontractors to meet the financial covenants of the Credit Agreement would constitute a default under the Swap Agreement. (Swap Agreement § 5(a)(vi)(1).) In the event of such a default, Citibank had the right to terminate the Swap Agreement. (Id. § 6(a).) In order to terminate, Citibank was required to provide notice to United Subcontractors. Citibank could then terminate the agreement on

5

"a day not earlier than the day such notice is effective," but in any event must terminate not later than twenty days after the notice had been given. (Id.)

On December 12, Citibank delivered a letter to Gallagher, notifying him of Citibank's intent to terminate the Swap Agreement: "In accordance with the provisions of ... the [Swap] Agreement, an Event of Default with respect to [United Subcontractors] has occurred and is continuing. This notice constitutes notice under the [Swap] Agreement. Designation of an Early Termination Date and computation of amounts due ... will be sent under separate cover."

On December 14, counsel for the Requisite Lenders circulated, by email, a document entitled Waiver and Amendment Agreement (the "Draft Waiver"), which was unsigned and marked "DRAFT." Under this proposed amendment to the Credit Agreement, United Subcontractors' breach of its financial covenants would be waived by the Requisite Lenders.

On the morning of December 18, Citibank notified United Subcontractors that it was going to terminate the Swap Agreement later that day. United Subcontractors objected by facsimile, on the ground that the Requisite Lenders had "agreed to and are in the process of executing a Waiver and Amendment Agreement which removes any default under [the Credit Agreement]. As such, there is no default at the present time." Citibank responded with a

6

facsimile stating, "we have received your facsimile of today ... advising that a waiver was in process but has not as yet been finalized. Please be advised that the Transactions were terminated as of 11:00 am today prior to receipt of your letter and the finalization of any waiver."

The Swap Agreement provided that a payment would be made in the event of a termination, according to a calculation method described in § 6(e)(i)(3). Citibank, in its December 18 facsimile, demanded a wire transfer of $2,751,333.

United Subcontractors continued to make its scheduled payments under the Credit Agreement. On December 27, 2007, the Requisite Lenders executed the Waiver and Amendment Agreement. The amendment waived United Subcontractors' September 30, 2007 failure to meet the financial covenant ratios. To continue to hedge its interest rate risk, United Subcontractors entered into a new swap agreement with a different counterparty.

## DISCUSSION

Summary judgment "should be rendered" if a court determines "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

United Subcontractors admits that the Swap Agreement provided for an early termination if the Credit Agreement's

financial covenants were not met.  United Subcontractors also admits that it did not meet the financial covenants on September 30, 2007.  Summary judgment turns on two issues:  whether United Subcontractors supplied a "written concurrence" waiving its failure to meet the financial covenants, and whether Citibank, by terminating the Swap Agreement, breached its duty of good faith and fair dealing.

**I.  There was no "written concurrence"**

United Subcontractors argues that one or both of its draft agreements serve as the "written concurrence" of the Requisite Lenders, under § 10.04 of the Credit Agreement, to waive the failure to meet the financial covenant ratios.

According to United Subcontractors, the plain language of the contract indicates that a written concurrence may be something other than a formal amendment or a fully executed waiver.  The Credit Agreement provides that "no amendment ... or waiver" shall be effective "without the written concurrence of the Requisite Lenders."  Because § 10.04 uses the words "amendment," "waiver," and "concurrence" separately in the same sentence, these three nouns indicate different documents.  If "written concurrence" was simply a synonym for "amendment" or "waiver," there would be no need to include the term at all; the section could have read, "no amendment or waiver shall be

8

effective without the signatures of the Requisite Lenders." Section 10.05 also shows that a "written concurrence" is something other than an amendment or a waiver, since the "Administrative Agent may ... with the written concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender." United Subcontractors therefore argues that the Draft Term Sheet and, failing that, the Draft Waiver constitute the written concurrence of the Requisite Lenders.

None of these arguments helps United Subcontractors. Whatever form a written concurrence may take within the meaning of § 10.04, it cannot be an unsigned document with the word "DRAFT" printed on every page, circulated as an email attachment. When interpreting a contract, the court should give fair meaning to the language employed and reach "a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized." Joseph v. Creek & Pines, Ltd., 217 A.D.2d 534, 535 (2d Dep't 1995). The parties could not reasonably have intended that an unsigned draft, or for that matter a draft document of any kind, would qualify as the written concurrence of the Requisite Lenders. A written communication is "insufficient" to bind parties where "the substantive terms thereof were to take effect only upon execution of the agreement, and the only signed writing ... clearly characterized the substantive term as a draft." In re U.S. Surgical Corp., 157

9

A.D.2d 547, 548 (1st Dep't 1990) (internal quotation marks omitted).

The Draft Term Sheet required "Consent of the Required Lenders" as a condition precedent to the amendment's effectiveness, suggesting that the document itself was not the written concurrence of the Requisite Lenders.  Similarly, the Draft Waiver states that "the Requisite Lenders are willing to agree to waive such Events of Default," but required as a condition precedent the receipt of the lenders' signatures and the receipt of a waiver fee.

I find that, as a matter of law, neither the Draft Term Sheet of November 20, 2007, nor the Draft Waiver of December 14, 2007, constitutes a written concurrence.  Because there was no written concurrence by the Requisite Lenders waiving the failure to meet the Credit Agreement's financial covenants, Citibank was within its rights to terminate the Swap Agreement under the cross-default clause.

**II.  Citibank did not act in bad faith**

United Subcontractors argues that Citibank violated the duty of good faith and fair dealing owed under all contracts governed by New York law, and violated the duty imposed by N.Y. U.C.C. § 1-208.  Neither argument has merit.

## A. Common law duty of good faith and fair dealing

United Subcontractors accuses Citibank of bad faith under two theories: (1) Citibank terminated the Swap Agreement in retaliation for United Subcontractors' refusal to pay the $1.5 million fee Citibank demanded to arrange an amendment, and (2) Citibank terminated the Swap Agreement even though it knew that the Requisite Lenders were drafting an amendment to waive the problem.

United Subcontractors has not presented any evidence or testimony from which an inference may be drawn that Citibank's termination was in retaliation for refusing to pay the amendment fee. During oral argument on this motion, United Subcontractors was invited to explain what discovery would be helpful, but was unable to come up with anything other than a generalized request to see Citibank's credit files. (Transcript of September 18, 2008 Hearing, at 49-50.)

Putting aside the fact that United Subcontractors' position has no evidentiary support, Citibank's motivation in terminating the swap agreement is not important. The duty of good faith and fair dealing "includes a promise not to act arbitrarily or irrationally" when the contract contemplates an exercise of discretion. <u>Dalton v. Educ. Testing Serv.</u>, 87 N.Y.2d 384, 389 (1995). In <u>Dalton</u>, a testing service's contract stated that the service could cancel a test score so long as it had "'reason to

question'" the score's validity. Id. at 390. Whether such "'reason to question'" existed was left to the discretion of the testing service. Id. Therefore, the duty of good faith and fair dealing was imposed on the use of that discretion. Here, in contrast, Citibank's right to terminate the Swap Agreement does not arise from a finding within the discretion of the bank. Citibank's termination rights arose from financial data generated by the borrower. Citibank and United Subcontractors agreed that if the financial data reached a certain ratio, Citibank could terminate the agreement. The duty of good faith and fair dealing does not apply in such a situation. "Where a contract allows a bank to withhold consent for particular conduct and sets no express restrictions on the bank's right to do so, the bank is not prohibited from unreasonably or arbitrarily withholding such consent." State St. Bank & Trust Co. v. Inversiones Errazuriz Ltda., 374 F.3d 158, 170 (2d Cir. 2004) (citing Bonady Apartments, Inc. v. Columbia Banking Fed. Sav. & Loan Ass'n, 465 N.Y.S.2d 150, 154 (N.Y. Sup. Ct. 1983), aff'd, 99 A.D.2d 645 (4th Dep't 1984)). See Suthers v. Amgen Inc., 441 F.Supp.2d 478, 485 (S.D.N.Y. 2006) ("courts have refused attempts to impose liability on a party that engaged in conduct permitted by a contract, even when such conduct is allegedly unreasonable").

The financial covenant ratios in the Credit Agreement are not randomly generated numbers. Failure to meet the ratios

serves as a red flag to the lenders that something might be amiss with the borrower.  In particular, failure to meet these two ratios indicated that United Subcontractors' earnings were not keeping pace with the company's interest payments and total debt.  United Subcontractors emphasizes the fact that it has never missed a loan payment.  However, exceeding the ratios is a sign that things might not go well for the borrower in the future, even though loan payments are timely in the present.  Both parties agreed that, if the financial data raised certain red flags, Citibank could end its obligations under the Swap Agreement.  The duty of good faith and fair dealing does not impose any additional restrictions on Citibank's exercise of that right.  511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002) (duty of good faith and fair dealing does not imply obligations inconsistent with other terms of the contractual relationship).

    This analysis is not changed by the fact that Citibank knew the Requisite Lenders were drafting a waiver.  A party to a contract is allowed to act in its own self-interest consistent with its rights under the contract.  Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co., 30 N.Y.2d 34, 46 (1972); Gallagher v. Lambert, 143 A.D.2d 313, 315 (1st Dep't 1988); Suthers, 441 F.Supp.2d at 485.  The Swap Agreement takes into account the possibility of a race between Citibank and the

Requisite Lenders, where Citibank would try to terminate before the Requisite Lenders waived the problem. The parties agreed to give Citibank the upper hand in such a situation by allowing Citibank to terminate on the same day that it gave notice of termination. (Swap Agreement § 6(a).) Had the contract required a gap between notice and termination, it would allow the Requisite Lenders to implement a waiver before termination took place.

As it turned out, Citibank gave United Subcontractors ample time to obtain the written concurrence of the Requisite Lenders. Citibank did not give notice of termination until a month after it had received United Subcontractors' notice of default. Citibank then waited an additional six days before actually terminating the Swap Agreement. United Subcontractors had more than enough time to obtain a written concurrence from the Requisite Lenders. Citibank did not act in bad faith, but, on the contrary, waited more than a month before terminating the Swap Agreement.

**B. N.Y. U.C.C. § 1-208**

United Subcontractors argues that N.Y. U.C.C. § 1-208 requires Citibank to refrain from terminating the Swap Agreement unless Citibank believed in good faith that its prospects for

payment were impaired.  Section 1-208 states in relevant part that

> A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired.

It is unclear whether the N.Y. U.C.C. applies to swap agreements. Assuming it does, the argument of United Subcontractors still fails.  By its terms, § 1-208 does not apply to § 5(a)(vi) of the Swap Agreement.  The cross-default clause is not an acceleration clause, nor does it authorize additional collateral, nor is it "at will."  As discussed above, this section of the Swap Agreement allows Citibank to terminate when the borrower fails to meet precise financial ratios.  No additional conditions are imposed on § 5(a)(vi) by the N.Y. U.C.C.

**CONCLUSION**

For the foregoing reasons, Citibank's motion for summary judgment is granted, and United Subcontractors' counterclaim is dismissed.  Judgment shall be entered for Citibank and against United Subcontractors in an amount to be determined.  United

Subcontractors disputes the amount owed under the Swap Agreement, stating that "[a]bsent discovery, [United Subcontractors] is not in a position to verify the means by which Citibank calculated the Settlement Amount." (United Subcontractors' Response to Citibank's 56.1 Statements, ¶ 10.) Citibank is directed to provide a witness with knowledge of the calculations to answer any questions United Subcontractors has about how Citibank arrived at the number it has put forward. By October 23, 2008, the parties shall submit their calculations of the amount United Subcontractors owes to Citibank pursuant to § 6(e)(i)(3) of the Swap Agreement. Objections to such filings shall be submitted by October 30, 2008.

SO ORDERED.

Date:    New York, New York
         October 6, 2008

                                    S/_____
                                      MIRIAM GOLDMAN CEDARBAUM
                                      United States District Judge